# EXHIBIT 2

1                   UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF WASHINGTON

3

4   Firs Home Owners Association,    )
                           )

5        Plaintiff,         )
                           )   NO. 2:19-cv-01130

6        vs.               )
                           )

7   City of SeaTac, a Municipal    )
   Corporation,                )

8                         )
        Defendant.         )

9

10

11  REMOTE VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

12                       OF

13                 HELENA BENEDICT

14

15               July 24, 2020
                 10:00 a.m.

16             Seattle, Washington

17

18

19

20        TAKEN AT THE INSTANCE OF THE DEFENDANT

21

22

23

24

REPORTED BY:
25  PHYLLIS CRAVER LYKKEN, RPR, CCR NO. 2423

1    at?

2        A. If I'm recalling the right meeting, it was a

3    meeting between leaders of the Home Owner Association,

4    Dan Watson with the King County Housing Authority,

5    myself, and some other folks who were interested in

6    preserving the park and supporting the families, I think

7    just to talk about what options for preservation might

8    be, what it would look like, financially speaking, to

9    acquire the land, what kind of role the Housing

10   Authority could have.

11       Q. What's your recollection about the message from

12   Andrew Calkins at that meeting?

13       A. It was -- the message?

14       Q. Yeah.

15       A. He shared information that was useful.  At one

16   point they agreed, the Housing Authority agreed to pay

17   for a formal real estate appraisal that was more

18   extensive than this comparative analysis shown here,

19   which we appreciated.

20       Q. Did he share this valuation analysis at the

21   meeting?

22       A. I believe so.

23       Q. So you don't recall specifically?

24       A. I don't, honestly.  I presume he did.

25       Q. The reason I'm asking, of course, is that, I



```
1    mean, the evaluation analysis puts the park's value at
2    over $10 million.  Would you agree with that?
3        A. Yes.
4        Q. Was that, was that the first time, I guess, you
5    became aware that the park's value could be more than
6    $10 million?
7        A. Oh, I don't recall.  I don't think it was a
8    shock to any of us.
9        Q. Okay.  Did you have any thoughts about that?
10       A. I guess it felt helpful to have a number to work
11   towards in terms of looking for resources and looking
12   for funding.
13       Q. This is in February --
14       A. Sorry.  Go ahead.
15       Q. I'm sorry.  Please finish your answer.
16       A. There is a sort of cruelty in that the owner
17   bought the park for half that and did nothing to it and
18   that the zoning change drove up the value in that way.
19       Q. This is in February of 2017.  Do you recall if
20   at that time there was any discussions with the property
21   owner about selling the mobile home park?
22       A. I don't recall.
23       Q. Did you share this email or the valuation
24   analysis attached to this email with any residents of
25   the Firs Mobile Home Park?
```



 1   March 15, 2017?

 2        A. Yes.

 3        Q. Okay.  I have some questions.  Why were you

 4   meeting with Michael Blumson of Impact Capital?

 5        A. He, we -- we were trying to talk to folks who

 6   understood financing and he was --

 7        Q. What is Impact Capital or what was your

 8   understanding of what Impact Capital could offer?

 9        A. Our understanding was they make sort mission-

10   driven loans and get access to capital that could have

11   been potentially a source of money for the project or at

12   least help us wrap our heads around how it could be

13   done.

14        Q. I'm assuming you met with other people about

15   financing issues other than just Michael Blumson; is

16   that accurate?

17        A. Yes.

18        Q. Who are some other people you met with?

19        A. We met with people from the organization Craft3.

20   I honestly don't remember the names of the folks we met

21   with.  I met with Dulcie Claassen of the Washington

22   Community Reinvestment Association.

23        Q. Uh-huh.

24        A. There may have been more.  Those are the folks I

25   can think of off the top of my head.

Firs Home Owners Association vs City of SeaTac          Helena Benedict 07/24/2020

```
1        A. Yeah.  Sorry.  That's what I meant.  Yes.
2        Q. Okay.  Thank you.  So you had a chance to read
3    that attachment, right?
4        A. Yes.
5        Q. So the attachment references a $6 million
6    proposal.  Did you read that?
7        A. Yes.
8        Q. Yeah.  There in kind of the second paragraph,
9    purchase price 6 million.  Who came up with $6 million
10   as a purchase price?
11       A. I believe it was Mr. Lippek, Hank Lippek,
12   another attorney representing the families, based on the
13   tax appraisal price of just under 5 million, I believe.
14       Q. And that was, what, more than $4 million less
15   than the King County Housing Authority valuation
16   acquisition analysis you had seen in, was it January or
17   February of 2017; is that right?
18       A. Yes.  But it was $1 million more than he had
19   paid for it.
20       Q. And so I kind of want to go up to the top here
21   of the email.  If we can scroll up to the email.  So I
22   read this email to say that this offer is being made in
23   the hope that Mr. Park will reject it.  Is that kind of
24   what you're saying here?
25       A. I would say it's less of a hope and more of a
```



1   sent on January 6, 2018?  Do you see that?

2          A. Yes.

3          Q. Is that also a true and correct copy of an email

4   you sent?

5          A. Yes.

6          Q. So you're referencing getting some "concrete

7   commitments from the City."  What type of concrete

8   commitments were you looking for the City?

9          A. Land or funding.

10         Q. Can you be more specific?

11         A. If they were not going to stop the redevelopment

12  and displacement of the community, we wanted land to

13  build a replacement community or funding to help the

14  Home Owners Association purchase a property where they

15  could rebuild.

16         Q. Was it your, I guess, idea that the City would

17  donate land?

18         A. Potentially.

19         Q. Okay.  And -- okay.  And was this, were any of

20  these requests formally submitted to the City?

21         A. I'm not sure.

22         MR. PLANT:  Okay.  Okay.  I'm going to move on

23  to Exhibit No. 12.

24         Q. Ms. Benedict, is this a true and correct copy of

25  an email you received from Henry Lippek on January 24,



Firs Home Owners Association vs City of SeaTac          Helena Benedict 07/24/2020

1   2018?

2       A. Yes.

3       Q. Okay.  Go ahead and please read the email.  Let

4   me know when you're done.

5       A. Could we scroll down, please?  Thank you.  I've

6   read it.

7       Q. So I read this email to indicate that as of

8   January 2018, the Firs Mobile Home Park residents had

9   received no firm commitments of financing or loans or

10  grants to purchase the Firs Mobile Home Park.  Is that

11  your understanding of this email from Mr. Lippek?

12      A. Yes, I think that's fair.

13      Q. Okay.  Is that also a true statement, to the

14  best of your knowledge?

15      A. Yes.

16      Q. Okay.  Thank you.

17          MR. PLANT:  I want to go to Exhibit No. 13.

18      Q. Go ahead and read this email, Ms. Benedict.

19      A. Thank you.  I've read it.

20      Q. Is this a true and correct copy of an email you

21  received from Henry Lippek dated February 13, 2018?

22      A. Yes.

23      Q. Okay.  And what did you understand this email to

24  communicate?

25      A. That Mr. Park was not interested in selling the



```
 1   property.
 2       Q. So that had been, correct me if I'm wrong, but
 3   that had been a very consistent position of Mr. Park
 4   for, I mean, since, this is February 2018, since at
 5   least, if not before, the middle of 2017; is that
 6   accurate?
 7       A. Yes.
 8       Q. In fact, had Mr. Park ever indicated he was
 9   willing to sell the Firs Mobile Home Park property?
10       A. I don't believe so.
11       Q. Okay.
12       A. He might have indicated to a reporter once that
13   they couldn't afford it.
14       Q. Okay.  But, sure.
15          MR. PLANT:  Can we go to Exhibit No. 14?  There
16   we go.
17       Q. Ms. Benedict, go ahead and read this email.
18       A. Can you scroll down, please?  Thank you.  Okay.
19   Thanks.  I've read it.
20       Q. If we go to the top, Ms. Benedict, is this a
21   true and correct copy of an email that you received from
22   Amy Tower on February 23, 2018?
23       A. Yes.
24       Q. Yeah.  And you understand that in this email Amy
25   is sending you a copy of an appraisal report done by the
```



Firs Home Owners Association vs City of SeaTac          Helena Benedict 07/24/2020

```
 1                    C E R T I F I C A T E

 2    STATE OF WASHINGTON )
                          )  ss.
 3    COUNTY OF YAKIMA    )

 4

 5         This is to certify that I, Phyllis Craver Lykken,

 6    Certified Court Reporter in and for the State of

 7    Washington, residing at Yakima, reported the within and

 8    foregoing deposition; said deposition being taken

 9    remotely before me on the date herein set forth; that

10    pursuant to RCW 5.28.010 the witness was first by me

11    duly sworn; that said examination was taken by me in

12    shorthand and thereafter under my supervision

13    transcribed, and that same is a full, true and correct

14    record of the testimony of said witness, including all

15    questions, answers and objections, if any, of counsel.

16         I further certify that I am not a relative or

17    employee or attorney or counsel of any of the parties,

18    nor am I financially interested in the outcome of the

19    cause.

20         IN WITNESS WHEREOF I have set my hand this 4th

21    day of August, 2020.

22

23

24             PHYLLIS CRAVER LYKKEN, RPR,
               CCR NO. 2423
25
```

Central Court Reporting    800.442.3376

# EXHIBIT 12



**From:**  Henry Lippek
**To:**  helenab@tenantsunion.org; Vicente Omar Barraza; ishbeldickens@outlook.com; slippek@neomailbox.ch
**Subject:**  Re: Firs purchase offer
**Date:**  Wednesday, January 24, 2018 3:11:07 PM

My takeaway from yesterday's meeting arranged by Rep Mia Gregerson and Daniel Lugo (Helena and Isbel, very good job yesterday in laying out the problem):

> No one wants to be the first to commit to providing the Firs HOA a bridge loan or permanent financing to purchase the land underlying the Firs Mobile Home Park until a city, port, union, tribe, authority or other investor has made a commitment.

> It is difficult to calculate the total package required until we know what the Firs MHP land acquisition price will be (for estimation purposes $6,000,000 is a substantial premium above the current $4.14m assessed value. The assessed value is low *because* it is a mobile home park with no lawful closing date in sight. If the property were vacant, a developer could offer $10m if proposing a large high-rise commercial or residential development. Mr. Park has told some residents he is not interested in money, but in principle--he owns the land and he should be able to use it in any lawful way he wishes. Since the Relocation Plan is not implemented (requiring relocating all Firs homeowners and residents to new acceptable dwellings, it cannot be lawfully closed. We would be foolish to offer a *$4m additional premium* when the cost of an eminent domain proceeding would unlikely exceed $100,000.

> We need to calculate the down payment required--to be provided by a combination of grants, contributions by SeaTac, Port of Seattle, King County Housing Authority, unions and others, and contributions of money and sweat equity by Firs homeowners--to assure that monthly mortgage payments by Firs homeowners do not exceed about $500 over 15 years, the typical amount they now pay to Mr. Park to lease their respective Firs spaces.

> Because this is a short 60-day legislative session, for Firs HOA to obtain a bridge loan through a budget note will require bipartisan support among the House and Senate leadership and relevant committee chairs and minority leaders, which is unlikely to happen unless a sizable bipartisan group become cosponsors of SB 5520/HB1514.

Helena, Isbel and Omar can provide information and solicit support from King, Pierce and Snohomish County Democrats. I think I may be able to get some conservative Democratic and moderate Republican cosponsors and the first $1m in commitments-- perhaps from SeaTac, KC Housing Authority or the Catholic Church's homeless programs--and follow up with the Washington State Housing Finance Commission.

*Hank*

**FIRS008232**

The Public Advoc ATe NPPSC
1001 Fourth Avenue, Suite 4400
Seattle, WA  98154

T: 206 389-1652   |   F: 206 826-1304   |   E: lippek@aol.com

-----Original Message-----
From: Helena Benedict <helenab@tenantsunion.org>
To: Vicente Omar Barraza <omar@barrazalaw.com>; Henry Lippek <lippek@aol.com>
Sent: Wed, Jan 24, 2018 1:02 pm
Subject: Firs purchase offer

Omar and Hank,

Would either of you able to clarify briefly where we are with making the $6 million offer to Mr. Park? The
HOA directors would like to be able to clarify to the Association. Mr. Cruz might be in touch directly as
well.

Thanks so much,

Helena

**FIRS008233**

| From: | Henry Lippek |
|---|---|
| To: | Vicente Omar Barraza; helenab@tenantsunion.org |
| Subject: | Firs HOA sample loan amortization tables |
| Date: | Thursday, January 25, 2018 10:57:04 AM |
| Attachments: | Loan Amortization Tables.docx |

Attached is a quick initial sample of loan amortization rates that shows sensitivity to loan amount, interest rates and number of participating Firs homeowners.

These numbers do not include points, fees, closing costs or taxes, which can easily be 5% or $300,000 or so for a $6,000,000 loan.

This initial look suggests that $1,500,000 needs to be raised for a 20% down payment and closing costs—an amount achievable with effort, networking and luck.

*Hank*

The Public Advoc ATe NPPSC
1001 Fourth Avenue, Suite 4400
Seattle, WA  98154

T: 206 389-1652   |   F: 206 826-1304   |   E: lippek@aol.com

FIRS008230