# EXHIBIT 4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

---

FIRS HOME OWNERS ASSOCIATION, )
                              )
        Plaintiff,            )
                              )
   vs.                        ) No. C19-1130RSL
                              )
CITY OF SEATAC,               )
                              )
        Defendant.            )

---

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION
OF
JOSEPH SCORCIO

---

Taken at SeaTac, Washington

(All participants appeared via videoconference.)

DATE TAKEN: SEPTEMBER 30, 2020

REPORTED BY: LISA BUELL, RPR, CRR, CCR 2204
    Certified Realtime Systems Administrator

Firs Home Owners Association v. City of SeaTac                                      Joseph Scorcio

Page 16

1     mobile home parks that triggered the relocation planning
2     process outlined in the city code?
3         A.  I am not aware of any that occurred during my
4     time with the City, other than the Firs.
5         Q.  I'd like to next point to paragraph E at the
6     bottom of page 8.
7         A.  Yes.
8         Q.  Can you take a quick second and take a look at
9     that.
10            My question for you is:  Do you know if the City
11    of SeaTac notified the owner of any deficiencies in
12    the -- I'll call it the draft relocation plan for the
13    Firs Mobile Home Park?
14            MR. PLANT:  Objection.
15        A.  I have a recollection that they did.  As part of
16    standard practice, after those meetings and after
17    reviewing the draft documents, we work with all
18    applicants to make sure again that they said their
19    applications are correct and complete to the extent
20    possible.
21            I have no specific knowledge of the comments or
22    what was the content of that conversation or letter, if
23    there was a letter.  I assume there was a letter or an
24    email.
25    /////

1    take on it, it's an informative thing.
2        So when a department head like Jeff Robinson
3    informs me, as city manager, that a mobile park closure
4    has come in, I took it upon myself to advise the
5    council.
6        I very likely did that during the next council
7    meeting during the city manager's comments.  Each
8    council meeting included a period of time when I could
9    simply update the entire council as a whole on things
10   that were going on, which may or may not come before
11   them.
12       On much, much rarer occasions would have been an
13   opportunity, if something was more timely, in which I
14   either sent an email out to the council, informing them
15   of something or would inform them through committees or
16   something if they were meeting that day, but this is all
17   informal communication to just keep the elected
18   officials aware of what's going on around the city.
19       I would not view this email as anything other
20   than routine.
21   Q.  When you were city manager, either acting or
22   permanent, did you have regular meetings with the mayor?
23   A.  Yes.
24   Q.  How often did you meet with the mayor?
25   A.  Well, it varied.  And I guess -- I need to

1   mayor, between June of 2016 and November of '16,
2   discussing the Firs Mobile Home Park with the mayor?
3       A.  I don't know that I did.  I don't recall any
4   specific conversations.  It's very likely, since there
5   were things going on that -- regarding the application,
6   that I would have updated the mayor on anything that I
7   felt significant, but I don't know what any of those
8   were at the time.
9           That's the fairly -- that's a fairly bit of
10  minutia in a conversation, because again, preface this
11  with the overall sense, when I did inform the council of
12  the Firs Mobile Home Park closure application, and I
13  believe I did this at a city council meeting, I made it
14  very clear then that there was no action that would
15  involve the council regarding the closure.
16          This -- procedurally, this was a matter that
17  would go through the department, and its appeal would go
18  to the hearing examiner, and the appeal from there would
19  go to the court.
20          This came up I know many, many times in
21  public -- in the public council meetings, when members
22  of the Firs would come to make public comment to the
23  council.
24          And I would have to remind both the council and
25  the members that the issue of the Firs Mobile Home Park

1   closure was not a matter that would go in front of the
2   city council for action.
3         So I do know that I mentioned it many times over
4   the months as a reminder to everyone involved, your
5   clients as well as the city council, that this is a
6   matter that would not see itself in front of the city
7   council for action.
8         That's a long answer to your question.
9   Q.  Do you recall whether any of the councilmembers,
10  in the time period from June of '16 until November of
11  '16, had any opinions about the closure of the Firs
12  Mobile Home Park?
13  A.  I don't recall any specifically, but I'm certain
14  that they did individually.  Again, you have
15  conversations with individual councilmembers.  That's
16  just conversation.
17        When the council -- when we had a council
18  meeting and they sit in a quorum, actions and
19  discussions they have there are what is important to the
20  operations of the city.
21        So any councilmember is certainly entitled to
22  their own individual opinions and can state it whenever
23  or however they wish to state it, but I do not recall
24  specific conversations specifically about that mobile
25  home park closure.

1   Q.  Did you direct the staff to approve the
2   relocation report and plan?
3   A.  No, I did not.  That would have been
4   inappropriate for me to do that.
5   Q.  In the last paragraph of that email, do you know
6   why he stated that the City was notifying the tenants of
7   the park of the decision?
8   A.  I believe that the notice to -- the city code
9   provides that the notice of a decision would be provided
10  to the tenants.  If it was not required, it certainly
11  would have been logical for us to have done that, given
12  the amount of conversations that had occurred throughout
13  this process.
14      It would also be appropriate to notify property
15  owners and interested parties under the environmental
16  appeal, which is mentioned in the first paragraph.  And
17  so I think those two tie together very properly in a
18  procedural sense.
19  Q.  In your role as city manager, do you recall any
20  staff members or city councilmembers who believed that
21  the Tenants Union of Washington instigated the dispute
22  regarding the relocation plan?
23  A.  I don't recall any specific conversations about
24  that.  I -- my understanding was, is that the Tenants
25  Union had an opportunity to assist in representing and

1    for our purposes, starts when the decision was reached."
2         And then it continues on.
3        Q.  Go ahead and read the next sentence to me or
4    into the record, please, and then we'll stop there.
5        A.  Okay.  "That they hadn't dotted all the I's and
6    crossed all their T's, that can be appealed to the
7    hearing examiner and the hearing examiner is empowered
8    to double check our work, essentially."  That's the
9    nature of the appeal.
10       Q.  Having read that sentence, in particular, my
11   question is:  How can the City of SeaTac's requirements
12   mirror state law if they're stricter than state law?
13       A.  In our particular case, the steps are the same,
14   but we require or have a process that does allow a local
15   appeal to our local hearing examiner.  So there is a
16   check and balance that occurs.
17           We have a staff review and a staff-issued
18   decision, which is referred to in land use as an
19   administrative decision, and that is then subject to
20   appeal that can be brought before our hearing examiner.
21           So our additional strictness is in terms of a
22   procedural double check.  There may be substantive
23   matters, but I'm not aware of any that are significant.
24   What is different is our procedure providing this
25   additional opportunity.

1   alternatives?
2       A.  Specifically, the city council and my staff, we
3   followed the procedural aspects of it in terms of the
4   review of the mobile home park relocation and closure
5   plan.
6           We did, as I expressed earlier, work on pursuing
7   changes to state law to better support these closures,
8   and we certainly did not stand in the way of any efforts
9   to find a coalition that could support the residents'
10  desires to try to purchase the park.
11          But the City had no role in the purchase aspect
12  of it.  Those are matters between private parties, and
13  that has consistently been the City's view, as long as I
14  can recall, certainly during my entire time with the
15  City, that private party business is between private
16  parties, and the City does not get involved in those.
17          A different city manager, a different city
18  council could of course have always established
19  different procedural approaches to things, but not
20  during my time with the City was I aware of that.
21              (Discussion off the record.)
22              (A break was taken from
23              12:02 p.m. to 12:15 p.m.)
24          MR. BARRAZA:  With that, I'd like to go to
25  Exhibit 23, please.

Firs Home Owners Association v. City of SeaTac                                    Joseph Scorcio

Page 79

1    Councilmember Wachtel contacted Dan and requested that
2    he send a new -- or another copy of the original letter
3    with the erroneous statement that the city is "opposed
4    to this action removed"?
5        A.   I do not know why Councilmember Wachtel
6    approached Dan Watson directly, whether he had been --
7    well, clearly, from the earlier exhibit, he had been in
8    some communication with him before, from Exhibit 28.
9        Q.   Do you recall having any discussions with
10   Mr. Wachtel or anyone else regarding the removal of the
11   statement indicating opposition to the action?
12       A.   No, I do not recall.
13           MR. BARRAZA:  I'd like to go to Exhibit 31,
14   please.
15   BY MR. BARRAZA:
16       Q.   Exhibit 31 contains email communications from
17   Chelsea Hager -- I believe she was a lawyer working for
18   maybe the law firm that assisted the City with its
19   lobbying efforts in Olympia.  Is that a correct
20   impression that I have there?
21       A.   Yes.  Gordon Thomas Honeywell was the City's
22   representative for efforts down in the legislature, so
23   Chelsea and Briahna Murray were the two we were working
24   with during that time frame in 2018.
25       Q.   Do you recall receiving this email chain --

1       actually, let me strike that.
2              Do you recall receiving the email from Chelsea
3       Hager, on March 6, 2018, directed to Jeff Robinson, with
4       a carbon copy to you and Briahna Murray?
5           A.  Yes.  This was a subsequent piece of legislation
6       that we were pursuing.  I think, if you look at the next
7       page, it talks about the relocation assistance funding,
8       which, as I pointed out, was something we were very
9       strongly working towards.
10             And there's a reference in Chelsea's comments to
11      additional language about funding -- state funding to
12      help acquire the mobile home park -- mobile home parks,
13      plural, including the Firs.
14          Q.  Do you know why Chelsea stated that the language
15      should not cause concern as drafted?
16          A.  No, I don't -- I don't know why.  Not unusual
17      for us to get comment from our representatives in
18      Olympia, our legal reps down there, that we should
19      either -- either we needed to respond to something right
20      away or not, as in terms of its urgency or its
21      timeliness going to committee.
22             So, you know, I'm sure I read this at the time
23      from the standpoint of saying, I don't need to respond
24      to this.  She's just providing me information.
25          Q.  My understanding, from reading this email, is

1             C E R T I F I C A T E

2

3     STATE OF WASHINGTON

4     COUNTY OF KING

5

6         I, Lisa Buell, a Certified Court Reporter in and

7     for the State of Washington, do hereby certify that the

8     foregoing transcript of the deposition of JOSEPH

9     SCORCIO, having been duly sworn, on SEPTEMBER 30, 2020,

10    is true and accurate to the best of my knowledge, skill

11    and ability.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13    and seal this 7th day of October, 2020.

14

15

16    _____

17         LISA BUELL, RPR, CRR, CCR #2204

18

19

20

21

22

23

24

25