# EXHIBIT 10

1               CITY OF SEATAC CITY COUNCIL MEETING

2                    OCTOBER 25, 2016

3

4

5

6

7        TRANSCRIPT OF CITY COUNCIL MEETING REGARDING
                 FIRS MOBILE HOME PARK

8

9

10

11

12

13

14

15

16

17

18

19                    **CERTIFIED COPY**

20

21

22

23

24    Transcribed by:

25    Andie Evered, CCR

1
   Video transcription 10/25/2016
2

3         MS. MENDOZA-CASTREJON:  Good evening SeaTac City

4    council members and everyone in the audience.  I, Monica

5    Mendoza-Castrejon, from the Tenants Union of Washington on

6    behalf of the Firs Home Owners Association am here to say

7    that the families want to stay in their homes and keep

8    their families rooted in SeaTac.

9         We understand that you are making legislative

10   priorities and that you are appreciating us.  But, that is

11   not enough.  We are currently in a crisis.  And tonight,

12   during new business, we are requesting for you to extend

13   the appeal process so that families can work with legal

14   processes and have sufficient time to do so; the amount of

15   time that they have been given is simply not enough.  We

16   are also asking for several things from all of you.

17        The second thing I want to bring up is that if

18   the families were to leave, it would have a tremendous

19   impact on the schools of SeaTac and the money generated

20   from students attending the schools.  If the students who

21   live in the Firs Homes leave, this creates a detriment on

22   this behalf.

23        Thirdly, there was a resounding voice amongst the

24   tenants.  They know that SeaTac is their home, not the

25   hotels which John Park wants to build and displace the

1    families.  Having the families here brings tremendous help

2    towards your beautiful, diverse community which so many

3    people love about SeaTac.

4          The kids, hearing about them having to move are

5    scared, worried and cry often given how they fear that

6    they might have to leave.  They want to stay in their

7    homes that they are in right now.

8          City council members, this is your decision.  It

9    is an enormous opportunity for you all to join a regional

10   conversation around affordable housing, as well as nearly

11   every mayor in South King County has agreed to join a task

12   force and speak about affordable housing.

13         I have also spoken to many levels of government.

14   Statewide legislators, King County Council members,

15   including Dave Upthegrove as well as Larry Gossett, whom

16   are offering tremendous support for the families.

17         I also have a -- written support from King County

18   Council member Larry Gossett with me.  And, their message

19   was clear.  This decision rests on your hands, the city

20   council.  You have the power to decide the future of these

21   families.  It is a huge responsibility.  We know there are

22   alternatives.  But, we ask that you also meet with us to

23   explore any opportunity that there may be.

24         There is growing pressure in South King County to

25   consider how the economy and our communities are changing.



```
 1    The same (unintelligible) approach to our city life is not

 2    enough.  This is a community.  The City Council, as I've

 3    mentioned, is responsible for fostering community and not

 4    just collecting taxes.  We have a vision for a better

 5    SeaTac.  And, it is served by homes, not hotels.  We are

 6    asking for justice.  And, the families in the Firs

 7    Homeowners Association all have a resounding voice, that

 8    they want to say that this is their home and they want the

 9    opportunity to continue to be a part of this beautiful

10    community.

11            Again, I ask that you all, during new business,

12    extend the appeal process.  In addition, we ask that you

13    meet with us to explore the alternatives that are

14    available to us as a city.  Thank you.

15            MR. SIEFKES:  Patsy Wehr?

16            MS. WEHR:  Good evening, council members.  Thank

17    you for giving us your time this evening.  My name is

18    Patsy Wehr and I have been a resident of the Firs Mobile

19    Home Park in SeaTac for over 45 years.  On May 9th the

20    residents received a letter from relocation committee

21    stating that the mobile home park would close in June of

22    2017.

23            Our park has many families with children

24    attending Madrona Elementary, located across the street,

25    and in middle and high schools in the Highline District.
```



City of SeaTac City Council Meeting                    10/25/2016

```
 1    We have elderly and disabled residents on fixed incomes.

 2    We chose mobile homes because we couldn't afford

 3    conventional housing.  Many came to our country to give

 4    their families a better chance in life.

 5           In 1996 Kathryn Hillman, the previous owner,

 6    tried to get the park zoned commercial.  She came from

 7    Montana to dine with members of the planning department

 8    and city council members.  She sent letters, dripping with

 9    honey, trying to convince them to change the zoning to all

10    commercial.  The City Council declined her request and

11    kept our park residential.  She was required by Washington

12    State laws to offer each resident the opportunity to

13    purchase our space and then form an association.  The law

14    stated that 60 percent of residents needed to agree.  She

15    totally ignored this requirement.  And, at this point, she

16    is not happy with the city council so she sold the park to

17    foreign investors.

18           Most of these homes cannot be relocated because

19    of HUD codes.  There are those living in single-wide homes

20    are offered up to $7,000, only to have them demolished,

21    costs $8,000.  I have contacted four mobile home parks and

22    none have any spaces available.

23           We were informed, through a SEPA report, the

24    owners are planning to build two hotels and an apartment

25    complex.  We are tax-paying citizens of SeaTac.  We shop
```



Central Court Reporting   800.442.3376

City of SeaTac City Council Meeting                        10/25/2016

1    and work locally and contribute our share.  We love living

2    in the city.  We are being forced out of our homes because

3    of some money hungry investors.  We were told some space

4    is available in Kitsap and Clark counties.  Many of our

5    residents are related and don't want to be separated.

6    Where are we going to go?

7            I worked for Highline School District for 15

8    years, 13 at Madrona Elementary.  I've seen how it affects

9    children starting a new school.  Lack of attention, loss

10   of sleep, low appetite, a new teacher, loss of school

11   friends and depression.  It becomes a major challenge in

12   their young lives.  You see the agony in their little

13   faces.

14           On July 29th we had a fire that left three homes

15   destroyed, displacing these families but forced them to

16   keep paying their monthly space rent.  All of their

17   possessions, destroyed.  Forced to relocate.  The children

18   had to change schools.  All the while, our owner resides

19   in a home valued at $835,000.

20           MR. SIEFKES:  All right.  I'm sorry.  Your time's

21   up.

22           MS. WEHR:  Anything you can do would please would

23   be greatly appreciated.  And, thank you so much for your

24   time this evening.

25           MR. SIEFKES:  Thank you, Patsy.



Central Court Reporting   800.442.3376

City of SeaTac City Council Meeting                          10/25/2016

```
 1          Martha Zamora?
 2          (Interpreted from Spanish to English)
 3          (By Ms. Mendoza-Castrejon)
 4          MS. MENDOZA-CASTREJON:  Hello and good evening.
 5          My name is Martha Zamora and I am a member of the
 6    Firs Mobile Home Community.  We are a community of 72
 7    families.  And, for an injustice, we are at risk of being
 8    homeless.  Just a very, very short time ago, with
 9    something that they put on our homes, without letting us
10    know, they said that for one year they're going to close
11    the park and we're going to lose all of our homes.
12          Many people, including myself, bought these homes
13    and we've made many fixes that will make it impossible to
14    move.  This will not only destroy our community but also
15    our homes.  They're going to demolish the 72 homes, that
16    with so much sacrifice and care, we'd attended to.
17    Instead of these homes, they're going to create
18    development, they're going to create hotels, which is on
19    behalf of development and not for ourselves.  And for
20    ourselves, they are only offering $2,000 to move, each of
21    us.  We know that this will not even reach the amount to
22    move to a new apartment.  We come here not only for your
23    help so that we can stay here, but to hear opportunities.
24    A community that has stayed here for even up to 50 years.
25    We have talked to many forms of government, statewide,
```



```
 1   countywide, that have said that this is your opportunity
 2   to help us.  Thank you.
 3            MR. SIEFKES:  Thank you.  Irene Cruz?
 4            (Interpreted from Spanish to English by Ms.
 5   Mendoza-Castrejon)
 6            MS. MENDOZA-CASTREJON:  As you all know, I am
 7   here for the same cause.  I am here asking for all of you,
 8   as elected officials, that you hear with your hearts,
 9   especially on myself as a mother.  We're asking, please
10   listen, because they are going to destroy our homes.  I am
11   asking, please, don't do it not only for ourselves as
12   adults but for our kids.  Our kids who also go to schools,
13   our children who have a bright future and want to stay
14   here in the city of SeaTac.  Thank you.
15            (Break in audio)
16            MS. CASTRONOVER:  Hi, my name is Laura
17   Castronver.  I'm from 1319 South 251St, Des Moines.  And,
18   I'm here -- freedom of speech -- in regards to the bond
19   that's on our ballot --
20            MR. SIEFKES:  I'm sorry.  We have to follow state
21   law.  So, if you're going to go ahead and explain that
22   you're against the bond, we can't do that here.  It's just
23   against the rules.
24            MS. CASTRONOVER:  Okay.  I'm against the bond.
25   And, like I said, we've talked to the other councils,
```



1   Burien, Des Moines, and was not told no, we couldn't talk.

2        MR. SIEFKES:  Thank you, Laura.

3        MS. CASTRONOVER:  I'm sorry.  Where's our freedom

4   of speech?

5        MR. SIEFKES:  Again, we just have rules we have

6   to follow.  And, thank you.

7        All right.  That's the last person that signed up

8   for public comments tonight, so we'll move on.

9        We're on to item number 7, key city issues, by

10  acting city manager Joseph Scorcio.

11       MR. SCORCIO:  The last item on my list tonight

12  was to talk about the mobile home park appeal.  So, I

13  think I'll just move that one to the front of the list.

14       I've been keeping you apprised of the process

15  that's been going on and I wanted to give you a couple of

16  updates tonight.  And, I think this -- this is what the

17  folks that are here tonight are trying to get at.

18       So, as I mentioned, the last couple of meetings,

19  we have been reviewing the relocation plan in accordance

20  with the City requirements for that.  Our city

21  requirements are a mirror of state law that requires

22  certain processes to be met.  In the case of -- in this

23  particular case, the City, in reviewing it, also required

24  that the relocation plan be translated to Spanish because

25  there are so many Spanish speakers in residence.  That was



1    done.  That was approved.  All of the rest of the plan was

2    approved on Monday October 17th, and notices were provided

3    to the property owners and the homeowners at that time.

4         In accordance with the city code, and I believe

5    consistent with state law, there is a 14-day appeal

6    period, which we are in the middle of, and it ends on

7    October 31st, next Monday.  That appeal goes to the city

8    hearing examiner.  This is not a matter that statutorily

9    comes to the city council.  And, that's why -- I've know

10   I've said this at prior meetings, this is an issue.  If it

11   is appealed, it goes to the hearing examiner for review of

12   compliance of the plan with the statute.

13        The other thing that came up in the conversation,

14   and I wanted to clarify because this is very important,

15   park owners -- mobile home park owners are required to

16   provide at least 12 months advanced notice of closure to

17   all their tenants.  And, there is a formal process for

18   this that has to be filed through the state.  And, in our

19   last conversation, which was October 17th, with the

20   representatives of the state, this formal notice has not

21   yet been filed.  So, there was reference to a notice

22   having been provided earlier, that the closure was going

23   to be next June, I think was the statement.

24        Again, the state law requires a 12 month formal

25   notice.  And, that notice had not been filed with the



1    state, to our knowledge as of October 17th.  So, we are

2    following the process to the letter.  We are trying to

3    make sure that everything is done in accordance with the

4    requirements of city standards.  And, normally I don't,

5    but I think this is probably a good one for me to stop and

6    ask if the council members have any questions about this

7    particular matter that I can try to answer?

8             MR. SIEFKES:  Absolutely.  Katherine actually

9    asked first.

10            MS. CAMPBELL:  My only question is, does this

11   council have any legal authority to prevent the sale of

12   the property by the person that owns it?

13            MR. SCORCIO:  None that we are aware of, because

14   it is a private property matter and state law has specific

15   processes for mobile home park closures.  The city does

16   not have a role -- the city council particularly does not

17   have a role in the closures of mobile home parks.

18            MR. SIEFKES:  I understand that.

19            I'm sure somebody will take care of translating

20   that for me.  Would you do that for me, please?

21            MS. MENDOZA-CASTREJON:  We will let them know.

22            MS. CAMPBELL:  Okay.

23            MS. MENDOZA-CASTREJON:  And, actually, we would

24   like to follow up with everyone because we've been in

25   discussion with a lot of people as I mentioned



```
 1    (unintelligible) --
 2             (Crosstalk)
 3        MR. SIEFKES:  If you're going to engage that, we
 4    need to get her.  But again, I want to -- I want to
 5    stress, very clearly, opinions -- opinions of other
 6    parties relative to the city's responsibilities are their
 7    opinions.  We've been following this absolutely by the
 8    letter of city code.
 9             I'm not trying to get in the way of this but I
10    want to assure you that our city code is very clear on
11    what our responsibilities are and we've been adhering to
12    that.  And, the city council does not play a role in the
13    review of these closure plans.  That's the way it has been
14    laid out.  So, we're not trying to be, in any way,
15    contrary.  But, I wanted to make sure that the facts were
16    clear.
17             Tony?
18        MR. ANDERSON:  Yeah, one of the questions that
19    they asked, or a request that they made of -- some of the
20    speakers made to us is to extend the comment period.  Now,
21    you know, this thing -- this, obviously, has significant
22    impact on our community.  Lots of kids are affected by
23    this.  This is the first time, in my memory, that we've
24    had this come up.  So, this is something new that we
25    should give it the time it deserves.  I mean questions
```



```
 1   have come up from other mobile home parks.  Some folks at
 2   Bow Lake, some folks at Angle Lake, they're concerned that
 3   this thing is going -- could -- they could be next on the
 4   list.  And, you know, they're concerned that this could
 5   happen to them too.  So, we need to do the right thing and
 6   give it a thorough vetting.  Is there any way, we as a
 7   council or as a city, can -- can extend the comment
 8   period?  A lot of people are asking questions.  And,
 9   again, we need to get it right.
10           MR. SIEFKES:  I'm going to have Mark address that
11   in part.  But, again, I want to follow up.  The city has
12   code that we are required to review the closure plan by.
13   We are then required to provide notice, which we have
14   done, to the individual park owners.  And -- and it
15   establishes, by statute, a 14-day appeal period.  So,
16   we're well within that.  That is, again, only an appeal of
17   our review of the documents that have been in front of us.
18   This has nothing to do with the State's review and the
19   State's ultimate decision whether to authorize the
20   closure.  So, again, we're -- we're marching down,
21   following the path, and trying to provide every
22   opportunity possible.  And, I'm going to turn it over to
23   Mark to --
24           MR. ANDERSON:  Okay.  I may have missed -- asked
25   the wrong question here.  I was under the impression that
```



City of SeaTac City Council Meeting                    10/25/2016

```
 1   it was a comment period.  But it's the appeal period?
 2          MR. SIEFKES:  That is correct.
 3          MR. ANDERSON:  And the appeal has already been
 4   sent so it's --
 5          MR. SIEFKES:  They can file an appeal that would
 6   go to our hearing examiner to review our administrative
 7   review and approval of the closure plan.
 8          MR. ANDERSON:  Okay.  If they don't get together
 9   within the two-week period, is there a way we could extend
10   the appeal period?  Because we -- obviously some language
11   barriers here.  And, again, this is our first crack at
12   this thing.  Are we stuck with a two-week period?
13          MR. JOHNSEN:  Yes, I think they are.  And the
14   reason why, the appeal process is set forth in our
15   municipal code.  And, when the property owner went -- you
16   know, started this process, he or she -- I don't know if
17   it's a he or a she -- but the property owner is following
18   what our code is.  It would be unfair for, coming just as
19   a matter of fairness, to change code in mid process.  This
20   is actually part of our zoning code as well.  And so I am,
21   you know, fairly certain that the issue investing would
22   also come up and they would be best to that code.  So, for
23   a couple of reasons that I can think of right now, and
24   there's there might be others, I don't believe that that
25   is something that we can change.
```



```
 1          MR. SIEFKES:  All right.  Pam?
 2          MS. FERNALD:  Joe, did you want to say something
 3   else?
 4          MR. SIEFKES:  Waiting for questions.
 5          MS. FERNALD:  Okay.  Well, so, what I'd like to
 6   say is that I don't think there's a person up here that
 7   doesn't understand what's happening and does not have --
 8   what word do I want to use -- well, compassion.  It's even
 9   more than compassion -- is not broken-hearted that people
10   will be displaced.  But, what I want to make clear, and
11   I've said this to guys when it came to the town meeting as
12   well, you know, I think -- I think you're getting some bad
13   information, some bad advice.  And so I -- I respectfully
14   request that you wouldn't come here and say it is up to us
15   when we know, we all know, it's not up to us.  We don't
16   have any legal recourse.  If we did, we'd be doing it.
17   So, if somebody is telling you that, I mean we can't break
18   the law.  We can't break our law.  We can't just change
19   something on a whim at the last minute to fit what's going
20   on.  And, so, maybe I'm not expressing it correctly, but
21   all I'm saying to you is, you know, with your signs and
22   things, we get it but there's nothing we can do.  And, I
23   think we mentioned before, that to go to the legislature
24   and state laws that could be changed.  And, I know, for a
25   fact, that staff here has done everything they -- do you
```

1    want -- could you wait until I'm finished?

2              UNIDENTIFIED SPEAKER:  (Unintelligible.)

3              MR. SIEFKES:  You don't get a respond.  It's our

4    turn, sorry.

5              (Crosstalk)

6              MS. FERNALD:  I know that our staff has worked

7    diligently within all the rules that we've got and the

8    laws trying to find a way -- I know that the county has

9    because I've seen you at -- some of you at our county

10   meeting where I was.  And, I requested that they reach out

11   and find out what could be done to help you.  So, we're

12   working within our laws.

13             So, please I -- make this clear.  I don't want

14   anybody out there to think that we are letting them down.

15   It's not up to us at this point.  So, I'm so sorry.  You

16   know, if it was the other way -- if it was flip flopping

17   and you guys wanted to do something with your own private

18   property, and the other person would come here and say

19   they're trying to kick us off of our property -- You know,

20   it works both ways for anybody.  So, you know, we have to

21   go by the law.

22             MR. SIEFKES:  All right.  Rick?

23             MR. FORSCHLER:  So, the official notice hasn't

24   been given yet; is that right?

25             MR. SCORCIO:  The official notice required at the

1    state level.  The State has not received the plan nor have

2    they issued the one-year closure for --

3            MR. FORSCHLER:  So the clock still hasn't

4    started.

5            MR. SCORCIO:  The clock has not started.

6            (Crosstalk)

7            MR. FORSCHLER:  -- for one year?

8            MR. SCORCIO:  Right.

9            MR. FORSCHLER:  Okay.  And the appeals period, is

10   that after the clock starts?

11           MR. SCORCIO:  The appeal period is for our

12   decision, having reviewed the plan, having then allowed

13   the plan to move forward.

14           MR. FORSCHLER:  But has that even started since

15   the official notice hasn't been given?

16           MR. SCORCIO:  Yes.

17           MR. FORSCHLER:  Okay.

18           MR. SCORCIO:  Yeah.  It's two separate clocks.

19           MR. FORSCHLER:  Okay.

20           MR. SCORCIO:  Our action -- the City of SeaTac

21   made a conscious decision some years ago to impose a

22   review of closure plans for mobile home parks.

23            It's -- our requirements are stricter than state

24   law.  If we had not, council prior -- some council prior

25   to this decided to add this in, if they had not done that,

1    we wouldn't have a role in this closure at all.  The fact

2    that we do, and the fact that we have gone through the

3    steps in that to make sure that the closure plan was

4    translated, distributed, the notices have been provided,

5    the clock, for our purposes, starts when the decision was

6    reached.  That they hadn't dotted all the I's and cross

7    all their T's, that can be appealed to the hearing

8    examiner and the hearing examiner is empowered to double

9    check our work, essentially.  That's the nature of the

10   appeal.  But, they still have to go through the entire

11   state process.  They still have to go through those of

12   that official twelve month clock in which we are not a

13   party.

14           MR. FORSCHLER:  So, is someone going to make it

15   known to the hearing examiner that that clock hasn't

16   started yet?

17           MR. SCORCIO:  Yes.  We would obviously be -- if

18   an appeal is filed, will be presenting why we think it

19   meets city requirements.  But, we're also going to make

20   sure that all the facts that we have been gathering on

21   this case are presented as well.

22           MR. FORSCHLER:  So this will be, this next

23   question, I guess, would be for Mark or you.  Do either of

24   you know other -- other cities?  It's my impression that

25   SeaTac kind of goes above and beyond already what other



```
 1    cities have required for mobile home closures.
 2           MR. SCORCIO:  We've done a bit about that and
 3    apparently Mark (unintelligible) City of Seattle is the
 4    only other jurisdiction that has specific local standards
 5    in our immediate area, SeaTac and Seattle.
 6           Mark, do you want to amplify?
 7           MR. JOHNSEN:  No, I think that's my understanding
 8    as well.  I haven't obviously researched every -- and I
 9    don't think staff has -- every city in the state.  But,
10    we're unique.  I think -- I think that's a very safe
11    statement.
12           MR. FORSCHLER:  You're doing more than most do?
13           MR. JOHNSEN:  That's correct.  And as Joe
14    indicated, we would not be -- if we didn't have a code in
15    place to review the plan, our review would be very
16    limited, if much at all.
17           MR. FORSCHLER:  Thank you.
18           MR. JOHNSEN:  So, that's why we're going through
19    this process.
20           MR. SIEFKES:  All right.  Peter?
21           MR. KWON:  Let's go back to zoning real quick.
22    So, I'm looking at our city zoning map and it looks like
23    that property, and the IHOP that's by it and that entire
24    strip in fact, is commonly zoned CDC, community
25    (unintelligible) center, which is the exact same zoning
```



```
 1    all the way up and down International Boulevard.  I mean
 2    that -- the entire strip is the same community, zoning
 3    center.  I'm wondering, how long had it been zoned this
 4    way?  Do we know?  We didn't change the zoning.  It's been
 5    like that, I'm assuming?
 6              MR. JOHNSEN:  I don't have a -- I don't have it
 7    at my fingertips, but it has been zoned that way for a
 8    very long time.  And, we can certainly -- we can certainly
 9    check on that.  But, there's no change in recent history
10    that has occurred.  This is has been outstanding from the
11    city.  And, I think the comprehensive plan designation for
12    this area goes back to 1994 for the same thing, supporting
13    commercial.  So, I'd expect the zoning would as well, at
14    least back that far.
15              MR. KWON:  So this is potentially back to when
16    the city first incorporated if zoning on International
17    Boulevard hasn't changed?
18              MR. JOHNSEN:  Very likely, yeah.
19              MR. KWON:  Okay.
20              MR. SIEFKES:  All right.  So, the only thing I'd
21    say is, if everybody sitting up here wanted to keep you in
22    your homes, and we all voted to keep you in your homes, we
23    couldn't keep you in your homes.  It's not under our
24    authority to do so.  If anybody is telling you it is under
25    our authority to help you stay in your homes, they're not
```



Central Court Reporting    800.442.3376

```
 1    telling you the truth.  This is governed by state law.
 2    The only person in this room that has any ability to help
 3    you is councilman -- or representative Mia Gregersen.  So,
 4    if she's not helping you, you know, then that's the only
 5    person here that can help you.  All right.  Tony?
 6              MR. ANDERSON:  Well, yeah.  Actually I got like
 7    three questions.  First off, in this (unintelligible) --
 8    could the hearing examiner extend the appeal period if --
 9    if they -- if they brought an appeal to the hearing
10    examiner and say, because of the complexity of this issue,
11    present it to the hearing examiner and the hearing
12    examiner says yes, this is complex.  We can push this out.
13              MR. SIEFKES:  The answer to that is no.  You
14    can't extend the appeal period, in my opinion.  But, would
15    he -- you know, obviously, his deliberations of these
16    issues, if it was a -- with the complexities, et cetera,
17    if he needed, you know, additional time to render a
18    decision, he has the authority in that regard.
19              MR. ANDERSON:  Okay.  Is there a time between the
20    when the one-year period starts and the hearing -- the
21    appeal meeting with the hearing examiner?  I mean they're
22    not -- they're unrelated; right?
23              MR. SIEFKES:  Yes.  And I can't -- I don't have
24    the answer to that specific question.  I can't give you an
25    answer on that.
```



```
 1          MR. ANDERSON:  Okay.  There's been a lot of
 2    information on this thing bouncing around in the media,
 3    and apparently -- and I've been just getting the periphery
 4    of it -- Bellevue, didn't they have a similar issue to
 5    this and Bellevue came up with some kind of
 6    (unintelligible) resolution?  Are you familiar with that
 7    at all?
 8          MR. SIEFKES:  I am not.  I don't know if Joe is
 9    or anybody else is.  But, I'm not aware of anything in
10    Bellevue.
11          MR. ANDERSON:  Okay.  Pam heard something about
12    it.  What do you think about it, Joe?
13          MR. SCORCIO:  Oh, I'm not -- well, again not
14    addressing what Bellevue may or may not have done and all
15    the circumstances, I don't know.
16          Bellevue also has a housing program in which they
17    may have been able to intercede.  That started, in the
18    back of my mind, a recollection of what -- what occurred
19    in that -- in that case.  But in terms of statutory
20    authority, we have -- we have our stuff in place.  And, as
21    Mark pointed out, this is a -- this is an application that
22    is in process.  And, you cannot change the rules on an
23    application once it's in process.  It vests.  So, we have
24    to process the review of the closure plan, as we have
25    done, according to what's on the books today.
```



1         And, I do, I think, want to echo and clarify a

2    little bit about Mark's comments in response to your

3    question.  Once an appeal is filed, then the materials can

4    be provided to the examiner.  Then the questions can be

5    raised about whether we complied, we the city complied, in

6    our review of it.  It is not -- the hearing examiner would

7    not be deciding whether or not a park can close or not.

8    It's only whether or not the closure plan meets the

9    requirements established.  I want to be very clear about

10   that.  We have a very limited and well-defined role in the

11   process.  The State controls the actual closure -- closure

12   plan decision.

13        MS. FERNALD:  And so, do you -- this wasn't going

14   to be my question but it is now.

15        So, part of the -- I haven't seen the closure

16   plan.  Is one of the elements of the closure plan how

17   tenants are going to be reimbursed?

18        MR. SCORCIO:  Yes.

19        MS. FERNALD:  And -- okay.  And that's all a part

20   of the state piece, I know.

21        MR. SCORCIO:  Yes.

22        MS. FERNALD:  Okay.  So, that's part of the

23   closure plan.  Okay.  So, what I was -- my original

24   question was going to be something to the effect of rather

25   than sit here and onsie, twosie, give you the -- bless you



```
 1   -- third degree, maybe -- I just -- I guess I want to say
 2   I feel -- I feel confident that the City has done, and is
 3   doing, whatever they can legally and responsibly do in
 4   this situation.  And if I say that, that's correct; right?
 5   I mean that we're not holding back.  We're not trying to
 6   pull any -- we're not trying to trick anybody.  We're just
 7   doing everything we can.  I know we are -- to help.
 8            MR. SCORCIO:  In my view, we are doing absolutely
 9   everything we can do.  And, I think as I've mentioned, we
10   went to extraordinary measures to make sure that the plan
11   was translated and verified, that it was accurately
12   translated to what we had approved in English language,
13   what we are -- we are familiar with, and we went that
14   extra distance.  I think we have done everything we can,
15   and we are not stepping beyond our authorities.  I want to
16   assure you of that as well.  We are -- we are doing what
17   we can do.
18            MS. FERNALD:  So if anything comes up, you know,
19   based on some of the items that Tony brought up for
20   example, if, during the rest of this time, anything comes
21   to our attention that, you know, there's a loophole or
22   anything comes up that we could do something, we would;
23   right?  I mean legally.
24            MR. SCORCIO:  Yes.  I mean we always -- we always
25   adhere strictly to the requirements that are in the -- in
```



1    the code, and we're documenting, we're being accurate,

2    we're making sure.  Because if -- if anything we've done

3    is helpful along the way, to either the residents or the

4    property owners, we want to make sure everything's done

5    properly.  We don't want to make any mistakes along the

6    way.  And, we certainly don't want to be viewed, in either

7    case, as being impartial to the law.  The law is what has

8    been established.  So, I think we are -- with high

9    confidence, I'm saying we're doing everything we can and

10   reasonably should do.

11           MS. MENDOZA-CASTREJON:  Thank you.

12           MR. SIEFKES:  Thanks.  Rick, final?

13           MR. FORSCHLER:  Thank you.  Yeah, just real

14   quick.  So, Joe, part of our legislative agenda, it says

15   SeaTac supports increased funding to ensure adequate

16   relocation assistance for displaced residents of

17   redeveloped mobile home parks and legislation that

18   provides greater rights to mobile home tenants.

19           So, that's on our legislative agenda for next

20   year.

21           MR. SCORCIO:  Assuming our lobbying efforts are

22   successful and we get the state legislature to change

23   something, because the clock has not started yet on that,

24   would there be time for that law to go into place and have

25   some benefit to these folks, or do we know?



1            MR. FORSCHLER:  Well, we don't know for sure.

2    But, I would -- I would say that there is a likelihood of

3    some improvement.

4            (End of requested portion of video)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

City of SeaTac City Council Meeting                          10/25/2016

```
1                        CERTIFICATION

2

3             I, Andie Evered, do here by declare

4   under penalty of perjury under the laws of the

5   State of Washington that the following is true and

6   correct

7             1.  That I am an authorized

8   transcriptionist;

9             2.  This transcript is a true and correct

10  record of the proceedings to the best of my

11  ability.

12            3.  I am in no way related to or employed

13  by any party in this matter; and

14            4.  I have no financial interest in the

15  litigation.

16            Dated in Bend, Oregon, this 1st day of

17  June, 2020.

18                       _Andie Evered_

19                       Andie Evered, CCR
                         State of Washington CCR #2393
20

21

22

23

24

25
```