# EXHIBIT 20

1

2                                    CITY OF SEATAC

3

4                      APPEAL OF AN ADMINISTRATIVE DECISION

5

6              THE FIRS MOBILE HOME PARK RELOCATION PLAN

7    _____

8                                         )
     FIFE MOTEL, INC.                     )
9                                         ) No. APL 0001
                    Applicant.            )
10                                        )

11   _____

12            PROCEEDINGS BEFORE HEARING EXAMINER

13            THE HONORABLE STEPHEN K. CAUSSEAX, JR.
     _____

14

15                         6:00 p.m.
                      January 10, 2017

16

17

18

19

20

21

22

23

24   PROCEEDINGS TRANSCRIBED BY: JACQUELINE L. BELLOWS, CCR 2297

25


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

VERBATIM REPORT OF PROCEEDINGS; January 10, 2017                                    2

```
1                              APPEARANCES

2
     For the Applicant:
3
     WALTER H. OLSEN, JR.
4    Olsen Law Firm PLLC
     205 South Meridian
5    Puyallup Washington 98371
     253.200.2288
6    walt@olsenlawfirm.com

7

8    For the City of Seatac:

9    MARY E. MIRANTE BARTOLO
     4800 South 188th Street
10   Seatac, WA  98188-8605
     206.973.4640
11   mmbartolo@ci.seatac.wa.us

12

13
     For the Appellants, FIRS MOBILE HOME PARK HOMEOWNERS
14   ASSOCIATION:

15   VICENTE OMAR BARRAZA
     Barraza Law, PLLC
16   14245-F Ambaum Boulevard Southwest
     Burien, Washington 98166
17   206.933.7961
     omar@barrazalaw.com

18

19

20   Also Present:            SAMUEL POTTS, Interpreter

21

22

23

24

25
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0004

1                        I N D E X

2       PRESENTATION BY THE CITY OF KENMORE

3       Testimony of Steve Pilcher ----------------------------- 10

4       Cross-Examination by Mr. Olsen ------------------------- 11

5       Cross-Examination by Mr. Barraza ---------------------- 14

6       Direct Examination by Ms. Bartolo --------------------- 23

7       Recross-Examination by Mr. Barraza -------------------- 26

8

9       PRESENTATION BY THE APPELLANT

10      Testimony of Crisanto Medina

11      Direct Examination by Mr. Barraza --------------------- 28

12      Cross-Examination by Ms. Bartolo ---------------------- 37

13      Testimony of Helena Benedict -------------------------- 37

14      Testimony of Irene Cruz ------------------------------- 40

15      Testimony of Luis Moreno ------------------------------ 41

16      Testimony of Martha Zamora ---------------------------- 43

17      Testimony of Leticia Vidales -------------------------- 44

18      Testimony of Rosa Isela Delgado ----------------------- 46

19      Testimony of Saul Garcia ------------------------------ 47

20      Testimony of Patsy Ware ------------------------------- 48

21      Testimony of Maria Anita Brito ------------------------ 52

22      Testimony of Guadalupe Rodriguez ---------------------- 54

23      Testimony of Maria Del Refugio Rodriguez -------------- 56

24      Testimony of Hugo Zamora ------------------------------ 59

25



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0005

1                      I N D E X (Continued)

2   Testimony of Earl Gipson ------------------------------- 60

3   Testimony of Stephanie Ruiz --------------------------- 61

4   Closing argument by Mr. Barraza ----------------------- 71

5   Closing argument by Ms. Bartolo ----------------------- 75

6

7

8   EXHIBITS FOR IDENTIFICATION                          PAGE

9   Exhibit 1   Department of Community and Economic     8
                Development Staff Report with
10              Attachments 1-6

11  Exhibit 2   Barraza Law Reply to Staff Report        8

12  Exhibit 3   Declaration of Mailing Relocation        8
                Report and Plan
13
    Exhibit 4   Letter from Ed Kim, dated May 8, 2016    15
14
    Exhibit 5   Letter from Jong Park, dated July 7,     18
15              2016

16  Exhibit 6   Letter from Steve Pilcher, dated         21
                October 17
17
    Exhibit 7   Determination of Nonsignificance,        30
18              dated July 22, 2016

19  Exhibit 8   Tenants Union of Washington, dated       38
                January 19, 2016
20

21

22

23

24

25


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0006

```
 1
 2                    Seatac, Washington; January 19, 2017
 3                              6:00 p.m.
 4                              --oOo--
 5
 6            THE HEARING EXAMINER:  Good evening, ladies
 7   and gentlemen.  We will convene the agenda for Thursday
 8   January 19th and consider the matter that's scheduled
 9   for 6:00 o'clock.  And that is Case number -- it's an
10   administrative appeal, Case No. APL 16-1.
11            Before we go any farther, I want to swear in
12   our interpreter this evening so he can interpret my
13   introductory remarks.  Mr. Potts, do you want to raise
14   your right hand, please.  Would you identify yourself
15   for the record.
16            THE INTERPRETER:  Good evening.  My name is
17   Samuel Potts.  I am a Washington State court certified
18   Spanish interpreter for the Spanish language.  I have
19   been sworn and have an oath on file with the Washington
20   AOC.
21
22                    Samuel Potts,
23        sworn as a Spanish language interpreter
24               by the hearings examiner.
25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0007

```
1              THE HEARING EXAMINER:  The appeal of APL 16-1
2    is of a decision of the acting community and economic
3    development director to approve a mobile home park
4    relocation plan for the Firs Mobile Hope Park that is
5    located at 20440 International Boulevard.  The appellant
6    in the matter is Crisanto Medina, and he is represented
7    by attorney Vincente Omar Barraza.
8              For the record, my name is Steve Causseaux.
9    I'm the City of Seatac hearings examiner.  Do you want
10   to -- okay.  Go ahead.
11             (Brief off-record discussion.)
12             THE HEARING EXAMINER:  Then I'll just start
13   with my name again.  Okay.  All right.
14             My name is Steve Causseax.  I'm the City of
15   Seatac hearings examiner.  I am an attorney in the
16   private practice of law with the law firm of McCarthy
17   and Causseaux that is located at 902 South Tenth in
18   Tacoma.  If anyone knows of a reason why I should not
19   hear the matter this evening, please indicate, otherwise
20   we will go ahead and proceed.
21             The way we will proceed, then, is we will
22   first hear a presentation from the city Department of
23   Community and Economic Development.  Then we will see if
24   the property owner Fife Motel, Inc., has anything they
25   wish to present.  Following that, we will hear testimony
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0008

 1  from the appellant and those that the appellant wishes

 2  to call as a witness.  If you are present and you are

 3  not planning on being called by the appellant, it will

 4  be necessary for you to be called by one of the

 5  attorneys, whether it be the city or the property owner,

 6  since this is an appeal and the parties to the appeal

 7  are Mr. Medina, the home owners, and the city.

 8          Mr. Barraza?

 9          MR. BARRAZA:  Mr. Hearings Examiner, I just

10  wanted to confirm for the record -- and you alluded to

11  this just now -- that the appellants are Crisanto Medina

12  and the Firs Mobile Home Park.  Thank you.

13          THE HEARING EXAMINER:  Then we can go ahead,

14  then, with the city's presentation.

15          UNIDENTIFED SPEAKER:  Are you going to swear

16  us in, Mr. Examiner?

17          THE HEARING EXAMINER:  When she calls you as a

18  witness.

19          MS. BARTOLO:  Before I begin with my opening

20  remarks, there's a procedural matter.

21          THE HEARING EXAMINER:  Can you identify

22  yourself for the record.

23          MS. BARTOLO:  Yes, in fact, I can.  Mary

24  Elizabeth Mirante Bartolo.

25          Anyways, I've talked to both counsel this



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0009

1   evening.   Mr. Olsen sent us on Tuesday a declaration of

2   mailing, relocation report, and plan.   And it includes

3   the mailing matrix.   We're all stipulating that this can

4   be admitted.   I don't have any objections on behalf of

5   the city, and Mr. Barraza indicated that he has no

6   objection to this being admitted.

7           Is that correct, Mr. Barraza?

8           MR. BARRAZA:   Yes, that's correct.

9           THE HEARING EXAMINER:   Thank you.   I think for

10  now I will mark the city's staff report as Exhibit 1 and

11  then I will mark Mr. Barraza's reply to the staff report

12  as Exhibit 2.   Then I will mark the most recent

13  declaration as Exhibit 3.   I'll be marking other

14  exhibits such as the prehearing conference and other

15  correspondence subsequent to the hearing.

16          (Hearing Exhibits No. 1-3 marked for

17          identification.)

18          MS. BARTOLO:   One more preliminary matter, we

19  were here on the 5th of January.   Mr. Barraza and

20  Mr. Olsen were not, which is not a problem.   I just

21  didn't know if there was anything you wanted to indicate

22  that occurred at that time.

23          THE HEARING EXAMINER:   No.   The only thing

24  that occurred at that time is that we continued the

25  hearing to tonight.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0010

1          MS. BARTOLO:  I'm ready to begin.

2          Fife Motel, Inc. is the owner of the Firs

3     Mobile Home Park located at 20440 International

4     Boulevard in the City of Seatac.  The owner desired to

5     close the mobile home park to pursue redevelopment of

6     his property.  Pursuant to Seatac Municipal Code

7     15.465.H, we prepared a relocation plan and submitted it

8     to the city.  The final report and plan was received by

9     the city on October 7, 2016.

10         On October 17, 2016, Acting CED Director Jeff

11    Robinson approved the relocation plan.  His decision to

12    approve the plan is the sole issue for consideration in

13    this appeal.  Closure of the Firs Mobile Home Park is

14    not what this appeal is about and is irrelevant to this

15    proceeding.  In short, the sole issue for to you

16    consider is whether the city followed the code in

17    approving the plan.

18         The evidence will show that the code was

19    followed.  The burden of proof is on the appellant to

20    show by a preponderance of the evidence that the city

21    did not follow the code.  Mr. Pilcher will provide brief

22    testimony.  And he can be sworn in any time.

23

24

25


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0011

```
 1
 2                        STEVE PILCHER,
 3        sworn as a witness by the hearings examiner,
 4                     testified as follows:
 5
 6          MR. PILCHER:   My name is Steve Pilcher.  I'm
 7    the planning manager for the City of Seatac.  I was the
 8    primary staff person working with the mobile home park's
 9    relocation agent in receipt and review of their proposed
10    mobile home park relocation report and plan.  That was
11    an iterative process.  And at the end of that, I
12    concluded, in conjunction with CED director,
13    Mr. Robinson, that the plan met the standards of the
14    Seatac Municipal Code.
15          I was also one of the authors of the staff
16    report, which was finalized in conjunction with our
17    legal department.  That staff report iterates the
18    reasons of how we came to the conclusion that the
19    relocation plan is consistent with the city code.  And
20    we stand on our report.  We would like the report, then,
21    to be considered part of my testimony.  Thank you.
22          THE HEARING EXAMINER:  Thank you.  Do you have
23    any questions that you want to ask Mr. Pilcher?
24          Please identify yourself for the record.
25          MR. OLSEN:  Yes.  My name is Walt Olsen, and I
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0012

```
 1    represent Fife Motel, Inc., which does business as the

 2    Firs Mobile Home Park.

 3

 4                        CROSS-EXAMINATION

 5    BY MR. OLSEN:

 6         Q.    Mr. Pilcher, when you refer to the Seatac

 7    Code, are you referring to Chapter 15.465 which includes

 8    the mobile home park relocation ordinance?

 9         A.    That is correct.

10         Q.    That ordinance requires a number of elements

11    in the relocation plan?

12         A.    Yes, sir.

13         Q.    One of those elements is an inventory of all

14    the tenants and their mobile homes shall be prepared in

15    a format established by the department?

16         A.    That is correct, sir.

17         Q.    And did the Firs Mobile Home Park provide an

18    inventory of park tenants and their mobile homes?

19         A.    Yes, they did.

20         Q.    Did the inventory identify park tenants and

21    information such as age, income, number of years in the

22    park?

23         A.    Yes, it did.

24         Q.    Did the inventory include the age and

25    condition of the mobile home?
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0013

1      A.   Yes, it did.

2      Q.   Did the inventory include the costs of pad

3   rental, park utility fees, and other charges?

4      A.   Yes, that was part of that inventory.

5      Q.   Does another element of a relocation plan

6   include the environmental conditions element?

7      A.   Yes, it requires the preparation of what we

8   call a SEPA checklist.

9      Q.   Was that completed by the Firs?

10     A.   Yes, it was.

11     Q.   Did the relocation report plan include

12  options, as identified in sub paragraph C of the

13  ordinance?

14     A.   I assume you're referring to 600.H.2.c?

15     Q.   H.1.c, actually.

16     A.   Yes, the report did include the listing of the

17  housing opportunities that might be available in the

18  area.

19     Q.   Did the information also include a list of

20  low-cost apartments or other low-cost housing in King

21  County?

22     A.   Yes, it did.

23     Q.   Did the information include information from

24  banks concerning first-time home buyers?

25     A.   Yes, it did.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0014

1      Q.    Did the information include information from

2  county or nonprofit entities concerning relocation park

3  options?

4      A.    Yes, it did.

5      Q.    Did the relocation report and plan include a

6  statement of housing preference, based on the available

7  options, gathered from each mobile home tenant?

8      A.    Yes, it did.

9      Q.    Did the relocation plan include a statement of

10  anticipated timing for park closure by Firs Mobile Home

11  Park?

12      A.    Yes, it did.

13      Q.    And did the relocation plan provide a

14  statement of any coordination plans or actions, in

15  addition to those that you've just testified to,

16  regarding what actions the park owner intended to take

17  to minimize the impacts of the park closure?

18      A.    Yes, it does.

19          MR. OLSEN:   That's all the questions I have.

20          THE HEARING EXAMINER:   Mr. Barraza, do you

21  have any questions?

22          MR. BARRAZA:   Yes, Mr. Hearing Examiner, I do.

23

24

25


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0015

```
 1
 2                      CROSS-EXAMINATION
 3   BY MR. BARRAZA:
 4        Q.   Mr. Pilcher, did the inventory provided by the
 5   landlord or the owner include data from all of the
 6   households at Firs?
 7        A.   Yes.  We believe that it did, yes.
 8        Q.   Are you aware of any concerns that families
 9   refused to provide the data?
10        A.   We did understand there was difficulty getting
11   that information from some individuals.
12        Q.   Is it true, sir, that the Seatac Municipal
13   Code Section H.A.3, I believe -- I'll read it if I
14   may -- states that "The inventory request form shall
15   clearly state to tenants that the disclosure of age,
16   income, and housing costs is voluntary and that the
17   purpose of requesting the information is to assess the
18   impact of the proposed closure."
19             Would you agree that, as I've summarized it,
20   would you agree that that's essentially what that
21   provision requires?
22        A.   Yes.  That's -- just for clarification of the
23   for the record, that is a paragraph following
24   15.465.600.H.1.iii, small Roman numeral three.
25        Q.   Thank you.  Do you know if the inventory
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0016

1    request form provided that disclaimer to the tenants?

2        A.    I don't recall that it did.

3        Q.    Thank you.  Was the inventory form translated

4    into Spanish?

5        A.    No, it was not.

6        Q.    Are you aware of any of the correspondence

7    that the owner sent to the families prior to the

8    approval of the relocation plan?

9        A.    We do have a copy of a letter sent in early

10   May of 2016.

11       Q.    I have a few questions about that if I may.

12             MR. BARRAZA:  Mr. Hearing Examiner, I have

13   copies of that letter that we could submit as exhibits.

14   I do believe it is in the record already.  But I did

15   bring copies of that letter if you'd like to mark it.

16             THE HEARING EXAMINER:  Since you've referred

17   to it specifically, we'll go ahead an mark it Exhibit 4.

18             MR. BARRAZA:  May my paralegal approach?

19             THE HEARING EXAMINER:  Sure.

20             I'll mark the May 8th letter as Exhibit 4.

21             (Hearing Exhibit No. 4 marked for

22             identification.)

23             MS. BARTOLO:  Just so we're clear, this is

24   also Exhibit 4 to the staff report which you've now

25   marked as, I think, Exhibit 1.



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0017

1        MR. BARRAZA:  Mr. Pilcher, the document marked

2   as Exhibit -- I'm sorry -- as Exhibit 4, is this the

3   letter that you're referring to?

4        A.   Yes, sir.

5        Q.   Would you agree that SeaTac Municipal Code

6   15.465.600.H.2.b requires the owner "to notify in

7   writing all affected park tenants and the department

8   that the owner's beginning the process of preparing a

9   mobile home relocation plan"?

10       A.   That is what the code states, yes.

11       Q.   Does the city consider the May 8th letter to

12  fulfill the notice requirement that I just read to you?

13       A.   Let me pause for a minute.  (Reviewing

14  document.)  Yes, we did consider that to be adequate.

15       Q.   Did the city verify that all of the affected

16  tenants received that notice?

17       A.   No, we did not.

18       Q.   Did the owner notify the city in writing that

19  it was beginning the process of preparing a mobile home

20  relocation plan?

21       A.   Well, they did by us getting receipt of this

22  letter of May 8th.

23       Q.   Do you know if the owner translated the

24  May 8th letter into Spanish?

25       A.   I do not know.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0018

1       Q.   It's my understanding that SeaTac Municipal

2   Code 15.465.600.H.2.b states, quote:  "The department

3   shall schedule a meeting with tenants to inform them of

4   the owner's proposal for the property, the requirements

5   of the mobile home relocations standards as contained

6   herein, and the proposed time line for the process."

7       Do you know that to be a true statement with

8   respect to the code?

9       A.   Yes, it is.

10      Q.   Did the department schedule a meeting with the

11   tenants to inform them of the owner's proposal for the

12   property?

13      A.   We did not schedule a meeting ourselves.  We

14   attended a meeting that was scheduled by the mobile home

15   park about relocation data.

16      Q.   Do you know what -- when that meeting

17   occurred?

18      A.   Sure.  It is in early July.

19      MR. BARRAZA:  Mr. Hearing Examiner, I'd like

20   to ask that a letter dated July 7th be marked as

21   Exhibit 5.

22      THE HEARING EXAMINER:  Is that also presently

23   in the records?

24      MR. BARRAZA:  It is also in the record, I

25   believe.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0019

1            THE HEARING EXAMINER:  We'll go ahead and mark

2     it Exhibit 5.

3            (Hearing Exhibit No. 5 marked for

4            identification.)

5     Q    (By Mr. Barraza) Mr. Pilcher, referring to the

6     exhibit marked as No. 5, did you see that letter prior

7     to this meeting -- prior to this hearing?

8         A.   I do not recall.

9         Q.   This letter, I would submit to you, states

10    that a meeting occurred on Monday, July 11th.  Is that

11    correct?

12        A.   I did attend a meeting on Monday July 11th.

13        Q.   Did you attend that meeting with a Spanish

14    language interpreter?

15        A.   Could you repeat the question.

16        Q.   Did you attend the meeting with a Spanish

17    language interpreter?

18        A.   There was a Spanish language interpreter

19    present.

20        Q.   Did the city pay for that interpreter?

21        A.   No, we did not.

22        Q.   Was the July 11th letter translated into

23    Spanish?

24        A.   Not that I'm aware of.

25        Q.   Did the city ask that the letter be


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0020

1   translated?

2        A.   No, we did not.

3        Q.   I would submit to you, sir, that this letter

4   states that an open house was held at the residence on

5   May 14, 2016.  I want to assume that that is true.  It's

6   my understanding that that occurred on May 14th.  Is

7   that your understanding?

8        A.   Yes, I do understand that.

9        Q.   Is it true that the first relocation plan was

10  submitted to the city on May 27th?

11       A.   I believe that's correct.  I'll check my

12  dates.

13       Q.   Assuming the accuracy of the May 14th letter,

14  did the city ever question whether the owner could

15  complete the inventory and gather relocation preferences

16  in approximately 14 days from nearly 70 families?

17       A.   Well, we were aware of time the difference,

18  yeah.

19       Q.   I would submit to you as well that the letter

20  states that one-on-one meetings were held with the

21  residents after the May 14th meeting.  So my question to

22  you is did the city verify that one-on-one meetings were

23  held with the residents between May 14th and May 27th of

24  2016?

25       A.   No, we did not.


206 622 6875 | 800 631 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0021

1      Q.   I want to ask a couple of questions, if I

2  might, about the SEPA, S-E-P-A, process.  Is it true

3  that the city issued a determination of nonsignificance?

4      A.   Yes, we did.

5      Q.   Was a notice issued by the city regarding its

6  determination of nonsignificance?

7      A.   Yes, it was.

8      Q.   Was that notice translated into Spanish?

9      A.   No, it was not.

10     Q.   Did the city ever determine whether or not

11  that notice was served on all of the residents?

12     A.   No, we did not.  It's not a requirement of our

13  code.

14     Q.   Is it true, though, that the SEPA checklist is

15  an integral part of the relocation plan?

16     A.   It is a required part.  Yes, it is.

17     Q.   But it was not provided to the residents?

18     A.   It is a public document, available for review

19  at city offices.

20          MR. BARRAZA:  I have a couple of questions,

21  before I wrap up, regarding the city's approval letter,

22  dated October 17th, 2016.  That, too, is part of the

23  record.  And perhaps the city attorney knows exactly

24  which exhibit that is.  I have additional copies as

25  well.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0022

1          Would you like to mark it, or should we

2    identify it?

3          THE HEARING EXAMINER:  For convenience, why

4    don't we go ahead and mark it.

5          MR. BARRAZA:  May my paralegal approach?

6          MS. BARTOLO:  It's Exhibit 2 of the staff

7    report.  And it's the letter dated October 17, 2016.

8          THE HEARING EXAMINER:  We'll mark the

9    October 17th letter as Exhibit 6.

10         (Hearing Exhibit No. 6 marked for

11         identification.)

12    Q.   (By Mr. Barraza) Is that your signature on

13    that document, sir?

14    A.   Yes, it is.

15    Q.   My first question about this letter is was

16    this letter translated into Spanish?

17    A.   No, it was not.

18    Q.   Can you explain why the letter references

19    SeaTac Municipal Code 15.464.600.H.2.f?

20    A.   That was a scribner's error.

21    Q.   May I interpret that to mean that that code

22    does not actually exist?

23    A.   That is correct.

24    Q.   Do you know if this letter was delivered to

25    the residents?


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0023

1      A.    I personally mailed it to the list of

2  residents provided to us in the relocation report.

3      Q.    With respect to the relocation plan that this

4  letter approved, did you instruct the owner to translate

5  it into Spanish?

6      A.    We asked the owner's agent to have the front

7  portion of the relocation report translated into

8  Spanish.

9      Q.    And just to confirm, what is included in the,

10  if I'm not mistaken, front portion -- I don't want to

11  put words in your mouth -- of the plan?

12      A.    It is the main body of the plan which is then

13  followed by copies of information from the numerous

14  resources regarding housing options and financing and

15  the other things we've discussed earlier this evening.

16      Q.    Do you know who paid for that translation?

17      A.    The city billed the mobile home park owner for

18  that translation -- or excuse me.  I misspoke.  They

19  paid for the original translation, themselves.

20      Q.    Do you know why only the relocation plan was

21  translated?  I'm sorry.  I withdraw that.  Let me ask

22  the question a different way.

23          Can you explain why the city did not require

24  the owner to translate the May 8th letter, the

25  October 17th letter, and the July 7th letter into

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0024

1   Spanish?

2        A.   We felt the relocation plan was important to

3   be translated.  The other correspondence you referred

4   to, obviously we did not have translated.  There is no

5   requirement to do so pursuant to our codes.  And again,

6   our concern was that the plan itself is available in

7   Spanish.

8             MR. BARRAZA:  Mr. Hearing Examiner, I have no

9   further questions of this witness at this time.

10            THE HEARING EXAMINER:  City, do you have any

11  questions?

12

13                  DIRECT EXAMINATION

14  BY MS. BARTOLO:

15       Q.   Mr. Pilcher, you've testified that the

16  October 17th, July 7th, and the May 8th letter was not

17  translated in Spanish; correct?

18       A.   That is correct.

19       Q.   You indicated that it's because it was not

20  required by the code; correct?

21       A.   That is correct.

22       Q.   Did you -- you've also indicated that you

23  voluntarily asked or required the park owner to

24  translate the plan into Spanish; is that correct?

25       A.   We asked the park owner to have it translated



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1    into Spanish, and they complied with our request.

2         Q.   Please explain the process you went through to

3    get the plan translated.

4         A.   Staff asked the park owner's agent to have the

5    plan translated.  Upon receipt of that translated

6    version, we hired a third-party translator to verify its

7    accuracy.  That translator opted to retranslate the plan

8    from the original English, feeling that it provided a

9    more accurate translation.  And that is the version

10   contained in the final plan that was approved by the

11   city.

12            MS. BARTOLO:  Nothing further.

13            THE HEARING EXAMINER:  Mr. Olsen, do you have

14   anything further?

15            MR. OLSEN:  No.

16            THE HEARING EXAMINER:  I have one question,

17   Mr. Pilcher.  I just want to clarify your testimony to

18   make sure I understood one part of it.  This is from

19   your testifying regarding the SEPA notice.  Was it your

20   testimony that the SEPA checklist was sent to each

21   tenant in the mobile home park?

22            THE WITNESS:  No.  It was -- the site was

23   posted with a public notice board --

24            THE HEARING EXAMINER:  I guess --

25            THE WITNESS:  -- with a copy of the SEPA



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0026

```
1    determination.
2             THE HEARING EXAMINER:  I'm looking at
3    subsection 2, paren D.  And the first sentence requires
4    the mobile home park owner to complete a SEPA checklist.
5    Then the second sentence says:  "A copy of the SEPA
6    checklist shall be sent to each tenant of the mobile
7    home park."
8             THE WITNESS:  2?  Excuse me, sir.
9             THE HEARING EXAMINER:  It's under "Required
10   Processes," H.2.d, little d.
11            THE WITNESS:  Correct.  It is not clear,
12   according to the code, whether that is the park owner's,
13   the applicant's, responsibility or the responsibility of
14   the city to send that out prior to us making a SEPA
15   determination.
16            THE HEARING EXAMINER:  The SEPA -- the city,
17   does the city in its other SEPA determinations provide
18   notice?  Or is that left to the project applicant?
19            THE WITNESS:  We provide notice once a SEPA
20   determination has been made.  Other than state agencies
21   that are on our primary SEPA distribution list who
22   receive a copy of the both the checklist and the
23   determination, our standard practice is, once a
24   determination is made, the determination is sent to
25   parties of interest.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0027

1          THE HEARING EXAMINER:  Do you know if the

2    mobile home park owner sent a copy of the SEPA checklist

3    to each tenant?

4          THE WITNESS:  I do not know.

5          THE HEARING EXAMINER:  All right.  Thank you.

6          MR. BARRAZA:  May I ask one question?

7          THE HEARING EXAMINER:  Yes.

8

9                    RECROSS-EXAMINATION

10   BY MR. BARRAZA:

11      Q.   Mr. Pilcher, did anyone appeal the SEPA

12   determination of the city?

13      A.   No, there was no appeal.

14         MR. BARRAZA:  That's all.  Thank you.

15         THE HEARING EXAMINER:  Does the city have

16   anything further it wishes to present?

17         MS. BARTOLO:  No, thank you.

18         THE HEARING EXAMINER:  Mr. Olsen, does the

19   mobile home park have anything it wishes to present?

20         MR. OLSEN:  No.

21         THE HEARING EXAMINER:  Mr. Barraza, we've been

22   going for a half hour.  Mr. Potts, do you need a little

23   break?

24         THE INTERPRETER:  The interpreter would

25   appreciate a little recess, yes, your honor.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0028

1          THE HEARING EXAMINER:  Let's take about a

2    couple minutes here and give Mr. Potts a rest.  Then,

3    Mr. Barraza, you can call your first witness.

4          MR. BARRAZA:  Thank you.

5          (Recess taken.)

6          THE HEARING EXAMINER:  Mr. Barraza, do you

7    want to call your first witness?

8          MR. BARRAZA:  I'll like to call Crisanto

9    Medina.

10          MR. MEDINA:  My name is Crisanto Medina.  I

11    live at Firs Mobile Home Park.

12

13                    CRISANTO MEDINA

14       sworn as a witness by the hearings examiner,

15               testified as follows:

16

17          MR. BARRAZA:  I just have a few brief

18    questions for Mr. Medina.

19          THE INTERPRETER:  For the record, this is

20    Crisanto Medina.  The spelling is C-R-I-S-A-N-T-O, last

21    name, Medina, M-E-D-I-N-A.

22

23

24

25


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1
 2                         DIRECT EXAMINATION
 3     BY MR. BARRAZA:
 4          Q.   Mr. Medina?
 5          A.   Yes.
 6          Q.   You live at Firs Mobile Home Park; is that
 7     correct?
 8          A.   Yes.
 9          Q.   And are you president of the First Homeowner
10     Association?
11          A.   Yes.
12          Q.   I have a few brief questions for you.
13          A.   Yes.
14          Q.   I want to start with a letter dated May 8,
15     2016.  Of course now we need to find it.  I believe this
16     was marked as Exhibit 4.  We're going to hand the
17     exhibit to the witness.
18               Have you seen, Mr. Medina, this letter before?
19          A.   Yes.
20          Q.   I believe it said that there's an open house
21     for residents on May 14th.  Is that correct?
22          A.   Yes.
23          Q.   Did you attend that meeting?
24          A.   On May 4th?
25          Q.   May 14th, I believe.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0030

1        A.    May 14the, yes.

2        Q.    Did you understand that letter dated May 8,

3   2016?

4        A.    No.

5        Q.    Did you fail to understand it because it was

6   in English?

7        A.    Yes.  Because it was in English, I did not

8   understand it.

9        Q.    How did you know to go to the meeting?

10       A.    I went because they put this piece of paper up

11  on the door.

12       Q.    So you heard about the meeting or knew about

13  the meeting?

14       A.    I didn't know, but I was informed of it.

15       Q.    And the next thing I want to ask you about,

16  sir, is a letter dated July 7, 2016.  I believe this was

17  marked as Exhibit 5.  Have you seen this letter before?

18       A.    Yes.

19       Q.    Did you understand the letter?

20       A.    No.

21       Q.    Earlier we were talking about a document or a

22  process called SEPA, S-E-P-A.

23            MR. BARRAZA:  And I believe I have a copy of

24  the determination of nonsignificance.  This should be in

25  the record, sir.  But we also brought copies if you'd


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0031

```
1    like to mark it.
2            THE HEARING EXAMINER:  We'll mark the SEPA DNS
3    as Exhibit 7.
4            MR. BARRAZA:  May she approach?
5            THE HEARING EXAMINER:  Yes.
6            (Hearing Exhibit No. 7 marked for
7            identification.)
8       Q    (By Mr. Barraza) Mr. Medina, have you seen
9    this letter before?
10      A.   It was left in front of my house.
11      Q.   Do you know when you received it?
12      A.   I don't remember.
13      Q.   Do you know what it says?
14      A.   No.
15      Q.   Did anyone ever inform you that you had 14
16   days to appeal the decision that the city made in this
17   letter?
18      A.   No.
19      Q.   I want to take you back briefly to the open
20   house in May.  Do you remember that meeting?
21      A.   Yes.
22      Q.   My understanding is that the residents at the
23   meeting were asked to complete an inventory.  Is that
24   correct?
25      A.   Yes.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0032

VERBATIM REPORT OF PROCEEDINGS; January 10, 2017                    31

1        Q.    Was that inventory in Spanish?

2        A.    No.

3        Q.    Do you know if people refused to fill out that

4   form?

5        A.    Yes.

6        Q.    Could you give us an estimate of how many?

7   Was it more than 20?

8        A.    More than 30.

9        Q.    Did anyone ever inform you in writing or

10  verbally --

11       A.    No.

12       Q.    Let me finish the question.

13            Did anyone ever inform you that the purpose of

14  the inventory was to assess the impact of closing this

15  park?

16       A.    Yes.

17       Q.    Was that verbally or in writing?

18       A.    In writing.

19       Q.    On the inventory form?

20       A.    Yes.

21       Q.    Was that in English or Spanish?

22       A.    In English.

23       Q.    Did anyone ever verbally tell you the reason

24  for the inventory?

25       A.    No.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0033

1      Q.    Did anyone explain that the information was

2   voluntary?

3      A.    No.

4      Q.    Did anyone ever tell you that the information

5   would be confidential?

6      A.    No.

7      Q.    Do you recall receiving a letter dated

8   October 16th, closing the park?

9      A.    Yes.

10      Q.    Was that document in Spanish?

11      A.    No.

12      Q.    Was there a Spanish language interpreter at

13   the May 14th meeting, the open house?

14      A.    No.

15      Q.    Was there an interpreter at the July 11th

16   meeting that Mr. Pilcher from the city attended?

17      A.    No.

18      Q.    Wasn't -- I understood that there was a young

19   woman that was translating.

20      A.    Yes, there was.  But she wasn't translating

21   well, and there wasn't documentation.

22      Q.    Were you confused by what she was saying?

23      A.    Yes.

24      Q.    Was it because she didn't speak Spanish well?

25   Or was it that she didn't understand what was being said

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0034

1    in English?  I just want to be more precise about what

2    exactly was difficult about understanding her.

3        A.    We didn't understand her.

4        Q.    Were you the only one that felt that way?

5        A.    No.

6        Q.    Did you receive the relocation plan?

7        A.    No.

8        Q.    The relocation plan was the big document that

9    came with the October 7th letter, I believe.

10       A.    No.

11       Q.    Do you know if the relocation plan was

12   received by other people?

13       A.    Yes.

14       Q.    Did you see the relocation plan?

15             MS. BARTOLO:  I need to object.  I at least

16   want to put this on the record.

17             THE HEARING EXAMINER:  Go ahead.

18             MS. BARTOLO:  I just want to be heard on this.

19   The relocation plan, at this point this appeal is about

20   whether the plan was approved and whether it followed

21   the steps.  Now, you're talking about what happened

22   after that approval.  I'm just bringing this your

23   attention that we're beyond what is the scope of this

24   appeal, from my perspective, from the city's

25   perspective.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0035

 1          THE HEARING EXAMINER:  My understand is that

 2    the question was whether he received it or not.

 3          MS. BARTOLO:  Correct.  The action being

 4    appealed is whether --

 5          THE HEARING EXAMINER:  Oh, I see what you

 6    mean.

 7          MS. BARTOLO:  -- the proper steps were

 8    followed in approving.  I just want to note my objection

 9    for the record.

10          THE HEARING EXAMINER:  I understand.  Yes.

11    Thank you.

12          MS. BARTOLO:  Thank you.

13          THE HEARING EXAMINER:  Go on.

14          MR. OLSEN:  The Firs would join in the city's

15    objection and also identify the statute that provides

16    for the scope of this review at SMC 15.465.600, sub

17    paragraph H.2.e.  That statute provides:  "The

18    department shall review the relocation plan to ensure

19    compliance with the requirements of subsection H.1 of

20    this section."  Subsection H.1 is the required elements

21    of the plan, on which I examined Mr. Pilcher.

22          Subsection 2 is titled "Required Process."

23    But this section requires the department to review the

24    relocation plan to ensure compliance with the required

25    elements portion of the statutes.  So even testimony as


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0036

```
 1   to sub paragraph H.2, the process, is not governed by
 2   this statute which provides for this review and the
 3   statute which follows it, which provides that "Once it
 4   is determined that the requirements of Subsection A of
 5   this section have been met, the director of the
 6   department shall issue a decision on the relocation plan
 7   based on the impacts of the proposed action.
 8             So the Firs would ask that evidence be limited
 9   to required elements of the plan as provided for in the
10   code.  Thank you.
11             MR. BARRAZA:  If I may weigh in, please.  The
12   question was not asked with respect to process of
13   service but to lay the foundation for my next question.
14             THE HEARING EXAMINER:  Go ahead.
15             MR. BARRAZA:  My question -- and for the
16   record I do want to point out that he did see it.  I'm
17   not asking whether or not he received it.  He did see
18   it.  The city went to apparently some trouble to make
19   sure that it got retranslated so that it was understood
20   or that it could be understood.  That is my question.
21        Q    (By Mr. Barraza) Did you understand the
22   Spanish language translation of the relocation plan?
23        A    No.
24        Q    Were there parts of the plan in Spanish that
25   were cut off?
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0037

VERBATIM REPORT OF PROCEEDINGS; January 10, 2017                    36

1        A.    Uh-huh.

2        Q.    As a result, my question is -- I'm asking the

3    same question, and I just want to confirm.  You had

4    trouble understanding it; is that correct?

5        A.    Yes.

6              MR. BARRAZA:  Thank you.  Those are all of the

7    questions I have for Mr. Medina.

8              THE HEARING EXAMINER:  Thank you, Mr. Medina.

9              THE WITNESS:  Thank you.

10             MR. BARRAZA:  I'd like to Juan --

11             THE HEARING EXAMINER:  Excuse me a second.

12   Wait; wait; wait.

13             MS. BARTOLO:  I have a couple questions.

14             THE HEARING EXAMINER:  As Mr. Medina is the

15   appellant, I'll allow you to ask him.  But I don't want

16   to discourage people from speaking in thinking they

17   might be cross-examined.

18             MS. BARTOLO:  Right.

19             THE HEARING EXAMINER:  But since Mr. Medina is

20   the appellant, go ahead.

21

22

23

24

25

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0038

VERBATIM REPORT OF PROCEEDINGS; January 10, 2017                    37

```
1
2                          CROSS-EXAMINATION
3    BY MS. BARTOLO:
4        Q.   Mr. Medina, good evening.  I'm just curious.
5    I want to understand why you testified that you had
6    trouble understanding the Spanish version of the
7    relocation plan.  Why was that?
8        A.   Because it wasn't well written, the Spanish.
9             MS. BARTOLO:  Thank you.
10            THE HEARING EXAMINER:  Okay.  Anything?
11            MR. OLSEN:  No.
12            THE HEARING EXAMINER:  Thank you, Mr. Medina.
13            MR. BARRAZA:  I have one more witness I'd like
14   to call, a representative of the tenant's union.
15   There's two representatives here.  I believe it's
16   Helena.  I'm calling Helena Benedict.  Ms. Benedict, if
17   you could, introduce yourself for the record.
18            THE HEARING EXAMINER:  Let me have her swear
19   herself in first.
20
21                        HELENA BENEDICT
22       sworn as a witness by the hearings examiner,
23                      testified as follows:
24
25            MS. BENEDICT:  My name is Helena Benedict.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0039

```
1    I'm from the tenants union in Washington, here to

2    support Mr. Medina and the Firs Homeowner Association.

3    In the interests of time, I won't speak.  But I have a

4    testimony I'd like to deliver if I may.

5            THE HEARING EXAMINER:  Yes.

6            (Brief off record conversation.)

7            THE HEARING EXAMINER:  Do you want to bring it

8    forward?  Our next number is at 8.  Thank you.  I'll

9    mark -- do you happen to have extra copies for either

10   Mr. Olsen or the city?  We can get a copy after the

11   hearing.

12           (Hearing Exhibit No. 8 marked for

13            identification.)

14           MR. BARRAZA:  I have no further questions of

15   this witness.

16           THE HEARING EXAMINER:  Thank you.  Do you

17   have -- you don't have any additional witnesses you can

18   call?

19           MR. BARRAZA:  I'm not calling any other

20   witnesses.  But we do have a long list of families who

21   reside at Firs Mobile Home Park that would like to

22   illuminate some of the issues that we raised in our

23   appeal.

24           THE HEARING EXAMINER:  Then we will hear

25   testimony from residents of the Firs Mobile Home Park
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0040

```
 1   that are also members of appellant Homeowners'
 2   Association.  You don't have any particular order.  So
 3   whoever wants to speak, can come forward.
 4            MR. BARRAZA:  I believe that the interpreter
 5   has a list.  And I don't see any reason why we can't
 6   just follow that list.
 7            THE HEARING EXAMINER:  If we have a list, then
 8   I'll just have you just call out the list.  If person
 9   doesn't want to speak, just let us know.
10            MS. BARTOLO:  Mr. Hearing Examiner, I have
11   another procedural issue.  The last witness who
12   testified handed you up some documents that none of us
13   counsel have been provided.  So we don't know the
14   contents of those statements.
15            THE HEARING EXAMINER:  Why don't I just give
16   it to you.  And you can either, at a break, make a copy
17   or just look it over, see if you and Walter Olson have
18   any objections.
19            MR. BARRAZA:  I've not seen any of that as
20   well.
21            THE HEARING EXAMINER:  Okay.  I think we can
22   go ahead, then, if you want to call the first speaker.
23            THE INTERPRETER:  Yes, your honor.  The first
24   speaker I have on the list is Irene Cruz.
25            MS. BARTOLO:  One more procedural thing before
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0041

```
 1    this witness testifies, there's been some testimony that
 2    certain letters -- the May 8th letter, the July 7th
 3    letter, the October 17th letter -- and the SEPA notice,
 4    which is the determination of nonsignificance of
 5    July 22nd, that those have not been translated in
 6    Spanish.  In the interests of time, we stipulate that
 7    they were not translated into Spanish.
 8             THE HEARING EXAMINER:  Thank you.
 9
10                    IRENE CRUZ
11        sworn as a witness by the hearings examiner,
12                 testified as follows:
13
14             THE INTERPRETER:  The first person to testify
15    is Irene Cruz, spelling I-R-E-N-E, C-R-U Z.
16             MS. CRUZ:  First of all, good evening.  I want
17    to testify that, yes, it is true what Mr. Cruz said,
18    that the letters that we received, first of all, they
19    were all in English and we did not understand them.  I
20    was able to understand because my son explained to me
21    what they were about.  But you can understand that he's
22    still young and he cannot, he cannot understand exactly
23    what the letters are about.
24             And I want to ask if the members of the City
25    of Seatac, if they asked themselves how much this could
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
1    hurt us, that we'd be moved from our houses, from the

2    clinics that are near us, away from our schools, our

3    children's schools, or our jobs.  What impact could this

4    have on the older people that live in the community?

5              Personally I have a child with autism.  And

6    the clinic -- well, it was very difficult for me to find

7    a clinic to take him to his therapies.  If we move now,

8    it would be very difficult for me to find another clinic

9    nearby.  Or for my work, I could end up out of work

10   because of this.  That's all I wanted to say.

11             THE HEARING EXAMINER:  Thank you, Ms. Cruz.

12             THE WITNESS:  Thank you; thank you.

13             THE INTERPRETER:  Your Honor, ma'am clerk,

14   next we have Luis Moreno.  The name is spelled L-U-I S.

15   The last name Moreno, M-O-R-E-N-O.

16

17                       LUIS MORENO

18       sworn as a witness by the hearings examiner,

19                     testified as follows:

20

21             MR. MORENO:  My testimony is about the

22   relocation plan and the open houses that the hotel made.

23   At no time did I receive a paper asking for my

24   information about my mobile home.  Also the relocation

25   plan, they sent it late.  It arrived on the 1st or the
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0043

```
 1   3rd of November.  And the appeal date expired on

 2   October 31st.  At no time was I notified of that.

 3           And when they came to personally give the

 4   relocation plan, they just put it up with a piece of

 5   tape and never knocked on the door.  And it was in a

 6   different person's name, the previous owner.

 7           And I'd also like to add that -- it's a bit

 8   separate from the relocation plan.  But I bought my

 9   mobile home from Mr. Park about 3 1/2 or 4 years ago.

10   And he knew at that moment when he sold it to me, in the

11   case that the park were to be closed, the mobile home

12   that he sold to me would not be able to be moved.  And I

13   paid him 8,300 for it.  It was destroyed.  I spent

14   nearly $20,000 repairing it.  I just finished it last

15   year, 2016, the month of -- around May.

16           And that was all I wanted to talk about, that

17   this is injustice.

18           THE HEARING EXAMINER:  Thank you, Mr. Moreno.

19           THE INTERPRETER:  Next, your honor, we have

20   Martha Zamora.

21           THE HEARING EXAMINER:  Could you spell the

22   last name, the names there for me.

23           THE INTERPRETER:  Yes.  The spelling of the

24   name is Martha, M-A-R-T-H-A.  The last name, Zamora,

25   Z-A-M-O-R-A.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0044

1

2                         MARTHA ZAMORA

3          sworn as a witness by the hearings examiner,

4                    testified as follows:

5

6          THE WITNESS:  Now, I'm here to talk about the

7    relocation plan that was presented by the owner, which I

8    didn't understand completely because the majority of the

9    plan was in English.  The two meetings that we had with

10   the relocation specialist did not provide us with enough

11   clear information because the supposed interpreter did

12   not translate and did not speak Spanish well.

13          At said meetings they never informed us that

14   they were doing an inventory nor what its purpose was.

15   Also they never told us that we could or that we had the

16   right to appeal said plan.  Nor did they ask us where we

17   would like to live.  And they didn't take into account

18   how this would impact our lives, seeing how the majority

19   of us that live at Firs are all family members.  In that

20   way, we all support each other.

21          And my case and in many others, where we have

22   chronic diseases, I've spent weeks hospitalized.  And

23   thanks to the support of my family members, my children

24   are able to continue with their lives normally.  My

25   daughter doesn't lose -- doesn't miss class at her

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0045

1   school, Madrona.  And my son is able to stay with people

2   we trust and people that are safe.

3           Personally I believe this plan didn't take

4   into account the impact and how this would affect our

5   daily lives.  They never asked us where we wanted to

6   live.  And well, thank you.

7           THE HEARING EXAMINER:  Thank you.

8           THE INTERPRETER:  This is Leticia Vidales,

9   L-E-T-I-C-I A; last name, V-I-D-A-L-E-S.

10

11                    LETICIA VIDALES

12       sworn as a witness by the hearings examiner,

13                   testified as follows:

14

15       MS. VIDALES:  My name is Leticia Vidales

16   Gomez.  On May 14th, at the open house, they gave us a

17   paper and told us that it was to mark down our

18   attendance.  And at no time did they tell us that it was

19   for relocation.

20           Personally, my family will be affected because

21   there are several of us in our home, those that are

22   going to school.  And moving would cause us several

23   problems.  For example, our jobs would be very far away

24   from us, and our schools.  This would make my youngest

25   daughter have to start over from zero at a new school.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0046

```
 1              For example, an example would be one of my
 2     daughters is in high school.  This is her last year.
 3     And, after graduating, she'll be going to university.
 4     If we move, it would depend on the distance as to which
 5     school would be best.  And it would depend on the
 6     financial assistance we'd be able to give her with her
 7     school expenses.
 8              There's a lot of confusion with the relocation
 9     because they haven't given us the correct information
10     because the information is in English and not all of us
11     speak English.  Our children speak English.  But they
12     don't know how to translate it.
13              And now at no time was there someone that went
14     personally to my house to give me the correct
15     information about what relocation means.  And this is
16     having such an affect on us, to me, my family, and all
17     the families that live at Firs Mobile Home Park.  That's
18     all I have to say.  Thank you.
19              THE HEARING EXAMINER:  Thank you, Ms. Vidales.
20              THE INTERPRETER:  This is Rosa Isela Delgado,
21     spelling R-O-S-A; second name, I-S-E-L A; last name
22     D-E-L-G-A-D-O.
23
24
25
```

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0047

```
 1

 2                      ROSA ISELA DELGADO

 3         sworn as a witness by the hearings examiner,

 4                    testified as follows:

 5

 6         MS. DELGADO:  My name is Rose Isela Delgado.

 7  I'm a resident of Firs Mobile Home Park.  I have two

 8  daughters.  One of them goes to Madrona Elementary

 9  School.  And the notice of the park's closure affects us

10  all due to the financial situation not being good at

11  this time to be able to relocate ourselves somewhere

12  else.

13         In our house, our first language is Spanish.

14  And I have not had all the information necessary to

15  understand the park owner's plans.  My daughter refuses

16  to change school and leave her teachers and friends.  I

17  wouldn't like to have to relocate myself due to the

18  investment made in our houses, thinking of having

19  something to offer and a future for our kids.  Thank

20  you.

21         THE HEARING EXAMINER:  Thank you.

22         THE INTERPRETER:  Saul Garcia, spelling

23  S-A-U-L; last name Garcia, G-A-R-C-I-A.

24

25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0048

```
 1
 2                              SAUL GARCIA
 3           sworn as a witness by the hearings examiner,
 4                         testified as follows:
 5
 6              MR. GARCIA:  Well, I'm here for the same
 7   reason as all of my other companions.  About the letters
 8   that they're talking about, I did not receive any.  At
 9   that time the mail had been destroyed, and it was being
10   stolen.  And just one letter that I did receive, I did
11   not receive it.  It was just in front of my house.
12              And also I'm doing very poorly because they're
13   saying that they're going to take away our houses.
14   They're not just moving them.  They said they were going
15   to give 12,500 if it was a double.  And the singles were
16   7,500.  But we weren't going to see any of that money.
17   They were going to use it to demolish them.  That means
18   they are just going to kick us out of there.  That's it.
19   That's all.
20              THE HEARING EXAMINER:  Thank you, Mr. Garcia.
21              THE INTERPRETER:  Your honor, could the
22   interpreter ask for a rest?
23              THE HEARING EXAMINER:  Sure.  Why don't we
24   take a few minutes.
25              (Recess taken.)
```

 206 622 6876 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0049

```
 1            THE HEARING EXAMINER:  If we could find our
 2    seats, we'll go ahead and reconvene.
 3            Do you want to call our next witness?
 4            THE INTERPRETER:  Yes, your honor.  I believe
 5    we do have more one witness who will be testifying in
 6    English, Ms. Patsy Ware.
 7
 8                        PATSY WARE
 9        sworn as a witness by the hearings examiner,
10                    testified as follows:
11
12            THE HEARING EXAMINER:  Could you please state
13    your name for us, please.
14            MS. WARE:  My name is Patsy Ware.  That is
15    P-A-T-S-Y, W-A-R-E.  I need to taken my glasses off to
16    read.  Most people have to put them on to read.
17            THE HEARING EXAMINER:  You and I are alike.
18            MS. WARE:  Good evening, Mr. Hearing Examiner.
19    My name is Patsy Ware, and I'm a resident of the Firs
20    Mobile Home Park and have resided there for almost 46
21    years.
22            I chose mobile home living because it was
23    affordable for my budget and was close to my job.  My
24    last employment was at Madrona Elementary, right across
25    the street from my home, saving me from a long commute.
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0050

1          The first two years of my day consisted of

2     spending it in a welcome room.  This consisted of

3     spending time with students new to our district.  I've

4     seen how it affects children's, starting a new school:

5     Lack of a attention, loss of sleep, low appetite, a new

6     teacher, loss of school friends, and depression.  It

7     becomes a major challenge in their young lives.  You see

8     the agony in their little faces.

9          On July 29th, we had a fire that destroyed

10    several homes, displacing these families and forcing

11    them to find affordable housing.  They lost all their

12    possessions and many cherished items.  The children had

13    to change schools.  These families, having lost all of

14    their possessions, family heirlooms, and treasured

15    items, now having to start all over.

16         The residents of the park are all low income.

17    Some homes have disabled children.  And we have some

18    disabled seniors.  Many families came to America to

19    provide a better life, a safe environment, and a good

20    education.  We take pride in owning our homes.  Many

21    have made vast improvements, spending lots of hours and

22    money, now knowing they could be demolished.

23         The relocation committee supplied a list of

24    one-bedroom apartment in the area for $900 or more per

25    month.  This will not accommodate a family of four or


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0051

1   five.  Now, we have an environmental issue.  Many of the

2   homes are older than 1976 models and have asbestos.

3   This is causing great concerns for our land fills.

4            Please, for just a moment, walk in our shoes.

5   You're so proud to have bought your home.  You made many

6   improvements, using many hours of your time and your

7   hard-earned dollars.  Your family has adjusted, and your

8   children are very happy in school.  Suddenly you learn

9   all of this will change.  Everyone is faced with the

10  necessity to start all over again.

11           The options you are given are far beyond your

12  reach.  This is causing unrest in your home,

13  uncertainty.  And the thought of homelessness is

14  foremost in your mind.  This is not something our

15  beloved city can handle.  Seattle is dealing with that

16  issue now.  On Tuesday, The Seattle Times printed an

17  article, which I have, regarding space available for

18  homeless residents living in RVs.  Can our city handle a

19  situation such as this?  In my opinion, the answer is

20  no.

21           We love living here because of the diversity.

22  Many residents have jobs in the area, and they shop

23  locally and pay their property taxes.  I took it upon

24  myself to look for space in a mobile home park in the

25  area.  There's nothing available.  The choice given to


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0052

 1   us was Clark or Kitsap County, not an option for many of

 2   us.

 3           We were never notified by the city regarding

 4   the change of zoning from residential to commercial --

 5   absolutely nothing from the planning department.   I

 6   worked almost 20 years in high-rise hotel management.

 7   We were part of a worldwide hotel chain.   In my opinion,

 8   we have a sufficient number of hotel and motel rooms in

 9   our city.   Business fluctuates with the seasons.   I

10   recall many weeks of closing several floors of a

11   six-story hotel for lack of business.

12           Since all of this business of closing the park

13   started, I've had the opportunity of meeting so many

14   wonderful families in the park.   They are hard working,

15   very giving, and generous people.   Please, we are asking

16   your help in preserving our homes.

17           When you move a mobile home, everything must

18   be packed securely.   When you arrive at your

19   destination, many things are damaged or destroyed.   I've

20   been through this before.

21           I know I am a firm believer in helping my

22   fellow mankind.   My motto is:   People first, profit

23   second.   On behalf of the Firs mobile home families,

24   think you for your time.

25           THE HEARING EXAMINER:   Thank you, Ms. Ware.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0053

```
 1            THE INTERPRETER:  Maria Anita Brito.  The

 2    spelling should be M-A, space, A-N-I-T-A, last name

 3    B-R-I-T-O.

 4

 5                    MARIA ANITA BRITO

 6       sworn as a witness by the hearings examiner,

 7                 testified as follows:

 8

 9       MS. BRITO:  Good evening.  My name is Anita

10    Brito.  Today I'm here to share my experience with you.

11    But not without first thanking you for giving me the

12    opportunity to speak today.

13            As you already know, this problem is not just

14    affecting my family and myself but rather all affecting

15    all of the residents at Firs.  As you already know,

16    we're being evicted from our homes by Mr. Park.

17    Mr. Park is the landowner, and he wants to evict us.

18    Unfairly.  We know that he's the owner of the place.

19    Either way, this does not take away the fact that this

20    is an injustice, what this man is committing against us,

21    the residents of Firs.

22            I live in the community of Firs for almost 10

23    years.  We've been very happy living there.  We invested

24    our capital in buying our house.  Aside from that, we've

25    renovated it over the passage of the years so that it
```


206 622 6875 | 800 631 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0054

```
 1    would be in better condition so that our children live
 2    healthfully.  It's not fair that Mr. Park wants to evict
 3    us from our homes.
 4           Mr. Park doesn't have the least idea of the
 5    problem that's so big that he's caused us.  This has
 6    caused us a lot of stress to all of the people that
 7    reside at Firs.  We're desperate from thinking where
 8    we're going to go live.  We're hard working people.  But
 9    we don't have sufficient resources to move to another
10    place, seeing how rents are too high.  And nor is it
11    easy to find a different place.
12           For older people that live there, this would
13    be very difficult, difficult to move to a different
14    place.  Taking into account the help that they receive,
15    wouldn't be enough for them to do so or to survive
16    somewhere else.
17           My children have also been affected.  They're
18    very worried.  They go to Madrona the school named
19    Madrona that's very near our house.  I don't want to
20    even imagine the problem that this would cause for them.
21    It wouldn't be easy to incorporate themselves in another
22    school.  They receive special education.  My children
23    have been diagnosed with autism.
24           We would also be affected because my work is
25    very nearby.  If we move to another area, it would be
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0055

1    complete chaos.  My husband doesn't drive for health

2    reasons.  He works in the Central Seattle area.  But

3    thanks to the fact that we have the light rail here

4    nearby, this makes our lives a little bit lighter and

5    the same as many other people that work in that same

6    area and don't have to worry so much about public

7    transportation seeing how everything is very accessible

8    here in the City of Seatac.

9            For that reason we want to continue to be part

10   of this beautiful city.  That's all I have to say.

11   Thank you very much.

12           THE HEARING EXAMINER:  Thank you.

13           THE INTERPRETER:  This is Guadalupe Rodriguez.

14   The spelling is G-U-A-D-A-L-U-P-E; last name Rodriguez,

15   R-O-D-R-I-G-U-E Z.

16

17               GUADALUPE RODRIGUEZ

18       sworn as a witness by the hearings examiner,

19               testified as follows:

20

21           MS. RODRIGUEZ:  My name is Guadalupe.  I'm

22   here to testify about the letters that arrived at our

23   homes.  In particular in my case, those letters that

24   arrived at my home, well, we didn't understand anything

25   of them because they were in English.  It's just my

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0056

```
 1    husband and I.  And, well, neither of us understand the
 2    English language.
 3              And also I want to testify that there have
 4    been documents that we've received by mail.  And
 5    unfortunately my mail is opened due to the fact that the
 6    owner never pays any attention to the parking lot.  Of
 7    course they've stolen cards from us and done several
 8    things with them.  And this is just a sign that the
 9    owner doesn't pay attention.
10              In fact in the parking lot, there's a hole
11    that never -- that has never been filled in.  And always
12    when it rains, one can't even get by.  In fact, the
13    children sometimes have to jump over some plants
14    sometimes to be able to go to school because the owner
15    hasn't paid any attention to this.
16              And even that being the case, we decided to
17    stay in the park because we all live there and we
18    believe that we're happy to live there.  And I simply
19    want us to be paid attention to a little bit and paid
20    attention to how we feel because they want to kick us
21    out of our homes.  Thanks.
22              THE HEARING EXAMINER:  Thank you
23    Ms. Rodriguez.
24              THE INTERPRETER:  This is Maria Del Refugio
25    Rodriguez.  The spelling is M-A-R-I-A, space, D-E-L,
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0057

1    space, R-E-F-U-G-I-O; last name Rodriguez,

2    R-O-D-R-I-G-U-E-Z.

3

4                   MARIA DEL REFUGIO RODRIGUEZ

5         sworn as a witness by the hearings examiner,

6                     testified as follows:

7

8         MS. RODRIGUEZ:  Good evening.  My name is

9    Maria Rodriguez.  I'm here to give my testimony about

10   Firs Mobile Homes.  One day, after coming back to to

11   pick up my daughter from school, I saw a car parked in

12   the middle of the street and a man with a camera and a

13   tripod and a young man with a group of papers in his

14   hand.

15        When they came -- when I arrived at home, I

16   found some papers stuck to the door of the home.  I left

17   them there thinking that it was advertising from some

18   business.  And I didn't think it was very important.

19   Some days went by, and we realized that these papers

20   were the relocation plan.

21        And I thought relocation?  Maybe that means

22   that we're here and they're going to move us to a

23   different space, somewhere else.  And once that got my

24   attention, I started to flip through it.  And read, was

25   able only to understand some parts.  And then after

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0058

1    looking at it more closely, I could only really look at

2    is because it wasn't really understandable.  Maybe only

3    30 percent of the total was.

4            And I think is that that plan is not

5    functional for us.  My family and I spoke about it.  And

6    we think that this is racism on Mr. Park's part and also

7    on behalf of the City of Seatac.  I think that's it.

8    That's because we're an almost completely Latino

9    population.  We feel they're not respecting our rights

10   if it is that we have them.  I don't know what to think.

11           I start thinking when my kids go to school and

12   my husband goes to work, what would you do if you were

13   to receive such a notice, that your houses are going to

14   be demolished?  And I start to think that we're people

15   of low income.  We have only my husband's salary.

16           I think what are we going to do?  Where are we

17   going to take our children to live because they are our

18   main concern.  Talking about them a bit, and they, at

19   the their young age, are very worried about where

20   they're going to go live.  Do you know that my daughter,

21   who's only six years old, and my step-daughter who's

22   seven asked for Christmas for them to not take our house

23   away?

24           And they are very, very worried.  In fact, my

25   daughter is saving up quarters that she finds to look


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0059

```
 1   for a place to live.  And she says all the time, Where
 2   are we going to go live?  She's also worried because the
 3   school that she's going to, they're -- she receives
 4   special education.  And she says, If I were to go to
 5   another school, they won't give me the education that I
 6   need.
 7            My 15-year-old son is also very worried
 8   because he's made a lot of plans with his teachers for
 9   the next two years.  He has plans to go to college after
10   high school.  And he says that, if we move, maybe he
11   won't be able to get that help from the school.  And he
12   says that he will miss a lot of opportunities if we
13   change schools.
14            Finally, sirs, I ask you in the name of all of
15   these people and in my name as well to take into
16   consideration our needs and help us with an effective
17   relocation plan, that it be functional for all of us.
18   And please, put yourselves, at least for a moment, in
19   our shoes.  Thank you.
20            THE HEARING EXAMINER:  Thank you.
21            THE INTERPRETER:  I have three more names on
22   the list.  This is Hugo Zamora.  The spelling H-U-G-O;
23   last name Zamora, Z-A-M-O-R-A.
24
25
```

 206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0060

```
 1
 2                          HUGO ZAMORA
 3          sworn as a witness by the hearings examiner,
 4                      testified as follows:
 5
 6          MR. ZAMORA:  Good evening.  My name is Hugo
 7   Zamora.  I, like all of the other residents of Firs,
 8   we're worried about everything that's happening.  In the
 9   first place, because, since the beginning, all of the
10   information we've been provided was in English.  Many of
11   us do not speak English.  And this was a complete, huge
12   confusion for all of us.  Okay?
13          In the first place, because some people talked
14   about $7,000 and talked about $12,000.  But in reality,
15   we didn't know where this money came from or what this
16   money was for.  Until later, we found out that the
17   $7,000 was for the demolition of the houses.  And the
18   $2,000 was an offer that the owner was making to us.
19          And at that moment, when I found out about all
20   of that, I felt like they were making fun of us.  Why?
21   Because I think that we have a home that costs more than
22   $2,000.  Not just that, all of us invested in remodeling
23   these houses somewhat.  And we didn't spend 5- or
24   $6,000.  Many times many of us spent more than 15- or
25   $20,000.  So receiving a notification that you would be
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0061

```
 1   given only $2,000 for your home is like a slap in the
 2   face.  It's like making fun.  It's completely
 3   ridiculous.
 4          Another thing, too is the relocation that they
 5   proposed us was not completely clear or is not clear.
 6   They simply told us that there were possibilities that
 7   we could be sent more outside the city or to another
 8   county.  And that was all.  We didn't have anything
 9   clear in Spanish.  And this whole process, the majority
10   has been in English.  So this caused complete confusion.
11   That's all I have to say.
12          THE HEARING EXAMINER:  Thank you Mr. Zamora.
13
14                    EARL GIPSON
15      sworn as a witness by the hearings examiner,
16                  testified as follows:
17
18          MR. GIPSON:  I have been here before.
19          THE HEARING EXAMINER:  I need you to state
20   your name for the record.
21          THE WITNESS:  Earl Gipson, City of Seatac.
22          Mr. Hearing Examiner, I've been before you in
23   different situations, going against the city.  One thing
24   I can say, the difficulties they've had with the city
25   have nothing to do, it had nothing to do with racism.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0062

1    It is inappropriate in this venue to even make those

2    charges.  (Inaudible) dealt with that way, it probably

3    would have been me.  (Inaudible) proceedings in any

4    regard.  So I do object that even be brought into the

5    discussion.  Thank you.

6              THE HEARING EXAMINER:  Thank you, Mr. Gipson.

7              THE INTERPRETER:  This is Stephanie Ruiz.

8              MS. RUIZ:  Good evening.

9              THE HEARING EXAMINER:  I need you to --

10             MS. RUIZ:  My name is Stephanie --

11

12                       STEPHANIE RUIZ

13        sworn as a witness by the hearings examiner,

14                    testified as follows:

15

16             MS. RUIZ:  I'm a resident of the mobile home

17    park, Firs, for 11 years now, with my two daughters.  I

18    received a notice of the May meeting taped to my door.

19    I do not recall who it was from.  But the letter was

20    notifying us of the park closure and that we would have

21    a meeting to ask questions regarding the closure of the

22    park.  I attended the meeting.  And at the meeting we

23    were told that the would contact us to have a one-on-one

24    with each family.  Until this day, that has not happened

25    for myself.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0063

1          We are approximately 70 families that will be

2    losing our homes.  And I believe the City of Seatac has

3    plenty of hotels.  And so does Fife, Incorporated.  And

4    I also do not recall ever giving my information, age,

5    income, my cost of living at the park to anyone at that

6    meeting.  I was under the belief that that meeting was

7    just to ask questions regarding the relocation plan.

8          I really only attended the meeting on

9    May 14th.  I did not assist the meeting on July 2016,

10   which it only came to my attention today that there was

11   such a meeting.  So I never met with any member of the

12   City of Seatac.  I work as an interpreter.  So when I

13   was at the May meeting, I can also understand why my

14   neighbors had such a hard time understanding the

15   interpreter, because her Spanish was not that good.

16         I live in the Firs Mobile Home for 11 years

17   with my two daughters who attend Madrona Elementary.

18   I'm a single mom.  And it would be very difficult for me

19   to find a home where I would have the neighbors that

20   would help me with childcare, as I have help from the

21   people who live around me and support me.  So that's all

22   I have to say.  Thank you very much.

23         THE HEARING EXAMINER:  Thank you.

24         THE INTERPRETER:  Mr. Hearing Examiner, those

25   all of the names that the interpreter has on the list


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0064

1    for people that had marked themselves down as wishing to

2    testify.  Would you like me to ask the gallery if

3    there's anyone else?

4              THE HEARING EXAMINER:  Why don't we take about

5    five minutes.  Then, if you could, just ask.  If anyone

6    wishes to testify, maybe they could talk with

7    Mr. Barraza.

8              THE INTERPRETER:  Excellent.  Thank you, Your

9    Honor.

10             (Recess taken.)

11             THE HEARING EXAMINER:  We will go ahead and

12   convene the hearing.  And both Mr. Phipps (sic), our

13   interpreter, and Mr. Barraza advised that they not have

14   been approached by anyone else that wants to speak.  So

15   I will just ask the city if the city has anything it

16   wishes to present.

17             MS. BARTOLO:  Yes, Mr. Hearing Examiner.  I

18   have some closing remarks if you're ready for those.

19             THE HEARING EXAMINER:  I was -- yeah.  I was

20   going to find out if you had any additional evidence or

21   testimony you want to present.

22             MS. BARTOLO:  With respect to that, I would

23   like to keep the hearing open so that we would have an

24   opportunity to respond to what is now marked as

25   Exhibit 8, which is the letter that was handed to you


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0065

1    this evening.

2                THE HEARING EXAMINER:  Do you have any

3    objection to that Mr. Barraza?  Or do you want to

4    respond to it yourself?

5                MR. BARRAZA:  I guess I would like

6    clarification on what we mean by keeping it open.

7                THE HEARING EXAMINER:  I think what

8    Ms. Bartolo was referring to is that she would submit

9    something to me in the writing, responding to the

10   letter.

11               MR. BARRAZA:  To the extent that you would

12   keep it open to allow some written submissions, I would

13   just like to clarify for the public that they, too,

14   could weigh in and maybe provide a date certain where

15   the comment period closes.  But I otherwise concur with

16   the idea of keeping it open to provide some supplemental

17   written responses by the interested parties.

18               MR. OLSEN:  May I speak to that as well?

19               THE HEARING EXAMINER:  Yes, Mr. Olsen.

20               MR. OLSEN:  Thank you.  I think before leaving

21   the record open, there should be an opportunity to

22   review why we would leave it open and whether, if we

23   leave it open, would it be to provide relevant evidence

24   that would help the hearing examiner make a decision as

25   to this appeal.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0066

1          And in that regard, there are two potential

2     areas that the hearing examiner would keep the record

3     open.  One has to do with the Exhibit A letter from the

4     tenants union.  It addresses impact to the tenants.

5     We've heard a lot of testimony about impact.  Impact is

6     not one of the elements of a relocation plan.  In that

7     regard, if we're keeping the record open to provide more

8     evidence of impact, I don't believe it would help the

9     hearing examiner determine whether the six elements of a

10    relocation plan were in this relocation plan.

11         The other area has to do with the new

12    testimony and evidence that was offered just today

13    having to do with whether this SEPA checklist had been

14    sent to the tenants.  That wasn't a basis of appeal in

15    the notice of appeal or the supporting materials that

16    identified the specific reasons for the appeal or the

17    brief that was offered on behalf of Mr. Medina as to the

18    issues on appeal.

19         Still, though, that issue itself also begs a

20    review regarding relevance because this appeal, under

21    the statute, is not an appeal of the decision of the

22    director.  And that decision in the statute is the

23    decision to approve or disapprove of the plan.

24    Specifically, the ordinance provides that "The

25    department shall review the relocation plan to ensure


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0067

```
1    compliance with requirements of subsection H.1."
2            There are two sections to the relocation
3    ordinance.  The first section is subsection H.1 that
4    deals with the required elements of the mobile home part
5    relocation plan.  That's what was appealed.  The second
6    section, subparagraph H.2 is titled "Required Process."
7    And there are a series of steps that it provides.  But
8    the appeal right has to do with the simple issue of are
9    the six elements of the relocation plan required by the
10   objected are ordinance in this relocation plan.
11           I don't think we need to leave the record open
12   unless it addresses one of those six elements.  The SEPA
13   checklist plan isn't one of six the elements of a
14   relocation report plan.  Impact, as indicated in
15   Exhibit 8, is not one of the six elements.  So before
16   the record is left open, I would request that the
17   court -- the hearing examiner consider the issue of
18   relevance and whether -- what benefits could come of
19   leaving the record open in that regard.
20           THE HEARING EXAMINER:  Do you have anything
21   you want to add to that, Ms. Bartolo?
22           MS. BARTOLO:  I'll think I'd like to hear what
23   you have to say on that, Mr. Hearing Examiner.
24           MR. BARRAZA:  I do something.
25           THE HEARING EXAMINER:  Okay.
```


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0068

1          MR. BARRAZA:   I would just like to point out

2    that the municipal code in section H.1, subsection 3

3    states that the purpose of the inventory -- I'm

4    paraphrasing.   The purpose of the inventory is to assess

5    the impact of the proposed closure.   And that is in

6    section 1.   The impact is also referenced in section 2,

7    paragraph F:   "The director of the department shall base

8    their decision on the relocation plan based on the

9    impacts of the proposed action."

10         To the extent that impact is not defined as

11   one of the six elements, it is threaded throughout this

12   entire code.   And it is one of bases of the appeal that

13   the impact was not properly assessed.   And if I'm not

14   mistaken -- I did prepare it.   I'm relatively certain

15   that the SEPA checklist was discussed as part of our

16   initial appeal.   So I do feel like it is relevant.

17   Thank you.

18         THE HEARING EXAMINER:   Yes.

19         MS. BARTOLO:   Thank you.   I would just like to

20   say there's been some testimony, there's been some, what

21   appears to be some argument on this issue.   And

22   Mr. Pilcher testified that he posted that notice.   I

23   would like to point out there's another statute on SEPA,

24   on the public notice process.   And that's 16A.23.090.

25   It says you must post the subject property and put it in


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0069

1     the newspaper.  Mr. Pilcher testified that he did in
2     fact did do that.
3            There was also some question, I think, that
4     came up about who has the responsibility to send to the
5     tenants the SEPA checklist.
6            THE INTERPRETER:  Slow down a little.
7            MS. BARTOLO:  I'm sorry.  You know, I'm sorry.
8     Take a breath.  Breathe.  Let me know when you're ready.
9            THE INTERPRETER:  I'm ready.  Go ahead.
10           MS. BARTOLO:  I was on a roll.
11           And in the code it says that "The mobile home
12    park owner shall complete a SEPA checklist for the
13    relocation plan.  A copy of the SEPA checklist shall be
14    sent to each tenant of the mobile home park."  So on
15    this point I'm arguing, if it is relevant, it is the
16    responsibility of the park owner to do that.
17    Mr. Pilcher has fulfilled his obligations by posting on
18    the property and in the newspaper under 16.A.23.090.
19    That's all.
20           THE HEARING EXAMINER:  Well, the SEPA issue, I
21    saw that section on the SEPA issue today when I was sort
22    of finalizing my preparation.  What I think I would like
23    to do in this case is to leave the record open.  I know
24    that there are a lot of people here who could have
25    testified but didn't.  Maybe their testimony would be


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0070

1    cumulative, maybe not.

2              But what I would like to do here is leave the

3    record open for one week for people that would like to

4    submit written comments about the appeal.  Those

5    comments should be sent to the city.  Then, what I would

6    do is ask the city to send those, at the end of one

7    week, to send those to Mr. Mr. Barraza and Mr. Olsen who

8    could then respond to the letters and then collect that

9    all in one package and send it to me.

10             I would appreciate -- and I'm not -- again, I

11   have not had a chance to research or think about the

12   SEPA thing.  So if you have any case law or any

13   citations or whatever on that issue, I would appreciate

14   it.

15             The other question that I do have for the

16   city, I know that it's the city's position and it's the

17   property owner's position that what we are concerned

18   here with is the appeal of the relocation plan.  And I

19   know that the city issued a certificate approving the

20   plan.  And then the city steps back and says the

21   procedures following that approval are beyond the scope

22   of the appeal.  In other words, they are not relevant to

23   the approval of the plan.

24             But at the same time the ordinance seems to

25   say that the city has to issue a final approval of the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0071

1    reclamation (sic) plan.  In other words, they find that

2    the plan has been finally accomplished.  And so I guess

3    my question is then does the city retain jurisdiction?

4    Or is the city concerned with things that happen after

5    the plan to the extent that the city has to issue a

6    final approval or final what you would called an

7    occupancy permit maybe, but a final determination that

8    the -- that everything was done correctly?  So I would

9    appreciate, say, your addressing those issues in your

10   response.

11         MS. BARTOLO:  Thank you.  We do have a

12   response to that.  We will submit that.  Can you go over

13   the time lines again for -- or do you want to put that

14   in --

15         THE HEARING EXAMINER:  No, no, no.  I'd rather

16   do it now.  One week for everyone that would like to

17   comment to submit their comments to the city.  That

18   would include Mr. Barraza and Mr. Olsen and Ms. Bartolo

19   on the Exhibit 8.  Then -- well, I guess you could

20   combine those.  I don't see why you need to have two

21   separate things.

22         After the week, then, the city would take all

23   of the comments it receives and send those to Mr. Olsen

24   and Mr. Barraza.  They would then have -- or they and

25   the city would then have an additional week to comment.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0072

1    And then they would send those comments to the city.

2    And then the city would put all of the comments into one

3    package and send them to me at one time.

4              So then it would be next Thursday is -- the

5    close of business next Thursday would be the cutoff line

6    for any comments from residents and others.  And then

7    the following Thursday night or Thursday at the close of

8    business, that would be the cutoff for comments from the

9    city and the appellant and the property owner.

10             And I know that you're ready to make comment,

11   closing comments.  But if you would rather we include

12   those closing comments in your written information,

13   would you prefer to do that?

14             MR. OLSEN:  Agreed.

15             MS. BARTOLO:  Is the electronic submittal

16   acceptable?

17             THE HEARING EXAMINER:  Yes.

18             MR. BARRAZA:  I would like to make the closing

19   comments here tonight.  I will probably also provide

20   something in writing.  But I would like to summarize the

21   points.

22             THE HEARING EXAMINER:  Are there any other

23   questions that you counsel have before we then turn it

24   over to Mr. Barraza?

25             MR. OLSEN:  No.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0073

1      THE HEARING EXAMINER:  Okay, Mr. Barraza.

2      MR. BARRAZA:  Thank you Mr. Hearing Examiner.

3  I'm here this evening on behalf of Mr. Crisanto Medina

4  and the residents of the Firs Mobile Home Park, acting

5  through their Homeowner Association, to request that you

6  overturn the City of Seatac's decision to approve the

7  relocation plan that was formulated and submitted by

8  Fife Motel, Inc.

9      The basic position seems to be, of some

10 parties, that why does it matter if we can't ultimately

11 stop the owner from redeveloping his land?  I would

12 submit to you that it matters because due process of law

13 requires more than perfunctory, pro forma prejudgments.

14 These families are the bedrock of our service economy

15 and aspire to be entrepreneurs and to earn their

16 American dream.

17      These families matter because they're part of

18 the fabric of our community.  These families matter

19 because, legally speaking, they are not just mere

20 tenants.  The Washington constitution provides expansive

21 property rights.  And Washington law has long recognized

22 the property rights inherit in possession.

23      The mobile home lots, which imply or require a

24 one-year lease, reflect the unique tenancy of residents

25 that live in mobile home parks.  These families are



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0074

1    entitled to a one-year relocation.  RCW 6.13.010

2    recognizes the homestead rights of the families living

3    in manufactured housing.  And Seatac's own municipal

4    code provides this requirement to formulate a relocation

5    plan.  And this law that the city passed recognizes the

6    unique rights of the these families.

7           This code requires a robust, good-faith

8    dialogue between the owner and the residents to develop

9    a useful and accurate plan.  If the owner has the right

10   to redevelop his property, so, too, do these families

11   deserve due process when their property rights are being

12   threatened.  The city did not dot its Is or cross its

13   Ts.  Its final approval letter didn't even reference the

14   correct code.

15          The testimony of the residents tonight

16   illuminates the fact that the city failed to comply with

17   its ow ordinance.  There's no evidence in the record

18   that the SEPA checklist was served or that it was served

19   in a timely fashion in the language that the families

20   could understand so that they could exercise their

21   rights to appeal this land use decision.

22          There's no verification in the record that the

23   May 8th letter was served on the residents.  There's no

24   evidence in the record that the city received the

25   required notice from the owner.  The city represented


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0075

```
 1    and testified that the city accepted the tenant letter

 2    date May 8th as the notice on the tenants -- as the

 3    notice to the city.

 4              There's no dispute that the city failed to

 5    schedule a meeting with the tenants.  To the extent that

 6    the July 11th meeting filled the city's requirement, the

 7    owner was arguably acting under color of law when Steve

 8    Pilcher was present.

 9              The testimony tonight confirms that the owner

10    failed to prepare a useful plan.  It is unfathomable to

11    me that all of the inventory data and one-on-one

12    meetings with nearly 70 families occurred within 14

13    days.  The inventory form was not in Spanish.  I believe

14    that the city acknowledged that in their report.

15    Similarly, the inventory lacked disclaimers.  And the

16    city, if I'm not mistaken, acknowledged that as well.

17              There was testimony this evening that the plan

18    contained some information in Spanish.  But all the

19    other evidence or the other information, including

20    resources for alternative housing was in English.  There

21    was testimony that what was written in Spanish was

22    either not translated well or not formatted in a legible

23    manner.  The quality of the owner's translator was

24    inadequate.  And that is evidenced by the city's

25    decision to retranslate of the relocation plan.
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0076

1    There was evidence that their preferences were

2    not captured.  And there was a sense that the owner

3    failed to engage in a good-faith dialogue.  What good is

4    a Spanish language plan if all of the written

5    communications issued in the course of developing that

6    plan were written in English?

7    The testimony of the families confirmed that

8    they remain confused, uninformed, and unprepared to

9    relocate.  These families, Your Honor, Mr. Hearing

10   Examiner, have earned the right to the dignity of due

11   process when they have contributed so much to our

12   community and when their property rights are being

13   threatened.

14   We don't think it's too much to ask that the

15   relocation plan approved by the city be rejected and

16   that the city require the owner to develop a plan in

17   good faith and in accordance with the principles of due

18   process.  Thank you.

19   THE HEARING EXAMINER:  Thank you, Mr. Barraza.

20   Ms. Bartolo, do you have anything that you

21   want to present at this time?

22   MS. BARTOLO:  Yes.  I'll just make some brief

23   comments and supplement the rest in writing.

24   The first point is Mr. Barraza indicated that

25   none of the resources were in Spanish.  And in fact,


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0077

1  Mr. Hearing Examiner, you will see in the plan that was

2  submitted as part of the appeal, there are resources in

3  Spanish.  That should be -- that would be in the

4  original appeal, the supplemental documents that were

5  presented, which is then also part of the staff report

6  as an exhibit.

7          Mr. Barraza indicates that the city failed to

8  schedule the meeting.  We'd just like to point out that

9  that may be true as a technicality.  However,

10 Mr. Pilcher testified that the meeting was already

11 scheduled and he attended.  As far as the correct code

12 or incorrect code, this has been addressed in the staff

13 report, throughout the documents presented, and the

14 testimony -- or rather the oral argument of Mr. Barraza.

15         There was a scribner's error.  He claims that

16 that error prejudiced the rights of the tenants.  We

17 submit it did not prejudice the rights of the tenants --

18 of the residents.  Excuse me.  They were able to

19 navigate through this appeal process.  And they cited

20 the correct code.

21         Finally, there's been a lot of testimony and

22 argument regarding what the requirement is with respect

23 to translating these documents from English to Spanish.

24 The code does not require a translation.  Yet after

25 attending the meeting, the city realized the importance


206 622 6375 | 800 631 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0078

1    of translating the plan in Spanish and proceeded to do

2    so.

3              In the brief submitted by Mr. Barraza in his

4    written materials, he relies on Title 6 of the Civil

5    Rights Act of 1964 to say that the city has this

6    obligation.  We disagree with this analysis.  He's

7    specifically talking about limited English proficiency

8    which has been addressed in the Title 6 legal manual of

9    the Civil Rights Division with the United States

10   Department of Justice.

11             And in this regard, a requirement exists if

12   there is receipt of federal funding.  There is no

13   federal funding that is part of this plan or relocation

14   plan.  I believe Mr. Barraza may argue that whether you

15   have federal funding in this project or not, if the city

16   ever receives federal funding, then it has that

17   obligation.  We do not believe that that is correct.

18   And the manual, as submitted by the United States

19   Department of Justice, does not seem to apply it that

20   way, either.

21             I think that concludes my comments.

22             THE HEARING EXAMINER:  Mr. Olsen, do you have

23   anything?

24             MR. OLSEN:  Thank you.  I will reserve our

25   closing remarks for our written materials.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0079

1          THE HEARING EXAMINER:  Thank you.

2          Mr. Barraza do you have anything further, or

3    you want to reserve your . . .

4          MR. BARRAZA:  I do not.

5          THE HEARING EXAMINER:  Well, I would just like

6    to, first of all, thank everyone for coming this evening

7    and for all the courtesies that you've extended to all

8    the speakers.  There's no noise, confusion, or anything.

9    And I was able to hear all of the speakers and our

10   translator very clearly and distinctly.  So I really

11   appreciate that.

12         And secondly, I would like to thank all three

13   attorneys for a very fine presentation this evening and

14   also the courtesies in your questioning of the witnesses

15   and that types of things.

16         I guess most of all, I would like to thank

17   Mr. Phipps (sic) for his hard work.  I've had cases

18   before where we've had interpreters.  But they have

19   never held a candle to what we've heard tonight.  So

20   thank you very much.

21         MS. BARTOLO:  I actually obviously owe him and

22   apology.  I'm so sorry for speaking as fast as I did.

23         THE HEARING EXAMINER:  Anyway, thank you very

24   much.  Drive safely getting home.  And we are now

25   adjourned.



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0080

1    (Hearing adjourns at 8:53 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0081

```
 1
 2                     REPORTER'S CERTIFICATE
 3
 4         I, JACQUELINE L. BELLOWS, the undersigned
 5   Certified Court Reporter pursuant to RCW 5.28.010 authorized
 6   to administer oaths and affirmations in and for the State of
 7   Washington, do hereby certify that the foregoing transcript
 8   was transcribed under my direction; that the transcript is
 9   true accurate to the best of my knowledge and ability to
10   hear the audio; that I am not a relative or employee of any
11   attorney or counsel employed by the parties
12   Hereto; nor am I financially interested in the event
13   of the cause.
14              WITNESS MY HAND AND DIGITAL SIGNATURE this
15   28th day of March, 2017.
16
17
18   Jacqueline L. Bellows
     Washington State Certified Court Reporter, No. 2297
19   jbellows@yomreporting.com
20
21
22
23
24
25
```



206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

FIRSMBL0082