# EXHIBIT 1

Firs Home Owners Association v. City of Seatac

United States District Court, Western District of Washington

Case No. 2:19-cv-01130-RSL

Expert Report of Cheryl L. Markham, JD

December 8, 2020

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

Table of Contents

I. Description of Assignment ............................................................................................. 3
II. Expert Qualifications ................................................................................................... 3
III. Information Considered .............................................................................................. 4
IV. Background ................................................................................................................. 4
V. Summary of Opinions ................................................................................................13
VI. The City of SeaTac did not affirmatively further fair housing in their jurisdiction
    throughout the Firs Mobile Home Park closure process as required by their
    contractual agreement to do so in the *King County Consortium Interlocal Cooperation
    Agreement Regarding Community Development Block Grant Program*........................14

VII. The City of SeaTac abrogated their responsibility to assess and provide adequate
    language services for the Firs Mobile Home Park closure process, as warranted, due to
    their membership in the King County CDBG Entitlement Jurisdiction Consortium and
    as a direct recipient of federal CDBG funds every year since at least 2010, and, in
    particular, 2015, 2016 and 2017...................................................................................16

VIII. Conclusion ..............................................................................................................17

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

### Firs Home Owners Association v. City of Seatac

#### I.     Description of Assignment

1.  Counsel for Firs Home Owners Association has engaged my services to provide expert
    information and analysis regarding the King County CDBG and HOME Consortium, the related
    King County Consortium Analysis of Impediments to Fair Housing Choice requirements and
    other related plans and initiatives relevant to the agreements, benefits, duties and
    responsibilities that adhered to the City of SeaTac as member of the King County CDBG/HOME
    Consortium.

#### II.    Expert Qualifications

2.  I am a 1997 graduate of the City University of New York School of Law.
3.  I practiced law as a public interest attorney from July 1997 to August 2000; primarily focused on
    housing and fair housing cases.
4.  In August 2000 I went into public policy work as the Federal and Fair Housing Planner for the
    King County Housing and Community Development Program[1] ("KCHCD"), a program of the King
    County Department of Community and Human Services. In 2002 I was promoted to Section
    Manager of Housing Planning and Development; and in 2007 I was promoted to Program
    Director of the KCHCD Program, a position I held for eight years.
5.  In 2015 I was promoted to Strategic Policy Advisor in the Director's Office of the King County
    Department of Community and Human Services.
6.  From 2008 to 2014, I was on the Board of Directors of the National Association for County
    Community and Economic Development (NACCED). From 2014 to 2017, I was the Chair of the
    NACCED Housing and Economic Development Committees, and in 2018 I was elected to the
    NACCED Executive Board.
7.  In 2019 I left King County employment and opened a private Consultancy business. I have not
    provided expert testimony in a legal case previously.
8.  Throughout most of the years I was employed at King County – 2000 to early 2017 - I maintained
    the lead role in Fair Housing analysis and planning. I maintained the primary role of leadership
    with respect to the King County CDBG & HOME Consortium from 2007 to 2015. I maintained the
    primary leadership role for housing and human services aspects of Growth Management
    planning from 2002 - 2018.
9.  I have not authored any publications, however, I was either a primary writer or significant
    contributor to numerous plans, reports and legislation related to the KCHCD Program and the
    Department of Community and Human Services. Some of the voluminous number of documents
    include [a partial list]: Consolidated Housing and Community Development Plan, Annual Action
    Plan, Consolidated Annual Performance and Evaluation Report (CAPER), Analysis of

---

[1] Prior to 2019 HCD was a Program in the Community Services Division, Department of Community and Human
Services ("DCHS"), and has since become a Division of DCHS, the Housing Homelessness and Community
Development Division.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

> Impediments to Fair Housing Choice ("Fair Housing AI"), Fair Housing Action Plan, Regional
> Affordable Housing Program Interlocal Agreement, King County Consortium Interlocal
> Agreement for Community Development Block Grant Program and HOME Investments
> Partnership, Regional Equitable Development Initiative "REDI" Fund Master Agreement, Housing
> and Human Services Section of King County Countywide Planning Policies and King County
> Comprehensive Plan.

10. During my years of service with NACCED I presented numerous workshops to the members,
    including workshops on HUD Fair Housing Analysis of Impediments and Actions Plans for CDBG
    and HOME entitlement jurisdictions.

### III.   Information Considered

11. Information and documents considered are listed in **Attachment A** to this report.

### IV.   Background

#### King County CDBG and HOME Consortium

12. For most of my career at King County I had responsibility for analyzing data and research
    studies, strategic planning, program evaluation and related reports, planning processes and
    documents, program and initiative development, interlocal agreements and legislation for
    obtaining and maintaining federal Department of Housing and Urban Development ("HUD")
    funds for affordable housing, homeless programs and community development in King County
    outside Seattle. This included day-to-day administration of the King County CDBG and HOME
    Consortium and completion/updating of the KC Consortium Analysis of Impediments to Fair
    Housing Choice ("Fair Housing AI") and Fair Housing Action Plan.

13. The City of SeaTac was a signatory to the Interlocal Cooperation Agreement Regarding
    Community Development Block Grant Program[2] for federal HUD funds since before I began
    working at King County in 2000 and remained a member of the Consortium throughout the time
    I worked for the County. I worked directly with the cities to negotiate and finalize the King
    County Consortium Interlocal Agreement for 2015 – 2017 ("KC Consortium ICA"), including the
    language regarding "Affirmatively Furthering Fair Housing" duties required of all Consortium
    City members. The KC Consortium ICA was signed by the City of SeaTac City Manager and City
    Attorney in July 2014.

14. The "Affirmatively Furthering Fair Housing" ("AFFH") provision of the KC Consortium ICA clearly
    delineates that the duty to affirmatively furthering fair housing within the jurisdiction of each
    political subdivision member of the CDBG Consortium is a broad duty *in addition* to the duty  "to
    ensure that no CDBG or HOME Program funds are expended for activities that do not
    affirmatively further fair housing". HUD regulatory and statutory provisions are clear that the

---

[2] This interlocal agreement contained a provision incorporating Consortium partnership regarding federal HOME
funds at VIII.G.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

AFFH duty is *in addition* to Fair Housing law compliance for projects and is a duty to further the *purposes* of the Fair Housing Act by taking actions through policies and plans to eliminate all forms of housing discrimination and to foster inclusive communities that are free from discrimination and from a historic lack of access to opportunity in housing.

15. As required by the Interlocal Agreement, SeaTac assigned a Human Services Manager to be the lead contact and representative of the City for all King County Consortium ("KC Consortium") meetings and activities[3]. Per the KC Consortium ICA, City representatives were responsible to convey KC Consortium business and information to others at the participating city.

16. City representatives were invited to attend all planning processes, meetings, workshops and trainings including regular meetings of the Joint Recommendations Committee ("JRC") for the KC Consortium and Sub-regional city meetings. City representatives were always consulted in advance of the presentation of proposals or plans that required a vote of the JRC, including the adoption of a new Consolidated Plan and adoption of the Fair Housing AI and Fair Housing Action Plan, as these documents are binding on all KC Consortium partners. The SeaTac Human Services Manager was active in JRC meetings, South Sub-region meetings and activities, and Consortium-wide meetings, activities and trainings on a wide variety of topics germane to CDBG, including Fair Housing workshops and trainings jointly sponsored by KCHCD, King County Office of Civil Rights (KCOCR) and partner fair housing agencies.

17. Per the Civil Rights Act, Title VI and HUD Guidance, all jurisdiction members of a CDBG Consortium Entitlement Jurisdiction that receive CDBG and HOME funds, both directly and indirectly, for the benefit of their residents and for city projects are responsible for assessing language service needs within their jurisdiction pursuant to HUD's *Four Factor Analysis*. HUD designates the entire jurisdiction as the "service area" for CDBG Consortium members regarding language service assessments. This means that the entire city has the duty to assess language service needs. This is the case because each city signs on to the CDBG Consortium entitlement jurisdiction by their executive, mayor, city manager or the equivalent and benefits from Consortium-wide CDBG funding in addition to funding for city projects. This designation is different, for example, than a city that is not part of a CDBG Consortium and applies for and receives CDBG funds for a city project through their Community Development Program. In this case, the language assessment requirement would only affect the Community Development Program of the city.

18. Per HUD Guidance[4], the "Four Factor Analysis Assessing Limited English Proficiency (LEP)", contains the following: (1) the number or proportion of LEP persons served or encountered in the eligible service area [the entire jurisdiction for federal CDBG participating jurisdictions]; (2) the frequency with which LEP persons with a particular language need come in contact with the program, service or activity; (3) the nature and importance of the program, activity, or service provided to the well-being of recipients or residents touched by the program, service or activity; and (4) the resources available to the grantee/recipient and costs. At a minimum, a participating city in a CDBG Consortium is required to do a language assessment per the four factors when

---

[3] City duties are contained in Sections VII and VIII of the KC Consortium ICA.

[4] HUD provides "guidance" as there is not a HUD regulation regarding Limited English Proficiency requirements.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

       persons with limited-English proficiency are attempting to access city services or processes for official public business. It is possible that based on a four-factor assessment, a recipient may not need to provide translation in certain circumstances. However, the city must document the assessment and, as with all HUD records, maintain the documentation for six years. A city may choose to conduct language assessments on a case-by-case basis or a city may create a Language Access Plan for ongoing programs that is periodically updated.

19. The City of SeaTac and all KC Consortium cities benefit from Consortium-wide CDBG programs for which they do not have to apply for funding for their residents. All residents of Consortium cities that meet program eligibility requirements may apply for these programs. The Consortium-wide benefit programs are agreed to in the KC Consortium Interlocal Agreement and include: 1) Housing Stability Homeless Prevention Program; 2) Major Housing Repair Program administered by KCHCD; 3) Emergency Solutions Grant Program for homeless shelters, housing and services. In addition to the Consortium-wide programs there are two competitive CDBG fund pools, one for the North/East Sub-region of King County and one for the South Sub-region, which are available for direct application from cities and non-profits.

20. In addition, all KC Consortium cities benefit from the expenditure of federal HOME funds to affordable housing projects in their jurisdictions.

21. During the time I worked for King County the City of SeaTac consistently applied for and received direct CDBG funds from the South Sub-region CDBG fund. SeaTac projects funded with CDBG include community centers, sidewalk projects, park projects and a Minor Home Repair ("MHR") Program in partnership with the cities of Tukwila and Des Moines[5]. Each city partner in the MHR administers the program within their city and Tukwila holds the contract and performs the overall administrative function with King County. The joint MHR Program has been funded every year since at least 2010 and is still funded currently. Any eligible residents in the jurisdiction of SeaTac may access the MHR program services administered by the City. SeaTac received CDBG funds from King County for the MHR and other city projects in 2015, 2016 and 2017 in addition to the benefits they received from Consortium-wide programs serving residents of SeaTac.

22. While HUD Guidance does not require creation of a Language Access Plan, when a CDBG Consortium jurisdiction is administering an ongoing annual program such as the Minor Home Repair Program, it might be necessary and required to have a Language Access Plan in place. The Consortium-wide Major Housing Repair Program had a Language Access Plan when I worked at the County.

23. During the period in which I worked for KCHCD, the HCD staff took Fair Housing responsibilities very seriously, partnering with KCOCR on all aspects of these responsibilities, including:
1) holding trainings and workshops for housing providers, grantees, consortium city representatives and others;
2) providing fair housing briefings and workshops for JRC members and city representatives;

---

[5] In prior years the local partnership that directly administered a minor home repair program with Consortium CDBG funds included Renton, which no longer participates, and currently includes Covington.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

> 3) providing fair housing information resources in English and other languages as determined by HUD's Four Factor Analysis for language services and sharing language analysis and planning information with grantees and partners; 4) Adopting comprehensive written fair housing information for contractors and grantees concerning fair housing compliance;
> 5) providing advice and consultation to cities concerning affirmatively furthering fair housing responsibilities – examples of advice and consultation with KCOCR to Consortium cities included the City of Bellevue regarding group homes for persons with disabilities and language issues; the ARCH Eastside Cities Planner regarding local resident preferences in housing; the City of Federal Way concerning the siting of an Oxford House project for persons who had recovered from alcohol addiction.

24. KCOCR was the lead for conducting King County's Four Factor Analysis for language services pursuant to HUD guidance. KCOCR published the languages that were required to be translated by King County when conveying information deemed an "important" program, service or activity to the well-being of recipients. Spanish language was consistently determined to be necessary to translate for such programs, services and activities, including citizen participation activities.

25. KCOCR provided Fair Housing materials in multiple languages, which KCHCD shared out to the KC Consortium cities.

26. KCHCD provided trainings and workshops with the KC Consortium cities on a wide range of topics and shared HUD tools and resources in print and available on the HUD website, including HUD Guidance for language services.

27. In 2011 the KC Consortium partners agreed and the JRC voted to extend the 2007 – 2011 Fair Housing AI and Action Plan through 2014 while we worked with partners to adopt a new AI/Action Plan incorporating the regional Fair Housing and Equity Assessment ("FHEA"), currently in process with Growing Transit Communities partners [see section below]. In 2014 the KC Consortium adopted a new Consolidated Housing and Community Development Plan and Fair Housing AI/Action Plan covering years 2015-2019 that incorporated the regional FHEA.

28. Key findings of the KC Consortium 2011 – 2014 extended Fair Housing AI and the 2015-2019 AI relevant to this case include the following:
> 1) Matched pair fair housing testing performed in high-capacity transit corridor areas found that persons/households from protected classes of race, national origin and disability were 60% more likely to be treated in an adverse manner by landlords;
> 2) Immigrants and other protected classes feared retaliation from landlords for asserting housing rights;
> 3) Lack of consistent translation of documents concerning tenant/fair housing rights are a barrier to households for whom English is not their first language;
> 3) Public officials, policy makers and residents should be more informed and knowledgeable about fair housing;
> 4) Households of Hispanic ethnicity are targeted more frequently to show proof of "legal status" when applying for housing than other foreign-born households and other households in general;
> 5) Access to affordable housing near high capacity transit is a fair housing issue.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

29. Key actions identified in the 2015-2019 KC Consortium Fair Housing Action Plan relevant to this case include:
1) Work with partners on legislative matters, incentive programs, and tools that *encourage responsible development* in areas of low access to opportunity; *ensure that there are plans to address displacement of low-income persons, if such may occur*;
2) Provide technical assistance to help agencies get their questions answered by the appropriate fair housing professional;
3) Work with partners, stakeholders and private landlords on initiatives and requirements that will actively promote fair housing choice and increase access to housing for protected classes, including potential expansion of the *Landlord Liaison Program;*
4) Work with regional funding partners and fair housing agency partners to provide fair housing education and training, including specific education for public and elected officials – assess need for funding regarding special educational campaigns.

30. In early 2016 I was asked to attend a SeaTac City Council meeting as the KC Consortium's Fair Housing expert to discuss CDBG and related fair housing requirements. There were some newly elected members of the City Council and I was informed that the Council was considering whether to turn back a CDBG award for the Riverton Heights Park project and required more information. Some members of the Council appeared to believe that the newly updated HUD Affirmatively Furthering Fair Housing Federal Rule ("AFFH Rule") would take away the zoning power of cities.

31. The following points summarize my presentation at the early 2016 SeaTac City Council meeting:
1) the new AFFH rule would not remove zoning powers from cities;
2) while the new AFFH rule was effective nationally, the Consortium's current Fair Housing Plan would remain in place through 2019 and the new format for fair housing analyses and planning would be phased in at different times for different entitlement jurisdictions – KC Consortium was not scheduled to do an analysis and plan in the new format until 2020;
3) the new AFFH Rule clarified the meaning of "affirmatively furthering fair housing" as going beyond prohibition of discrimination and directing HUD program participants to take significant actions through policies and plans to overcome historic patterns of segregation and to foster inclusive and integrated communities that are free from discrimination;
4) I reviewed a couple of examples of policy activities in which King County was engaged with SeaTac and Consortium cities to "affirmatively further fair housing" – a) King County's partnership efforts with Communities of Opportunity ("COO") to build capacity in community-based leaders from communities of color and low-income communities, improve social equity, and mitigate involuntary displacement of vulnerable communities in a hot real estate market [see COO section below]; and b) King County's partnership with Consortium cities in Growing Transit Communities [see section below], including the shared Compact Agreement, Fair Housing and Equity Assessment and development of the Regional Equitable Development Initiative funding source for the inclusion of affordable housing near high capacity transit.
5) KC staff would provide more education in the future to clarify the changes in the Fair Housing Analysis and Action Plan;

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

> 6) I provided an overview of the basic CDBG requirements and major elements of the
> Consortium's current Fair Housing AI/Action Plan duties, which are binding on all Consortium
> partners;
>
> 7) I provided information for follow-up with myself or other County staff if the City might need
> technical assistance or have questions regarding fair housing duties.

32. The SeaTac City Council voted to retain the Riverton Heights Park project CDBG grant.

33. I did not receive any follow-up questions or requests for technical assistance from the City of
SeaTac regarding fair housing duties.

### Washington State Growth Management Act

34. For most of my career at King County I had the same responsibilities as those for federal funds
with respect to state and local funds for affordable housing and homeless programs. I also had
responsibility for Growth Management Act ("GMA") requirements pertaining to housing and
human services as the lead planner for the Housing Section of the King County Countywide
Planning Policies ("CPPs") and for specific sections of the King County Comprehensive Plan
concerning housing, affordable housing and human services. The CPP's are the overarching
policies that must guide development and major updates of the GMA-required Comprehensive
Plans of every city in King County.

35. The City of SeaTac has been a member of Sound Cities Association[6] ("SCA") from the time I
began working at King County and is currently a member. Myself and my staff at KCHCD worked
collaboratively with SCA staff on multiple planning and policy issues including KC Consortium
issues and the CPPs. In 2010 and 2011 SeaTac and other city members of the SCA South Caucus
were engaged in the process of developing the King County CPP's through their SCA staff
representatives.

36. In 2010 and 2011, I worked with a King County team to collaborate with cities and their
representatives to conduct a major update of the CPPs, effective in 2012. This timeline was
crucial so that the CPPs were published in advance of the coming round of major updates to
each City's Comprehensive Plan and the County's Comprehensive Plan. At the time, two issues
were occurring that led us to focus more intently on including a Fair Housing policy in the CPP's
to encourage all King County jurisdictions to adopt a fair housing policy in their Comprehensive
Plan. The first issue was the filing of lawsuits in other parts of the nation alleging that
jurisdictions receiving federal CDBG and HOME funds had failed to affirmatively further fair
housing through appropriate policies and activities, in contravention of their duties and
responsibilities. The second issue was that HUD, under the Obama Administration, was working
with Sustainable Communities Regional Planning Grant recipients [see section below] to pilot
potential new Fair Housing Planning rules and regulations that would improve the performance
of jurisdictions to affirmatively further fair housing. It was deemed important to cross-reference
and reinforce *equity-driven anti-discrimination policies* across multiple planning processes.

---

[6] Sound Cities Association was formerly "Suburban Cities Association"

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

37. The King County team worked with city representatives to negotiate a new fair housing policy in the CPP Housing Policies Section as follows: *H-13: Promote fair housing and plan for communities that include residents with a range of abilities, ages, races, incomes and other diverse characteristics of the population of the county.*

38. As the City of SeaTac was developing their 2015 Major Comprehensive Plan Update in 2014 our staff had a consultation discussion with the SeaTac Human Services Manager and Economic Development Manager to encourage fair housing, racial and social inclusion and equity-driven policies in the major update of SeaTac Consolidated Plan for 2015 pursuant to overlapping planning processes in which we were jointly engaged - CPPs, KC Consortium Fair Housing Plan & Growing Transit Communities FHEA partnership, and Communities of Opportunity.

39. King County incorporated a Fair Housing Access section into the 2016 King County Comprehensive Plan Major Update in Chapter 4, Section 3, Policies H-118, H-119 and H-120. While civil rights violations are only enforceable in King County's unincorporated areas, King County administers and contracts for some regional projects and services and linked the policies to those aspects of regional leadership.

40. The City of SeaTac did not adopt a policy consistent with H-13 into their 2015 Comprehensive Plan.

41. While SeaTac did not adopt a fair housing policy, they did adopt some goals, policies and strategies that are consistent with the Housing Section CPPs, the KC Consortium Fair Housing Action Plan and the social equity framework of COO. Such polices include:

Policy 1.1A: Promote Meaningful Community Engagement – Strategies include a) implementation of effective public awareness processes, b) providing forums and materials in multiple languages, c) building relationships with community leaders;

Policy 1.1C: Serve as a Model Equitable, Healthy and Environmentally Sound Employer and Agency – Strategies include a) seeking people representative of SeaTac's demographics to sit on commissions, committees and as staff members b) don't discriminate based on race, color, sex, sexual orientation, gender identity, ethnicity, religion, national origin, pregnancy, genetic information, marital status, disability or status as a U.S. veteran;

Housing Goals 3.5, 3.6 and 3.9: Policies include a) strengthen SeaTac's *existing* neighborhoods, b) increase opportunities for all economic segments of the community, *especially* in SeaTac's transit communities, c) offer incentive programs for developers to preserve, replace or build additional affordable units, d) in transit communities, ensure no net loss of affordable housing units, and e) minimize the impacts of mobile home relocation on low- and moderate-income residents.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

### Communities of Opportunity Initiative

42. Beginning in 2014, I was in the leadership of a King County initiative with the Seattle Foundation to create a new program and levy funding source to improve social equity, health outcomes and well-being for vulnerable families and children in lower income communities. The Communities of Opportunity (COO) initiative was launched in early 2014 and integrated into the Best Starts for Kids Levy funding, which was approved by King County voters in November 2015.

43. COO was designed to maximize positive impact by using cross-sector partnerships to co-design strategies with community-based leaders and by catalyzing public and private resources to underinvested neighborhoods.

44. In February 2015 COO conducted a competitive process to choose three place-based communities experiencing the most inequitable health and well-being outcomes. These three communities would receive targeted funding and technical assistance through a lead non-profit agency over a multi-year period of at least three years.

45. Seatac and Tukwila partnered with the non-profit Global to Local, located in SeaTac, for a COO application. The SeaTac/Tukwila/Global to Local project was one of three initial partnership projects chosen as COO place-based sites in early 2015[7]. The two other sites were Rainier Valley in Seattle and White Center in unincorporated King County. The budget for the three place-based sites in the Best Starts for Kids Implementation Plan was $1,450,000 for 2017 and $1,500,000 for 2018[8].

46. Seatac's Human Services Manager was a member of the committee for the COO Seatac/Tukwila place-based site and was actively involved in the project.

47. The Communities of Opportunity Plan, Section VII of the Best Starts for Kids Implementation Plan, states the following:

"Lack of opportunities, instability and displacement of children, youth and families reduce their chances of having healthy and prosperous lives. The environment where children, youth or young adults are reared is a strong contributor to their ability to thrive and reach their full potential. Economic inequality, which is increasing in the country and our region, may lead to worse health outcomes as well.

Low-income people and people of color have borne a disproportionate share of the burden of under-invested neighborhoods in the last 20 years. As the diversity of our region's population grows, full inclusion is necessary to achieve shared prosperity. Meaningful inclusion must address the needs and harness the assets, talent and potential of rapidly growing diverse populations/communities so that they are full partners in building our region's future.

Investing in strategies that address inequities in communities and systems is preventive work and will start us on a path that leads to an increase in opportunities and ability to thrive, and a

---

[7] Additional place-based sites have subsequently been chosen for funding since 2015.
[8] COO funding to the three original place-based sites continued in 2019 and 2020.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

>    reduction in costly crisis services. When opportunities are available for all people to reach their
>    full potential, the entire population of King County will benefit."

48. Once the three place-based sites were chosen King County staff began a co-design phase with
    the sites and their partners to collectively create a COO Framework for Action – Indicator
    Measures and Strategy Areas[9]. The SeaTac Human Services Manager was actively engaged in
    this planning process. Strategy Areas adopted by the COO partners that are most relevant to this
    case include:
    a) Preserve community-based cultural anchors;
    b) Support development of strong community leaders who are civically engaged;
    c) Support policies, strategies, system-level solutions and projects that improve the housing
       stability of households in the community; preserve existing affordable and moderately
       priced housing; mitigate displacement;
    d) Support development of new mixed-income, affordable and mixed-use housing projects
       that are designed to include community benefits and include community input in design
       concepts;
    e) Support organizing structures for community leadership and cohesion regarding housing,
       including tenant councils, neighborhood planning processes, community benefit
       agreements, etc.

### HUD Sustainable Communities Regional Planning Grant/Growing Transit Communities Partnership

49. In 2010 the Puget Sound Regional Council ("PSRC") applied for and was awarded a $5 million
    multi-year grant from HUD called the *Sustainable Communities Regional Planning Grant
    Program* ("Sustainable Communities") on behalf of a broad group of Puget Sound region
    partners. This was a new HUD program under the Obama administration. I was a member of the
    partnership committee that developed the application.
50. Locally, the grant-funded initiative was called *Growing Transit Communities* ("GTC"). GTC
    partners included counties and cities, universities and other institutions, and large non-profits
    engaged in sustainability work across transportation, housing and health sectors. An Equity
    Committee was funded and given staff support so that small community-based organizations
    would have a voice in the partnership on behalf of vulnerable communities.
51. HUD required that Sustainable Communities Grant partners produce and utilize a regional Fair
    Housing and Equity Assessment ("FHEA") in grant-funded regional planning activities and
    beyond. In part, the FHEA requirement was to pilot new fair housing assessment rules, policies
    and data sets that were under consideration for a future update of HUD's requirements for all
    grantees receiving federal HUD funds. I was a member of the Fair Housing Committee of GTC
    that worked across jurisdictions and partners to produce the FHEA.

---

[9] The COO Framework was shared with the partners before publication in the Best Starts for Kida Levy
Implementation Plan in 2016.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

52. Cities that were scheduled to have one or more Sound Transit voter-approved light rail stations
constructed in their jurisdiction were especially active in GTC. The City of SeaTac was one of
those cities and signed on to the GTC Compact Agreement by July 2015 after the FHEA was
adopted to guide GTC activities.  SeaTac received GTC funding from PSRC to help them complete
an *Angle Lake District Station Area Plan*. The Firs Mobile Home Park property was located
directly adjacent to the station plan area.

53. The GTC FHEA was incorporated into the KC CDBG Consortium 2015-2019 Fair Housing AI/Action
plan.

54. Page 2 of SeaTac's *Angle Lake District Station Area Plan* contains the following language:

Growing Transit Communities

As a signatory to the Puget Sound Regional Council's "Growing Transit Communities Compact,"
the City has committed to promoting *equitable* transit communities in light rail station areas,
and striving to achieve the following goals:

Attract more of the region's residential and employment growth to high capacity transit
communities;

Provide housing choices affordable to a *full range of incomes* near high-capacity transit;

Increase access to opportunity for *existing* and future residents of transit communities.

55. The GTC Compact defines *equitable* transit communities as:

"mixed-use, transit-served neighborhoods that provide housing and transportation choices, and
greater social and economic opportunity for *current* and future residents...Successful equitable
transit communities are created through *inclusive planning and decision-making processes,*
resulting in development outcomes that accommodate future residential and employment
growth, *increase opportunity and mobility for existing communities*, and enhance public health
for socially and economically diverse populations."

## V.     Summary of Opinions

56. Based on my review of all the documents in the case to date and my expertise from nearly 19
years of service at King County managing HUD programs, the King County CDBG/HOME
Consortium and other related programs I offer the following opinions:

   A.  **The City of SeaTac did not affirmatively further fair housing in their jurisdiction
       throughout the Firs Mobile Home Park closure process as required by their contractual
       agreement to do so in the *King County Consortium Interlocal Cooperation Agreement
       Regarding Community Development Block Grant Program*.**

   B.  **The City of SeaTac abrogated their responsibility to assess and provide adequate language
       services for the Firs Mobile Home Park closure process, as warranted, due to their
       membership in the King County CDBG Entitlement Jurisdiction Consortium and as a direct
       recipient of federal CDBG funds every year since at least 2010, and, in particular, the years
       2015, 2016 and 2017.**

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

57. I describe my analysis and conclusions in the remainder of this report.

**VI.    The City of SeaTac did not affirmatively further fair housing in their jurisdiction throughout the Firs Mobile Home Park closure process as required by their contractual agreement to do so in the _King County Consortium Interlocal Cooperation Agreement Regarding Community Development Block Grant Program._**

58. As provided in the Background Section of this report, the duty to "affirmatively furthering fair housing" ("AFFH") has long been a requirement of political jurisdictions that enter into a federal CDBG/HOME Interlocal Cooperation Agreement and receive benefits from the expenditure of such federal funds in their jurisdiction. The City of SeaTac signed such an agreement with King County for the period of 2015, 2016 and 2017 in July 2014. SeaTac benefits from Consortium-wide CDBG funded programs for their residents on an annual basis and regularly received (and still receives) CDBG funds for city projects including an annual award for a Minor Home Repair Program administered by the City with partners. SeaTac also benefits from the expenditure of federal HOME funds to affordable housing projects in their jurisdiction, including home buyer assistance [see Background Section numbers 13, 15, 19, 20 and 21].

59. HUD has clearly articulated through federal rules and regulations that the AFFH duty is not simply about compliance with Fair Housing laws for specific projects funded, although such compliance is also required. The AFFH duty is about analysis of discrimination and fair housing barriers in the geographic territory of the Consortium, creation of a plan that will reduce discrimination and fair housing barriers and taking actions to realize progress in reducing discrimination and fair housing barriers through enactment of policies, strategies and activities [see Background Section numbers 14 and 31].

60. The City of SeaTac, through their Human Services Manager, was actively engaged with KC Consortium business and participated in the development of the Consortium's Fair Housing AIs and Action Plans. These documents are binding on the City as a participant in the KC CDBG Consortium jurisdiction. The KC Consortium Fair Housing documents contained analysis and policies that could have helped the City to take affirmative actions to foster inclusivity, eliminate discrimination and mitigate harm to a vulnerable group of residents of Hispanic ethnicity at the beginning of the City's process concerning the closure of the Firs Mobile Home Park [see Background Section numbers 15, 16, 27, 28, 29].

61. The City of SeaTac had many resources and policies available to them to take affirmative actions to foster inclusivity, eliminate discrimination and mitigate harm to the mobile home park residents that they did not avail themselves of during the City process for closure of a park. Such resources and policies include:

    a)  Professional staff at King County with Fair Housing expertise. As outlined in the background section, I routinely partnered with KCOCR to provide advice and consultation with KC Consortium cities regarding potential issues of discrimination and abrogation of AFFH duties. I was never approached by SeaTac to consult with the City concerning the Firs

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

> Mobile Home Park, even though I made a presentation to the SeaTac City Council in early
> 2016 regarding AFFH duties and CDBG [see Background Section numbers 16, 23, 25, 26, 27,
> 31];

b) SeaTac was a member of the Global to Local partnership in SeaTac, which was receiving
   County and Seattle Foundation Communities of Opportunity ("COO") funding for the very
   purpose of working with community-based leaders, especially in communities of color, to
   improve opportunities for their communities, increase their civic engagement and mitigate
   harmful displacement that was occurring in a hot real estate market. SeaTac had a well-
   funded COO partner in their community that could have been consulted and brought in to
   work as a liaison at the beginning of the City process for closure of a park. Such an action
   would have been consistent with and evidence of the City's commitment to AFFH duties
   [see Background Section numbers 42 - 48];

c) SeaTac was a signatory to the Growing Transit Communities ("GTC") Compact. GTC
   developed a Fair Housing and Equity Assessment to guide the work of compact partners in
   fostering *equitable* transit communities in high-capacity transit corridors of the Puget Sound
   region. SeaTac's *Angle Lake District Station Area Plan* contains bold policy statements of
   their membership in GTC and their commitment to promote *equitable* transit communities
   and increase access to opportunity for *existing* and future residents near high-capacity
   transit in the City. SeaTac did not appear to take any affirmative action pursuant to these
   GTC Compact policies during the process of the park closure. Affirmative actions pursuant
   to the GTC policies and the GTC FHEA would have been consistent with and evidence of the
   City's commitment to AFFH duties [see Background Section numbers 49 - 55];

d) SeaTac did not take the opportunity to create a Comprehensive Plan policy consistent with
   CPP H-13 to *promote* fair housing and plan for diverse, inclusive communities in their 2015
   Major Comprehensive Plan Update. SeaTac did adopt other policies in the 2015
   Comprehensive Plan that are consistent with their AFFH duties [Policies 1.1A & 1.1C;
   Housing Goals 3.5, 3.6 and 3.9 & related policies – see Background Section #41], however,
   the City does not appear to have followed any of those policies during the City process for
   park closure [see Background Section numbers 35 - 41];

e) During the time I worked at the County it was not unusual for a Consortium City to hold a
   series of special study sessions when dealing with a sensitive issue of potential harm to
   many residents of the city. On a few occasions I was invited by other cities to such a special
   study session, along with community leaders, community organizations and other
   professionals with specific areas of expertise, to help the city consider all concerns,
   implications and potential courses of action. I know of many professional staff and
   community leaders working on related policy matters, including myself, who would have
   been eager to assist SeaTac in working through strategies to mitigate harm to the Firs
   residents. If SeaTac had taken such action from the beginning of the park closure process it
   would have been consistent with and evidence of commitment to the City's AFFH duties and
   the City's own adopted policies.

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

VII.    **The City of SeaTac abrogated their responsibility to assess and provide adequate language services for the Firs Mobile Home Park closure process, as warranted, due to their membership in the King County CDBG Entitlement Jurisdiction Consortium and as a direct recipient of federal CDBG funds every year since at least 2010, and, in particular, 2015, 2016 and 2017.**

62. As provided in the Background Section, jurisdictions that participate in a CDBG/HOME Consortium and use CDBG for projects in their jurisdiction are responsible, at a minimum, to provide an assessment of the need for language services within their jurisdiction using HUD's Four Factor Analysis. A jurisdiction may choose to complete analyses on a case-by- case basis or a jurisdiction may create a Language Access Plan and update it on an as-needed basis. SeaTac does not appear to have completed such as analysis for a matter that was of critical importance to the well-being of the Spanish-speaking residents of Firs Mobile Home Park [see Background Section numbers  17 and 18].

63. In the Supplemental Briefing by the City of SeaTac, In Re: Appeal of Revised Relocation Report and Plan for the Firs Mobile Home Park, the SeaTac City Manager and City Attorney argue that "The City is not subject to the Limited English Proficiency (LEP) requirement under Title VI because the City is not receiving and direct or indirect Federal Financial assistance. Specifically, the Community and Economic Development Department of the City is not receiving any Federal assistance at the time the Department was processing the relocation plan." The City acknowledges in the briefing that they would have been subject to the LEP requirement *if* the City had received direct or indirect federal funding during this period; with the additional argument that the Community and Economic Development Department would have to receive the federal assistance.

64. The City's Supplemental Briefing does not square with the facts. In 2014 SeaTac had signed a three-year contract for 2015, 2016 & 2017 to be a participating jurisdiction in the King County CDBG Entitlement Jurisdiction Consortium. The City received regular and ongoing indirect and direct federal CDBG and HOME federal funding throughout this three-year period. Although the City's claim that the Community and Economic Development Department must receive the federal assistance is not relevant to SeaTac as a CDBG Consortium participating jurisdiction, the City received direct grants of CDBG in 2014 and 2015 for the SeaTac Valley Ridge Community Center, and in 2016 and 2017 for the Riverton Heights Park Project. Both of these projects were Community Development projects [see Background Section numbers 19, 20 and 21].

65. Furthermore, SeaTac received an annual grant of CDBG funds for a Minor Home Repair Program that was eligible to residents throughout the jurisdiction of SeaTac. Given their direct administration of this program SeaTac most likely would be required to have a standing Language Access Plan in place to serve limited-English speaking residents participating in this program [see Background Section numbers 21, 22 and 24].

66. King County, through KCOCR, determined that Spanish was a priority language to be translated for services and activities that were of high importance to the well-being of County residents. All KCOCR Fair Housing documents were translated into Spanish and other languages determined

16

Firs Home Owners Association v. City of SeaTac
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

through the HUD Analysis. This information was shared with CDBG Consortium Cities and, as always, cities were encouraged to request technical assistance for specific matters that implicated CDBG requirements and duties. SeaTac did not request technical assistance regarding language services from King County concerning the City's process for closure of the Firs Mobile Home Park [see Background Section numbers 24, 25 and 26].

## VIII.    Conclusion

67. I conclude that the City of SeaTac did not affirmatively further fair housing in their jurisdiction during the Firs Mobile Home Park closure process as required by their contractual agreement to do so in the *King County Consortium Interlocal Cooperation Agreement Regarding Community Development Block Grant Program* when they failed to take any affirmative actions to mitigate the harm to a vulnerable protected class of families and households that were residents of their city and were losing the homes they owned.

68. The City of SeaTac had many policies, resources and partnerships available to them to ensure compliance with their responsibilities and duties as a partner in federal funding programs for housing and community development, as thoroughly described in this report. The City Council appears to not have availed themselves of any of these resources and policies to mitigate serious harms to their own residents throughout the park closure process. They appear to have not even availed themselves of the expertise of some of their own staff, such as their Human Services Manager who was knowledgeable about CDBG requirements, was aware of the ongoing CDBG funding and benefits the city was receiving through the Consortium and was active in the Communities of Opportunity partnership in the City.

69. I also conclude that the City of SeaTac abrogated their responsibility to assess and provide adequate LEP language services during the Firs Mobile Home Park closure process, as warranted, due to their membership in the King County CDBG Entitlement Jurisdiction Consortium and as a direct recipient of federal CDBG funds every year since at least 2010 and, in particular, 2015, 2016 and 2017.

70. At a minimum, SeaTac had a duty to assess the need for language services to the Firs residents during all aspects of the park closure process. Given the facts of the case under the HUD Four Factor Analysis it is my opinion that language access assistance was required during the park closure process.

My hourly rate as an expert witness in the matter of Firs Home Owners Association v. City of SeaTac is $200.00 per hour. For required travel my rate is $200.00 per hour plus mileage at the rate of 0.58 cents per mile. My compensation is not contingent on the outcome of this matter.

I certify that this is a true and accurate copy of my report.

Cheryl Markham, JD

Firs Home Owners Association v. City of SeaTac                    **Attachment A**
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

Cheryl L. Markham, JD
Expert Witness for Plaintiff


Information Considered

Pleadings and Related Filings:

1. First Amended Complaint, Firs Home Owners Association v. City of SeaTac, U.S. District Court [October 21, 2019]
2. Order Granting In Part Defendants Motion to Dismiss, Firs Home Owners Association v. City of SeaTac, U.S. District Court [March 23, 2020]
3. Supplemental Briefing by the City of SeaTac, In Re: Appeal of Revised Relocation Report and Plan for the Firs Mobile Home Park, City of SeaTac Hearing Examiner [February 2, 2017]
4. Findings of Fact, Conclusions of Law, and Order to Remand for Modification, Cristano Medina v, City of SeaTac, King County Superior Court [September 19, 2018]

Documents:

1. **2007 – 2014 KC Cons FHAI and Action Plan** [Fair Housing Analysis of Impediments & Action Plan]
2. **2015 – 2019 KC Cons FHAI and Action Plan** [Fair Housing Analysis of Impediments & Action Plan]
3. **CDBG Consortium ICA SeaTac**
4. **King County 2016 Consolidated Annual Performance and Evaluation Report (CAPER) – for 2015 Program Year** [SeaTac Valley Ridge Community Center CDBG Funding, p. 5; Tukwila Minor Home Repair Program CDBG  funding in partnership with SeaTac, Des Moines and Covington p.107;
5. **King County 2017 Consolidated Annual Performance and Evaluation Report (CAPER) – for 2016 Program Year** [Riverton Heights Park Project CDBG funding, p. 104; Tukwila Minor Home Repair Program CDBG funding in partnership with SeaTac, Des Moines and Covington p.107]
6. **King County 2018 Consolidated Annual Performance and Evaluation Report (CAPER) – for 2017 Program Year** [Tukwila Minor Home Repair Program CDBG funding in partnership with SeaTac, Des Moines and Covington p.38]
7. **Federal Register AFFH 2015**
8. **Final Guidance LEP.1.22.2007**
9. **HUD LEP Q&A 2007** [Issued after Final Guidance – a very digestible Q & A that was shared with Consortium partners]
10. **BSK Levy Plan Final** [Communities of Opportunity (COO) Section p. 84; COO Results Based Accountability Framework p.146]
11. **COO 2 Page Fact Sheet 2016**
12. **List of HUD Sustainable Communities Grantees Round 1**

Firs Home Owners Association v. City of SeaTac                    **Attachment A**
United States District Court, Western District of Washington
Case No. 2:19-cv-01130-RSL

13. **Final Growing Transit Communities (GTC) Compact**
14. **King County 2016 Comprehensive Plan** [Fair Housing Policies, Chapter 4, Page 4-8]
15. **King County 2012 Countywide Planning Policies** [Housing Section, Fair Housing Policy, Page 35]
16. **SeaTac Comprehensive Plan, Framework Goals and Policies, Volume 1**
17. **SeaTac Comprehensive Plan, Housing & Human Services, Chapter 3**
18. **SeaTac Angle Lake District Station Area Plan**

EXHIBIT 2



816 Second Ave, Suite 200, Seattle, WA 98104
p. (206) 343-0681
**futurewise.org**

*Firs Home Owners Association v. City of Seatac*
U.S. District Court Western District of Washington Case No. 2:19-cv-01130-RSL

Expert Report of Tim Trohimovich, AICP
Dated: December 9, 2020

## Contents

Description of the Assignment ........................................................................................................ 2

Expert Qualifications and Publications Published in the Last Ten Years .......................... 2

Information Considered .................................................................................................................. 3

A Complete Statement of All Opinions the Witness Will Express and the Basis and Reasons for Them ........................................................................................................................................... 3

Statement of Compensation ........................................................................................................ 10

A List of All Other Cases, in which, During the Prior Four Years, the Witness Testified as an Expert at Trial or by Deposition .................................................................................................. 10

Attachment A: Information Considered .................................................................................... 12

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 2 of 13

## Description of the Assignment

1.   Tim Trohimovich, the Director of Planning and Law for Futurewise, was engaged to identify actions that the City of SeaTac could have undertaken to conserve the Firs Mobile Home Park. Tim Trohimovich undertook this assignment with the approval of Futurewise.

## Expert Qualifications and Publications Published in the Last Ten Years

2.   My qualifications are listed on my Curriculum Vitae enclosed with this report in general terms. My current Curriculum Vitae is Attachment B to this report.

3.   During my planning career I have worked on housing issues in many parts of Washington State. This work has included writing policies, plans, and regulations to preserve and develop housing and affordable housing, writing funded grants to preserve and rehabilitate housing, and, on an interim basis, managing a nonprofit housing rehabilitation organization.

4.   During my employment with the City of Redmond, Washington I worked with mobile home park residents, other city staff, and the nonprofit Manufactured Housing Community Preservationists (MHCP) to acquire and preserve the Avon Villa Mobile Home Park in Redmond, Washington. This 96-household mobile home park continues to be owned and managed by MHCP as a mobile home park despite significant development pressure in the city.[1]

5.   As part of my work with Futurewise, I also participated in calls with a state elected official, state and county agencies, and nonprofits on opportunities to preserve the Firs Mobile Home Park in SeaTac. Futurewise was not paid for this work. Futurewise paid Tim Trohimovich for his time doing this work.

6.   One of the planning law topics I reach in the University of Washington Department of Urban Design & Planning is federal and state laws related to housing planning and development. This spring will be the third year I have taught that class as a paid instructor.

7.   Publications in the last ten years, other than reports prepared for Futurewise, include:

7.1     Lettman, Daniels, and Trohimovich, "Protecting Working Farm and Forest Landscapes: How Do Oregon and Washington Compare?" in Sterrett, Ozawa, Ryan, Seltzer, and Whittingon eds., *Planning the Pacific Northwest* (American Planning Association, Planners Press: 2015).

7.2     Trohimovich, *Urban Growth Area (UGA) Sizing and Locations* in Law Seminars International, <u>Growth Management Act</u> (Nov. 19 & 20, 2015).

---

[1] MHCP website last accessed on Dec. 4, 2020 at: <u>http://www.mhcp-wa.org/</u>.

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 3 of 13

7.3    Trohimovich, *New Developments at the Intersection of Water Rights and Land Use* in Law Seminars International, <u>Water Law In Washington</u> (July 27 – 28, 2015).

7.4    Trohimovich, *Environmental Perspective on Permitting Large, Controversial Projects in Washington State* in The Seminar Group, <u>Permitting Strategies</u> (March 2 & 3, 2017).

## Information Considered

8.   The information and documents that I considered in this analysis are listed in Attachment B to this report.

## A Complete Statement of All Opinions the Witness Will Express and the Basis and Reasons for Them

9.   The City of SeaTac is a "code city" operating under the authority of the Title 35A RCW, the Optional Municipal Code.[2]

10. Cities, including code cities, "may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws."[3]

11. Cities, including code cities, can acquire land for affordable housing.[4]

12. Cities, including code cities, may also fund affordable housing for low and moderate-income families and individuals.[5] RCW 84.52.105 allows the voters of a city to authorize and the city to impose additional regular property tax levies of up to fifty cents per thousand dollars of assessed value of the property in the city for up to ten consecutive years to finance affordable housing for very low-income households.

13. "On October 17, 2016, Steve Pilcher, Planning Manager for the City of SeaTac, approved the Relocation Plan and issued a Certificate of Approval" for the Firs Mobile Home Park.[6]

14. The Growth Management Act's (GMA) housing goal, in RCW 36.70A.020(4) calls on SeaTac to "[e]ncourage the availability of affordable housing to all economic segments of the population of this state, promote a variety of residential densities and housing types, and encourage preservation of existing housing stock." The GMA, in RCW 36.70A.070(2), requires the City of SeaTac's comprehensive plan to include a housing element that "includes a statement of goals, policies, objectives, and mandatory provisions for the preservation, improvement, and development

---

[2] SeaTac Municipal Code (SMC) 15.105.030 definition of City Hall; SMC 1.01.040.
[3] Wash. Const. Art. 11, § 11; RCW 35A.11.020.
[4] RCW 35A.11.020; RCW 35.82.010; Wash. Const. Art. 8, § 7.
[5] Wash. Const. Art. 8, § 7; RCW 35.82.010; RCW 35A.11.020.
[6] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 10 (Oct. 21, 2019).

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 4 of 13

of housing …" and "makes adequate provisions for existing and projected needs of all economic segments of the community." RCW 36.70A.040(3) requires the City of SeaTac to adopt "development regulations that are consistent with and implement the comprehensive plan …." RCW 36.70A.120 also requires that the City of SeaTac "shall perform its activities and make capital budget decisions in conformity with its comprehensive plan."

15. On June 9, 2015, the City of SeaTac adopted a comprehensive plan that included the following goals and policies:

GOAL 3.8
Support the maintenance of SeaTac's existing mobile home parks as a source of affordable housing.

Policy 3.8A
Encourage cooperation between the State, County, City, and other groups concerned with mobile home issues to increase opportunities for tenant ownership of mobile home parks.

Policy 3.8B
Encourage essential safety upgrades for older mobile homes.

Policy 3.8C
Where owners meet low income guidelines, utilize City resources to upgrade existing mobile homes to meet minimum building standards.

….

GOAL 3.9
Minimize the impacts of mobile home relocation on low and moderate income residents.

Policy 3.9A
Assist with identifying relocation options for mobile home park tenants forced to move due to mobile home park closure.

Policy 3.9B
Ensure that sufficient relocation plans are in place prior to the closure of any mobile home park.[7]

---

[7] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 5 (Oct. 21, 2019). These goals and policies are in the current *SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3 pp. HHS-11 – 12 accessed on Dec. 7, 2020 at: https://www.seatacwa.gov/home/showpublisheddocument?id=21323.

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 5 of 13

16. The comprehensive plan is implemented by several development regulations including zoning. SMC 15.465.600A created the Mobile Home Park Zone Classification. This "zone creates general standards for the siting of mobile homes on individual lots and parks, allows limited recreational vehicle storage and locations, encourages higher density and enhanced aesthetics while still providing moderate and low-income housing alternatives."[8] The permitted uses are shipping cargo containers (typically used for storage), a day care facility that provides for the group care of a maximum of twelve children in any twenty-four hour period, electric vehicle infrastructure such as charging stations, using a tank delivery vehicle with a maximum capacity of two thousand five hundred gallons of approved fuels to refuel commercial and construction vehicles with diesel engines, manufactured/modular homes, mobile homes, mobile home parks, home occupations, and certain wireless communications facilities.[9] The conditional uses are a day care facility that provides for the group care of more than twelve children in any twenty-four hour period and certain wireless communications facilities.[10] SMC 15.465.600(A), (B), (D), (E), (F), and (G) adopt standards for existing and new mobile home parks. The Mobile Home Park (MHP) zone is applied to several areas in the south part of the City of Sea Tac in the vicinity of South 204th Street.[11]

17. SMC 15.465.600(H) adopts mobile home park relocation standards for mobile home park closures or changes in use. SMC 15.465.600(H) requires the owner to submit a mobile home park relocation plan. The city must review and, if it meets the standards in SMC 15.465.600(H)(1) and (2), approve the relocation plan. As an alternative to the standard relocation plan, the owner of a mobile home park can "negotiate a relocation agreement with tenants to the satisfaction of such tenants, the agreement, signed by all affected tenants, shall be submitted to the City in lieu of the relocation plan and process" in SMC 15.465.600(H)(1) and (2).[12] In either case the relocation plan is then implemented.

18. At the time the City of SeaTac was considering the relocation plan for the Firs Mobile Home Park and currently, code cities, such as the City of SeaTac, can undertake a menu of policy and funding responses to conserve manufactured and mobile home parks. They include the following responses.

18.1     After learning about the potential for the closure of the mobile home park, City staff should explore alternatives for retaining the Firs Mobile Home Park. The could also explore the

---

[8] SMC 15.465.600A accessed on Dec. 7, 2020 at:
https://www.codepublishing.com/WA/SeaTac/#!/SeaTac15/SeaTac15465.html#15.465.600.
[9] SMC 15.205.040 accessed on Dec. 7, 2020 at:
https://www.codepublishing.com/WA/SeaTac/#!/SeaTac15/SeaTac15205.html#15.205; SMC 15.105.030 accessed on Dec. 7, 2020 at: https://www.codepublishing.com/WA/SeaTac/#!/SeaTac15/SeaTac15105.html#15.105.030; SMC 15.105.040 accessed on Dec. 7, 2020 at:
https://www.codepublishing.com/WA/SeaTac/#!/SeaTac15/SeaTac15105.html#15.105.030; SMC 15.105.130 accessed on Dec. 7, 2020 at:
https://www.codepublishing.com/WA/SeaTac/#!/SeaTac15/SeaTac15105.html#15.105.030.
[10] SMC 15.205.040; SMC 15.105.040.
[11] City of SeaTac *Zoning* (2/21/2020) last accessed on Dec. 8, 2020 at: https://www.seatacwa.gov/our-city/maps-and-gis/printable-maps.
[12] SMC 15.465.600(H)(3) last accessed on Dec. 7, 2020 at:
https://www.codepublishing.com/WA/SeaTac/#!/SeaTac15/SeaTac15465.html#15.465.600.

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 6 of 13

issues and opportunities presented by the proposed closure. City staff could also have worked with nonprofit organizations and the housing authority to evaluate the feasibility of acquiring the mobile home park. This is consistent with Comprehensive plan Goal 3.8 which directs the City to "[s]upport the maintenance of SeaTac's existing mobile home parks as a source of affordable housing."[13]

18.2     Staff could also contact the residents and homeowners in the Firs Mobile Home Park and explain and explore options with the residents, homeowners, and the mobile home park property owner. City staff could also refer the residents, homeowners, and the mobile home park property owner to the King County Housing Authority, nonprofits and state agencies who work to preserve mobile home parks, and potential funding sources. The appearance of fairness doctrine does not apply to staff communicating with an applicant or the public including members of the public directly affected by a decision to approve or deny a relocation plan such as the residents and homeowners in the Firs Mobile Home Park.[14] SMC 15.465.600(H)(2)(b) requires the "owner of the park to notify, in writing, all affected park tenants and the department that the owner is beginning the process of preparing a mobile home relocation plan." SMC 15.465.600(H)(2)(b) also requires the notice from the owner to include notice of a meeting between the City and the "tenants to inform them of the owner's proposal for the property, the requirements of the mobile home relocation standards," and the timeline. This meeting would also have been a good opportunity to explore options and refer the tenants, homeowners, and the mobile home park property owner to agencies and non-profits that could help.

18.3     City of SeaTac Comprehensive Plan Goal 3.8 directs the City to "[s]upport the maintenance of SeaTac's existing mobile home parks as a source of affordable housing."[15] Comprehensive Plan Policy 3.8A directs the City to "[e]ncourage cooperation between the State, County, City, and other groups concerned with mobile home issues to increase opportunities for tenant ownership of mobile home parks." The GMA in RCW 36.70A.120 requires that the City of SeaTac "shall perform its activities and make capital budget decisions in conformity with its comprehensive plan." The City could have implemented the comprehensive plan by working in cooperation with the state, the King County Housing Authority, and nonprofits to obtain funding to purchase the Firs Mobile Home Park. This could have included working with the legislature to obtain more funding, grant writing, and requesting funding from other local, state, and federal governments.

18.4     This is exactly what the City of Bainbridge Island did when it worked with the Kitsap Consolidated Housing Authority (now Housing Kitsap) and the residents to help Housing Kitsap to

---

[13] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 5 (Oct. 21, 2019); *SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3 p. HHS-11.

[14] RCW 42.36.010.

[15] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 5 (Oct. 21, 2019); *SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3 p. HHS-11.

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 7 of 13

buy the Islander Mobile Home Park in 2003.[16] The mobile home park was purchased "using a combination of local funds and [U.S. Department of Housing and Urban Development] HUD grant money."[17] The Islander Mobile Home Park was described as "an economic anomaly – the island's most affordable owner-occupied housing on some of Bainbridge's most valuable land."[18] The purchase price was $5.5 million.[19]

18.5    In 2008, the Washington State Legislature included $2.5 million in the state capital budget to purchase the Firs Mobile Home Park.[20] The City could have implemented its comprehensive plan by contributing local funding as the City of Bainbridge Island did to purchase the Islander Mobile Home Park in 2003.[21] The City could have used general fund revenues or requested the voters to approve an additional regular property tax levy of up to fifty cents per thousand dollars of assessed value of the property in the city for up to ten years.[22]

18.6    The City could have implemented its comprehensive plan by marketing the mobile home park to private buyers and nonprofits that would be willing to buy the Firs Mobile Home Park and continue to operate it as a mobile home park. This would not require the City to buy the mobile home park or contribute to its purchase if a for profit buyer or a nonprofit was able to use their resources to purchase the mobile home park. A nonprofit could have also used the state money and other resources to purchase the mobile home park.[23]

18.7    If there was a gap between the funds raised and the purchase price, the City could adopt a transfer of development rights program (TDR) to transfer development capacity from the Firs Mobile Home Park and other mobile home parks in the city . A TDR program would designate the Firs Mobile Home Park and potentially other mobile parks as TDR sending areas. The sending areas would be assigned development rights that could be transferred to receiving areas in the City's commercial, mixed-use, office, and business zones allowing taller or more intense developments. The TDRs could be calibrated to cover the difference in value between the mobile home parks and the other uses allowed by the zones in which the mobile home parks are located. So the mobile home park owners could sell the TDRs to other property owners to obtain the difference in value between the mobile park and the other allowed uses. This would allow the Firs Mobile Home Park to sell the mobile home park at its value as a mobile home park rather than its value as a commercial or mixed-use site and to be made whole. Or a for profit or nonprofit organization could buy the Firs

---

[16] Lynn Nordby, *Mobile Home Parks: The Newest Front for Housing Affordability* MRSC webpage (Dec. 18, 2017) last accessed on Dec. 7, 2020 at: http://mrsc.org/Home/Stay-Informed/MRSC-Insight/December-2017/Mobile-Home-Parks-As-Affordable-Housing.aspx.

[17] *Id.*

[18] *Trailer park gets a new lease on life* Bainbridge Island Review webpage (May 24, 2003) last accessed on Dec. 7, 2020 at: https://www.bainbridgereview.com/news/trailer-park-gets-a-new-lease-on-life/.

[19] *Id.*

[20] Engrossed Substitute Senate Bill 6095 p. 4 lines 15 – 18 (2018) last accessed on Dec. 8, 2020 at: http://leap.leg.wa.gov/leap/Budget/Detail/2018/2018cap6095-S.PL.pdf.

[21] Lynn Nordby, *Mobile Home Parks: The Newest Front for Housing Affordability* MRSC webpage (Dec. 18, 2017).

[22] RCW 84.52.105.

[23] Engrossed Substitute Senate Bill 6095 p. 4 lines 15 – 18 (2018).

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 8 of 13

Mobile Home Park then sell the development rights to cover part of the cost. This TDR program would be similar to the City of Seattle's successful TDR program to preserve affordable housing.[24]

18.8    The City could have implemented its comprehensive plan by rezoning the Firs Mobile Home Park to the City's Mobile Home Park (MHP) zone.[25] As a memo published by the American Planning Association's Planning Advisory Service explained:

> Zoning is one of the most important tools available to local government to prevent the redevelopment of [manufactured home communities] MHCs into another use. If a community is committed to preserving manufactured housing, the first step to signaling this intent is to explore adoption of a manufactured housing preservation zone. Creating an MHC-specific zone disallows other uses where existing communities are located. Comprehensive planning policy provides additional opportunity for a community to articulate its vision for these communities.

> In 2007, Snohomish County, Washington, adopted an ordinance establishing a Mobile Home Park zone to encourage the preservation of MHCs, and in 2009 it passed two additional manufactured home park ordinances strengthening zoning protections and enabling as many as 2,000 MHC residents to stay in their homes.[26]

The City of Sea Tac has both comprehensive plan goals and policies and a MHC-specific zone.[27] So the City could have rezoned the Firs Mobile Home Park. By zoning mobile home parks for mobile homes and mobile home parks, the risk of conversion is significantly reduced as high density uses and mixed-use, commercial, and industrial uses are not allowed.[28] This strategy is not unique to mobile home parks. Much of the City of SeaTac and many cities is zoned for detached single-family dwellings, public and semi-public uses, and related uses preventing those areas from being converted to apartments, mixed-use developments, commercial uses, and industrial uses.[29]

18.9    Other jurisdictions in addition to Snohomish County and the City of SeaTac have adopted Mobile Home Park zoning. The City of Tumwater adopted Mobile Home Park zoning and

---

[24] Nathan Torgelson, *Transfer of Development Rights A Critical Tool To Preserving Affordable Housing In Seattle* About Growth pp. 1 – 2 (State of Washington Department of Community, Trade, and Economic Development: Fall 2008) last accessed on Dec. 9, 2020 at: https://www.redmond.gov/DocumentCenter/View/1618/About-Growth---Fall-2008-PDF?bidId=.

[25] SMC 15.465.600(A), (B), (D), (E), (F), and (G).

[26] Crystal Launder, PAS Memo *Preserving Manufactured Home Communities* p. 8 (American Planning Association Planning Advisory Service: September/October 2020). PAS Memos are written by "practicing planners and experts in the field eager to share their experiences. Each issue has illuminating case studies with links to online resources for planners who want to dig deeper." PAS Memo webpage last accessed on Dec. 12, 2020 at https://planning.org/pas/memo/.

[27] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 5 (Oct. 21, 2019); *SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3 pp. HHS–11 – 12; SMC 15.465.600(A), (B), (D), (E), (F), (G).

[28] Crystal Launder, PAS Memo *Preserving Manufactured Home Communities* pp. 3 – 4 (American Planning Association Planning Advisory Service: September/October 2020).

[29] See the Urban Low Density Residential zones on the City of SeaTac *Zoning* (2/21/2020); SMC 15.205.030.

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 9 of 13

the Growth Management Hearings Board concluded the zoning is consistent with the Growth Management Act when a county or city considers the Attorney General's Advisory Memorandum on "Avoiding Unconstitutional Takings of Private Property" as part of its adoption.[30] In 2012, the Ninth Circuit Court of Appeals held that zoning that limits uses to mobile or manufactured housing parks and other limited uses is not a facial regulatory taking under the Washington State and U.S. Constitutions.[31]

18.10    If the City of SeaTac believed there were issues to resolve before applying a mobile home park zone to the Firs Mobile Home Park or if the City needed more time to rezone the mobile home park, the City could have adopted a moratorium on permits related to mobile home park conversions. As the American Planning Association's Planning Advisory Service explained:

> **If an MHC is at imminent risk of closure, consider an emergency redevelopment moratorium.** If a community is at imminent risk of closure, the local government can adopt a moratorium to buy time to explore or establish policy. Snohomish County adopted an emergency conversion moratorium and interim zoning ordinance to halt MHC conversions while it worked on its zoning updates.[32]

18.11    Under the law in effect in 2016 and current law, an application for approval of a relocation plan and a certificate of approval would not have vested to the existing comprehensive plan policies and development regulations including the existing zoning under Washington State law.[33] Washington State "employs a 'date certain' standard for vesting. *Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167 Wn.2d 242, 251, 218 P.3d 180 (2009); *Hull v. Hunt*, 53 Wn.2d 125, 130, 331 P.2d 856 (1958). Under the date certain standard, developers are entitled 'to have a land development proposal processed under the regulations in effect at the time a complete building permit application is filed, regardless of subsequent changes in zoning or other land use regulations.' *Abbey Rd. Grp.*, 167 Wn.2d at 250, 218 P.3d 180."[34] Short subdivisions and development agreements also vest developments to the existing policies and regulations, but other permit applications do not.[35]

---

[30] *Laurel Park Community LLC v. City of Tumwater*, Western Washington Growth Management Hearings Board (WWGMHB) Case No. 09-2-0010, Final Decision and Order (Oct. 13, 2009), at pp. 8 – 28 of 30 accessed on Dec. 8, 2020 at: https://www.gmhb.wa.gov/Global/RenderPDF?source=casedocument&id=46; *Laurel Park Community LLC v. City of Tumwater*, WWGMHB Case No. 09-2-0010, Compliance Order (March 25, 2010), at pp. 3 – 6 of 10 accessed on Dec. 8, 2020 at: https://www.gmhb.wa.gov/Global/RenderPDF?source=casedocument&id=2048.

[31] *Laurel Park Community, LLC v. City of Tumwater*, 698 F.3d 1180, 1186, 1188 – 93 (9th Cir. 2012).

[32] Crystal Launder, PAS Memo *Preserving Manufactured Home Communities* p. 8 (American Planning Association Planning Advisory Service: September/October 2020).

[33] *Town of Woodway v. Snohomish Cty.*, 180 Wn.2d 165, 173, 322 P.3d 1219, 1223 (2014), *abrogated by Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019) "the vested rights doctrine is now statutory. *Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 867 – 68, 872 P.2d 1090 (1994); RCW 19.27.095(1) (building permits); RCW 58.17.033(1) (subdivision applications); RCW 36.70B.180 (development agreements).

[34] *Town of Woodway*, 180 Wn.2d 165, 172 – 73, 322 P.3d at 1223.

[35] *Town of Woodway*, 180 Wn.2d at 173, 322 P.3d at 1223; *Potala Vill. Kirkland, LLC v. City of Kirkland*, 183 Wn. App. 191, 213 – 14, 334 P.3d 1143, 1154 (2014) *review denied Potala Vill. Kirkland, LLC v. City of Kirkland*, 182 Wn.2d 1004, 342 P.3d 326 (2015).

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 10 of 13

18.12   The City could have also implemented the comprehensive plan by upgrading existing mobile homes with low-income owners.[36] This can help keep mobile home parks attractive to existing and new tenants maintaining the economic viability of the mobile home park.

18.13   The City could have provided incentives to support mobile home park owners. As the Planning Advisory Service memo explained "[i]ncentive programs can be helpful, particularly to promote maintenance and replacement of infrastructure. Monetary incentives can facilitate infrastructure replacement, while code flexibility can make reinvestment in these communities more affordable and may be critical to ensuring that infrastructure replacement is possible without the loss of home sites. Infrastructure incentives can also enable jurisdictions to negotiate stabilized rents or other outcomes."[37]

18.14   The City of SeaTac could have implemented its comprehensive plan goal calling for the "maintenance of SeaTac's existing mobile home parks as a source of affordable housing" by condemning the Firs Mobile Home Park to preserve it for affordable housing.[38] Acquiring land for "low income" housing is a valid public purpose for condemnation.[39] The city could then have sold the park to its residents, an nonprofit, or a housing authority with appropriate restrictions to maintain it as affordable housing. Or the City could have worked with the King County Housing Authority to have the authority condemn the Firs Mobile Home Park.[40]

## Statement of Compensation

19.  Futurewise was compensated at a rate of $150 per hour for the work performed by Tim Trohimovich on this analysis and opinion. Futurewise's compensation is not dependent on the outcome of this case and does not include any contingent payments or contingent compensation. For this engagement, any travel or deposition time will also be charged at a rate of $150 per hour. Trial testimony will also be charged at the rate of $150. If the testimony is after 2021, this rate will be adjusted to include any increased costs to Futurewise.

## A List of All Other Cases, in which, During the Prior Four Years, the Witness Testified as an Expert at Trial or by Deposition

---

[36] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 5 (Oct. 21, 2019); *SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3 p. HHS-11.
[37] Crystal Launder, PAS Memo *Preserving Manufactured Home Communities* p. 9 (American Planning Association Planning Advisory Service: September/October 2020).
[38] *Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint p. 5 (Oct. 21, 2019); *SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3 p. HHS-11.
[39] *Petition of Hous. Auth. of City of Seattle*, 62 Wn.2d 492, 493 – 94, 383 P.2d 295, 296 (1963).
[40] *Petition of Hous. Auth. of City of Seattle*, 62 Wn.2d 492, 493 – 94, 383 P.2d 295, 295 – 96 (1963).

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 11 of 13

20. None. My last engagement as an expert witness in a contested case hearing was in 2014.

21. My opinions may be supplemented or amended upon receipt of additional information.

If you require additional information, please contact me at telephone 206-343-0681 Ext. 102 or email tim@futurewise.org

Very Truly Yours,

Tim Trohimovich, AICP, WSBA No. 22367
**Director of Planning & Law**

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 12 of 13

## Attachment A: Information Considered

The Washington State Constitution.

RCW 35.82.010.

RCW 35A.11.020.

The Growth Management Act, chapter 36.70A RCW.

RCW 42.36.010.

RCW 84.52.105.

Engrossed Substitute Senate Bill 6095 (2018).

*SeaTac Comprehensive Plan Elements* Housing and Human Services Element Chapter 3.

The City of SeaTac Municipal Code (SMC).

City of SeaTac *Zoning* [Map] (2/21/2020).

*Firs Home Owners Association v. City of Seatac*, No. 2:19-cv-01130-RSL U.S. District Court Western District of Washington First Amended Complaint (Oct. 21, 2019).

Lynn Nordby, *Mobile Home Parks: The Newest Front for Housing Affordability* MRSC webpage (Dec. 18, 2017).

*Trailer park gets a new lease on life* Bainbridge Island Review webpage (May 24, 2003).

About Growth (State of Washington Department of Community, Trade, and Economic Development: Fall 2008).

Crystal Launder, PAS Memo *Preserving Manufactured Home Communities* p. 8 (American Planning Association Planning Advisory Service: September/October 2020).

The PAS Memo webpage.

*Laurel Park Community LLC v. City of Tumwater*, Western Washington Growth Management Hearings Board (WWGMHB) Case No. 09-2-0010, Final Decision and Order (Oct. 13, 2009).

*Laurel Park Community LLC v. City of Tumwater*, WWGMHB Case No. 09-2-0010, Compliance Order (March 25, 2010).

*Firs Home Owners Association v. City of Seatac*
Expert Report of Tim Trohimovich, AICP
December 9, 2020
Page 13 of 13

*Laurel Park Community, LLC v. City of Tumwater*, 698 F.3d 1180 (9th Cir. 2012).

*Town of Woodway v. Snohomish Cty.*, 180 Wn.2d 165, 173, 322 P.3d 1219 (2014).

*Potala Vill. Kirkland, LLC v. City of Kirkland*, 183 Wn. App. 191, 334 P.3d 1143 (2014).

*Petition of Hous. Auth. of City of Seattle*, 62 Wn.2d 492, 383 P.2d 295 (1963).

MHCP website homepage.

# EXHIBIT 3

Firs Home Owners Association v. City of SeaTac                    Erin Sitterley

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRCIT OF WASHINGTON
SEATTLE DIVISION

----------------------------------------------------
                          )
FIRS HOME OWNERS ASSOCIATION     )
                          )
            Plaintiff,      )
                          )
   vs.                    ) C19-1130RSL
                          )
CITY OF SEATAC,              )
                          )
            Defendants.      )
_____)

     Videoconference Deposition Upon Oral Examination
                          of
                   ERIN SITTERLEY
----------------------------------------------------



                   9:30 AM

                October 8, 2020

                SeaTac, Washington
     (All participants appeared via videoconference.)




Leslie M. Sherman, RMR, CRR
CSR 2629

Firs Home Owners Association v. City of SeaTac                                Erin Sitterley

Page 14

1        Q.    And why is that?  Why did you not have an

2    opinion on it?

3        A.    Because this was not a matter that the

4    council could or should or would consider.

5        Q.    And is that an opinion that you formed based

6    on your own research or something that someone told

7    you?

8        A.    Well, it's not an opinion.  It's a fact.

9        Q.    Okay.

10       A.    And I did my own research on our duties as a

11   council.  I did my own research on the laws of the

12   State of Washington, and the code of the City of

13   SeaTac, and I also verified and clarified any

14   questions with our legal department.

15       Q.    Okay.  So tell me what you found based on

16   your analysis of state law and the city's code.

17       A.    I found that the council had no authority of

18   any kind to make any rulings on this matter.

19       Q.    Okay.  And did you -- you consulted state

20   law and the city code to make that determination?

21       A.    Yes.

22       Q.    And do you remember what state laws you

23   looked at?

24       A.    I don't recall.

25       Q.    Okay.  And what portions of the city's code

7335cce2-0eca-45ee-9907-524579338aac

# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF WASHINGTON

_____

FIRS HOME OWNERS ASSOCIATION,   )
                                )
          Plaintiff,       )
                                )
vs.                  ) No. C19-1130RSL
                                )
CITY OF SEATAC,            )
                                )
          Defendant.       )
                                )

_____

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

KATHRYN CAMPBELL

_____

Taken at SeaTac, Washington

(All participants appeared via videoconference.)

DATE TAKEN:  JULY 23, 2020

REPORTED BY:  ANITA W. SELF, RPR, CCR #3032

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 10

1       A.  -- so I cannot have an opinion about that.

2       Q.  Okay.

3           Now, you talked a little bit about the City

4   taking great efforts to assist the residents of the

5   Firs Mobile Home Park.

6           Did I understand that correctly?

7       A.  I said they worked very hard to assist them.

8       Q.   And when you say that, can you tell me what

9   comes to mind when you -- when you say that?

10      A.   Yes.  The legal department and, I believe, the

11  city manager, as well as members of the council looked

12  into about what was possible for the City to do.  And,

13  as I understand it, they were unable to find a way to

14  help them.

15      Q.   And do you remember what, at least, came

16  across your desk -- and I mean your -- your desk in a

17  broad way -- what came across your desk as some

18  actions that were taken by the City to help folks?

19      A.   Yes.  One thing was very clear to me.  The

20  property owner did not follow the State's regulations

21  correctly for notice to the residents, and the City

22  did its best to encourage the property owner to do

23  better.

24      Q.   Do you think if -- if the City -- so did

25  you -- were you -- is it your opinion that the City

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

# EXHIBIT 5

Firs Home Owners Association v. City of SeaTac                                    Pamela Fernald

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

_____

FIRS HOME OWNERS ASSOCIATION,   )
                                )
          Plaintiff,        )
                                )
vs.                    ) No. C19-1130RSL
                                )
CITY OF SEATAC,            )
                                )
          Defendant.        )
                                )

_____

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

PAMELA FERNALD

_____

Taken at SeaTac, Washington

(ALL PARTICIPANTS APPEARING VIA VIDEOCONFERENCE)

DATE TAKEN:  SEPTEMBER 9, 2020

REPORTED BY:  ANITA W. SELF, RPR, CCR #3032

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Firs Home Owners Association v. City of SeaTac                    Pamela Fernald

Page 28

1     Association, and that the transcript is of the City of

2     SeaTac city council meeting that was held

3     October 25th, 2016.

4          So with that, I would like to -- let me see.

5     Make sure -- let me make sure I'm on the right page

6     and the right line.  Okay.

7          Page 15, line 12.

8      A.  Yeah.

9      Q.   Ms. Fernald, the question is the following:

10    Do you disagree with the transcript where it states

11    that you stated, quote, I think you're getting some

12    bad information, some bad advice.

13         Is that accurate, that transcript?

14     A.   Where did this transcript come from?  It

15    doesn't -- I mean, is this an official transcript from

16    the City?  It says Certified Copy.  Okay.

17         So if that's what it says -- so what's your

18    question again?  What's your real question here?

19     Q.   What was the basis of your statement that the

20    families were getting bad information or bad advice?

21     A.   To be honest, they were being convinced by

22    outside people to come to the council, and after

23    being -- you know, after they had heard that there was

24    nothing -- that the City, it wasn't between the City,

25    it was between the property owner and the tenants, and

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Firs Home Owners Association v. City of SeaTac                    Pamela Fernald

Page 29

1    they were -- I felt they were just being pulled by

2    outside resources to keep coming to the council.

3         I mean, they kept getting the same answer.  At

4    least I kept saying the same thing.

5     Q.  And what was that same thing?

6     A.  That there wasn't anything legal that we could

7    do.

8     Q.  And what was the basis of that statement?

9     A.  I said twice already or three times, it's

10   private property.

11    Q.  As you sit here today, do you believe that

12   the families at the Firs Home Owners Association are

13   incapable of advocating for themselves?

14    A.  I don't know how -- I can't answer that

15   question.  That's a crazy question.

16    Q.  The next sentence I want to ask you about is

17   line 14 of page 15.  Why did you request that the

18   families not come here?

19    A.  Let me see.  This was after the -- that one

20   council meeting where they came and I basically said

21   the same thing, you know, there wasn't anything we

22   could do, and I'm just reiterating it.

23    Q.  Okay.

24        On line 15, why did you state, It's not up to

25   us?

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

# EXHIBIT 6

# Attachment B: Curriculum Vitae Tim Trohimovich

505 East Denny Way, Number 607
Seattle, Washington 98122-6925
Email: timtro@seanet.com
Mobile Phone: (206) 853-6077

## Research Interests

The effectiveness of land use and environmental planning laws and techniques.

## Education

**Juris Doctor degree, Cum Laude**, from the Northwest School of Law of Lewis and Clark College, Portland, Oregon, May 1992. Also earned a certificate in Environmental and Natural Resources Law.

**Bachelor's degree,** from Willamette University, Salem, Oregon May 1978. Double major in Urban and Regional Government and Political Science. Two-year community college degree from Grays Harbor College, Aberdeen, Washington in June 1976.

## Professional Experience

**Director of Planning & Law**, January 2001 to present

**Futurewise**, 816 Second Avenue, Suite 200, Seattle, Washington 98104. 206-343-0681. Futurewise is a statewide non-profit organization working to protect working farms and forests while making cities and towns great places to live. Reviews comprehensive plans and development regulations and amendments for compliance with the Growth Management Act, smart growth principles, and organization policies. Drafts and analyzes local and state legislation. Provides technical assistance to staff, associated organizations, and the public. Advocates for organization positions in local and state forums, including before local elected officials and the Washington State Legislature. Writes and edits legal briefs for Growth Management Hearings Board appeals, and cases before hearing examiners, superior courts, the court of appeals, and the Washington State Supreme Court. Conducts legal research. Presents oral arguments before Growth Boards and courts. Prepares technical reports. Prepares educational materials. Makes presentations before citizen groups, public agencies, conferences, and training programs. Gathers and analyzes data. Supervises staff and legal interns. Monitors board and court decisions related to land use and environmental law.

**Affiliate Instructor,** April to June 2019, 2020, & 2021

**University of Washington Department of Urban Design & Planning**, Box 355726, Seattle, WA 98195-5726. Team taught URBDP 580: Legal and Administrative Framework for Planning in 2019 and was the instructor for 2020 and 2021. Helped revise syllabus, gave lectures, led discussions, and reviewed papers. Helped manage the teaching assistant.

**Instructor,** 2004 to 2014

**University of Washington Professional & Continuing Education**, Box 354978, Seattle, WA 98195-9480. 206-685-8936. Team taught courses in

Tim Trohimovich, Curriculum Vitae
Page 2

environmental regulation and land use planning and permitting. Developed syllabi, assigned readings and exercises, gave lectures, led discussions, and graded students.

**Comprehensive Planning Division Manager,** August 1998 to January 2001

**City of Redmond Department of Planning & Community Development**, PO Box 98010, Redmond, Washington 98073-9710. 425-556-2440. Managed a six-person division that conducts long-range planning for the city and provides geographical information services for the department. Responsible for preparing and managing the budget and work program. Responsible for annual and periodic comprehensive plan updates, land use planning, transportation planning, drafting regulations, and the preparation of written and graphic documents. Managed data gathering and analysis. Recruited, hired, and evaluated staff and decided merit salary increases. Advocated for the department and city before administrative agencies and regional and state forums. Worked extensively with citizens, citizen organizations, professional staff, the press, and elected officials. Provided technical and legal assistance to other city staff and the public on long-range and current planning and development reviews. Assisted in defending the amended comprehensive plan in a Growth Management Hearings Board appeal.

**Senior Planner** (Planner III & Planner IV), June 1993 to July 1998

**City of Redmond Department of Planning & Community Development**, 15670 NE 85th Street, Post Office Box 98010, Redmond, Washington 98073-9710. 425-556-2440. Project lead planner for the Growth Management Act comprehensive plan. Wrote and edited many chapters of the adopted comprehensive plan. Wrote and edited development regulations. Wrote and edited the Overlake Neighborhood Plan and implementing regulations. Developed and implemented the planning and public review processes for the comprehensive plan and neighborhood plan. This included an early State Environmental Policy Act Planned Action. Helped write a citizens guide to the comprehensive plan. Primary staff to the Redmond Planning Commission between December 1993 and March 1999. Worked extensively with citizens, citizen organizations, professional staff, the press, and elected officials. Provided technical and legal assistance to other city staff and the public on long-range and current planning and development reviews. Contributed to the Draft and Final Environmental Impact Statements (EISs) on the adopted comprehensive plan and Overlake Neighborhood Plan and regulations. Assisted in defending the comprehensive plan from appeals, including an appeal that resulted in a favorable Washington State Supreme Court decision.

**Hearing Examiner,** August 1991 to December 1994

**City of McCleary**, Post Office Box 360, McCleary, Washington 98557. 360-495-3200. August 1991 to the December 1994. **City of Elma**, Post Office Box E, Elma, Washington 98541. (360) 482-2212. December 1992 to December 1994. Conducted hearings, made recommendations, and decided quasi-judicial land use applications. Part-time, contract positions.

**Legal Planner,**

**Washington State Department of Ecology**, Post Office Box 47690, Olympia, Washington 98504-7690. 360-459-6764. Temporary position while

Tim Trohimovich, Curriculum Vitae
Page 3

| | |
|---|---|
| June 1992 to the June 1993 | the incumbent was on maternity leave. Extended for special projects and to rewrite the *Washington State Coastal Zone Management Plan*. Decided Coastal Zone Management Act consistency certifications. Carried out long range planning projects included researching and writing policies and regulations that Ecology recommended local governments adopt to protect Growth Management Act critical areas. Analyzed regulatory reforms under the Shoreline Management Act. Analyzed and helped respond to proposed legislation affecting Ecology. Assisted staff in interpreting laws, regulations, and local shoreline master programs. Provided technical assistance to local governments, state agencies, federal agencies, and private parties on Coastal Zone Management Act consistency, the Shoreline Management Act, and permitting. Provided technical assistance to agency staff on the Growth Management Act and monitored Growth Management Hearings Board decisions. |
| **Environmental Planner 3**, May 1991 to August 1991 | **Washington State Department of Ecology**, Post Office Box 47690, Olympia, Washington 98504-7690. 360-459-6764. Researched and wrote a report analyzing the provisions of Washington's Growth Management Act (GMA) and its impact on Washington shoreline management program. Researched and wrote a technical assistance paper Ecology distributed to all Washington local governments in describing how they can integrate comprehensive planning under the GMA with their Shoreline Management Act master programs. |
| **Executive Director**, August 1987 to August 1989 | **Grays Harbor Regional Planning Commission**, 2109 Sumner Avenue, Suite 202, Aberdeen, Washington 98520. 360-532-8812. Responsible for the administration, operations, and finances of the Commission. Reported to the Regional Planning Commission. The Commission is made up of elected and appointed officials from the member governments. Supervised a staff of seven and administered the budget and work plan. Responsible for the preparation of plans, ordinances, regulations, reports, environmental documents, analyses, and grant applications. Assisted member governments in current and long-range planning. Staffed the Grays Harbor Regional Planning Commission, the Grays Harbor Regional Overall Economic Development Committee, the Grays Harbor Water Quality Committee, and other committees. Represented the Commission on various committees. Duties included extensive professional contact with elected officials; local, state, and federal agency staffs; citizens; the business community; labor; and the news media. Author or co-author of over 1.2 million dollars in approved state and federal grants. |
| **Chief Deputy Director**, February 1985 to August 1987 | **Grays Harbor County Planning & Building Department**, Post Office Box 390, Montesano, Washington 98563. 360-249-5579. Responsible for processing shoreline permits and subdivisions. Decided Shoreline Substantial Development Permits, Short Subdivisions, Large Lot Subdivisions, and flood plain approvals. Staffed the Grays Harbor County Shorelines Hearing Board and the County Parks and Recreation Advisory Council. Author or co-author of over three million dollars in awarded state and federal grants while with the |

Tim Trohimovich, Curriculum Vitae
Page 4

county. Reviewed building permits and development approvals. Administered planning and construction grants. Wrote adopted amendments to the zoning code, subdivision ordinance, and shoreline protection policies and regulations.

**Senior Planner,** for three years. Planner I to Senior Planner, September 1978 to February 1985

**Grays Harbor Regional Planning Commission**, 2109 Sumner Avenue, Suite 202, Aberdeen, Washington 98520. 360-532-8812. Over six years of progressively responsible planning experience. Advanced from an entry level planning position to the number two position in the agency. Responsible for all local assistance for the last three years of employment including long range planning, grant writing, and assisting member governments with current planning and environmental impact analysis. Activities included data analysis, plan development, ordinance drafting, policy evaluation, and plan and ordinance implementation. Author of over 3.3 million dollars in awarded state and federal grants. Made over a hundred public presentations.

## Publications

Lettman, Daniels, and Trohimovich, "Protecting Working Farm and Forest Landscapes: How Do Oregon and Washington Compare?" in Sterrett, Ozawa, Ryan, Seltzer, and Whittington eds., *Planning the Pacific Northwest* (American Planning Association, Planners Press: 2015).

Trohimovich, "The Growth Management Act at 20: What Do the Studies Show?" in Law Seminars International, *The Nineteenth Annual Two-Day Conference on Washington's Growth Management Act* (Nov. 3 and 4, 2010). (Trohimovich has also published other articles in continuing legal education publications.)

Trohimovich, *Critical Areas Ordinance Updates: An Overview of What Is Required*, Washington State Bar Association, Environmental & Land Use Law newsletter (August 2005).

## Honors / Awards

Teaching Excellence Award in Technology, Science, Health Sciences & Engineering, 2010.

City of Redmond All Star Award for the Planning and Community Development Department, 1995.

American Bar Association (ABA) Certificate of Excellence in Municipal Law, Northwest School of Law of Lewis and Clark College, 1992.

Winner, Oregon State Bar Association Real Estate and Land Use Section 1992 Writing Competition.

Coastal Community Action Council Public Service Award, 1990.

## Memberships / Affiliations

Washington State Bar Association. Active Membership Number: 22367.

Land Use & Environmental Law Section of the Washington State Bar Association.

Tim Trohimovich, Curriculum Vitae
Page 5

Oregon State Bar Association. In-Active Membership Number: 93119.

Bar of the Supreme Court of the United States.

American Institute of Certified Planners (AICP) and the American Planning Association.

Planning & Law and Small Town & Rural Planning Divisions of the American Planning Association.